JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | Cases Jointly Administered |
| **COMMUNITY TOWERS I, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 75-2456729, | Case No. 11-58944-SLJ-11 |
| **COMMUNITY TOWERS II, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 75-2560662, | Case No. 11-58945-SLJ-11 |
| **COMMUNITY TOWERS III, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 32-0065635, | Case No. 11-58948-SLJ-11 |
| **COMMUNITY TOWERS IV, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 77-0379075, | Case No. 11-58949-SLJ-11 |
| Debtor(s). | Date: October 15 - 16, 2012<br>Time: 9:00 a.m.<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3099<br>San Jose, CA 95113 |
| 111 W. Saint John Street, Suite 705<br>San Jose, California 95113 | Judge: Honorable Stephen L. Johnson |

## DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj
v19.docx

1    DEBTOR'S TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT
PLAN

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ........................................................................................1

II.  THE ISSUES ............................................................................................4

III. RELEVANT FACTS ..................................................................................5

    A.   Background ......................................................................................5

        1.   The Property............................................................................5

        2.   Management of the Property....................................................6

        3.   The Initial Loan.......................................................................6

        4.   The Extension of the Loan .......................................................7

        5.   The 2009 Financial Crisis ........................................................8

IV.  THE PLAN ............................................................................................10

V.   DISCUSSION .........................................................................................11

    A.   The Plan Is Feasible. .......................................................................11

        1.   The Debtors' Financial Condition .........................................11

        2.   The Projections ......................................................................12

            a)   The Rental Revenue Projections Are Reasonable .........................12

            b)   The Tenant Improvements And Leasing Commission Costs Projected By The Debtors Are Reasonable..........................13

            c)   The Debtors Have Demonstrated Ability To Generate Credible Projections.........................................................................13

    B.   The Plan Is Fair And Equitable........................................................14

        1.   Applicable Formula For Interest Rate Calculation ....................15

            a)   Circumstances Of The Estate ..........................16

            b)   Nature Of The Security ...................................17

            c)   Duration Of The Plan .....................................17

            d)   Feasibility Of The Plan ...................................18

        2.   Comparison Of Proposed Rates ...............................................18

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj
v19.docx

i  DEBTOR'S TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 2 of 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    The Plan Is In The Best Interests Of Creditors .......................................................18

D.    The Plan Complies With The Applicable Provisions Of The Bankruptcy Code...19

VI.    CONCLUSION...........................................................................................................19

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj
v19.docx

ii    DEBTOR'S TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT
PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 3 of
23

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Acequia, Inc.*,
 787 F.2d 1352 (9th Cir. 1986) ........................................11

*In re Fowler*,
 903 F.2d 694 (9th Cir. 1990) ..........................................15

*In re Villa Diablo Assocs.*,
 156 B.R. 650 (Bankr. N.D. Cal. 1993) ............................15

*Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. P'ship
(In re Patrician St. Joseph Partners Ltd. P'ship)*,
 169 B.R. 669 (D. Ariz. 1994)..........................................11

*Till v. SCS Credit Corp.*,
 541 U.S. 465 (2004) ("*Till*") ...............................15, 16, 17

*Wells Fargo Bank N.W. v. Yett (In re Yett)*,
 306 B.R. 287 (9th Cir. BAP 2004)....................................14

### STATUTES

11 U.S.C. §1129 .........................................................................3

11 U.S.C. § 1129(A) ....................................................................1

Section 1129(a)(1) of the Bankruptcy Code .........................4, 19

Section 1129(a)(7) of the Bankruptcy Code .........................4, 18

Section 1129(a)(11) of the Bankruptcy Code .......................4, 11

Section 1129(b)(1) of the Bankruptcy Code ..............................4

### OTHER AUTHORITIES

Rule 30(b)(6) ..............................................................................4

Section 1129(b)(2) .....................................................................14

Section 1129(b)(2)(A)(i) .............................................................14

Section 1325(a)(5)(B)(ii) .............................................................15

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj
v19.docx

iii   DEBTOR'S TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

# I.     INTRODUCTION

Pursuant to the Court's THIRD ORDER APPROVING DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) AND FIXING TIME FOR FILING ACCEPTANCES OR REJECTIONS OF PLAN AND OBJECTIONS TO CONFIRMATION OF PLAN, COMBINED WITH NOTICE THEREOF (the "Scheduling Order"), Community Towers I, LLC, Community Towers II, LLC, Community Towers III, LLC, and Community Towers IV, LLC (the "Debtors"), the debtors and debtors in possession herein, hereby submit hereby their trial brief in support of DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) (the "March 27 Plan" and, as modified by the FIRST MODIFICATION TO DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) filed on August 31, 2012, the "Plan"). [1]

The Trial Brief also is filed in response to CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN (the "Objection") filed by CIBC, Inc. ("CIBC") on May 21, 2012 in opposition to the March 27 Plan. In addition to responding to the Objection, this Trial Brief supports the Debtors' STATEMENT RE REQUIREMENTS OF 11 U.S.C. § 1129(A) AND (B) AND CHECKLIST FOR CONFIRMATION HEARING (the "Statement") filed concurrently herewith. Pursuant to the Scheduling Order, the Court will hold a hearing on the Confirmation of the Plan and the Objection thereto on October 15 and 16, 2012.

This is a single asset real estate case involving the two building, 305,000 square foot office complex located at 111 West Saint John Street and 111 North Market Street, San Jose, California (the "Property") purchased by the Debtors in June of 2006 for $41,500,000. The Debtors invested $12,000,000 from the sale or exchange of properties and borrowed $33,500,000 to purchase and fund improvements to the Property from CIBC pursuant to an interest-only promissory note (the "Note") secured by a deed of trust (the "Deed of Trust") at a variable rate of 2% above the London Interbank Offered Rate ("LIBOR") with a floor of 7% and a maturity date of June 10, 2009. The Property had only a 65% occupancy rate at the time of acquisition. The Debtors' plan was to improve the condition of the Property and lease it to 90% occupancy at which both CIBC and the

---

[1] All capitalized terms used but not separately defined herein shall have the meaning ascribed to them in the Plan. A term that is not defined herein or in the Plan but is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

1

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Debtors believed would achieve stabilization. Both the Debtors and CIBC expected and anticipated that the loan would be refinanced through CIBC at stabilization with a ten-year fixed rate loan.

Based on this expectation, the Debtors' principals invested almost $10,000,000 to fund capital expense, tenant improvements and leasing commissions and successfully brought the Property to stabilization by February 2009. However, the 2008-2009 sub-prime mortgage crisis precipitated the worst recession since the Great Depression and CIBC did not extend permanent financing. The Debtors were unable to refinance the Loan with other lenders and obtained an extension of the Note only on extremely onerous terms, including, among other terms, a monthly tenant improvement reserve payment of over $100,000 from the Property's cash flow. The Note and Deed of Trust were amended in accordance with the terms of the extension (the "Extension"). Because CIBC did not make disbursements from this reserve, the Debtors were unable to make the reserve payment and fund other vendor expenses and ceased making the reserve payment in November, 2009.

The Plan provides for issuance of an interest-only promissory note with a five-year term at a fixed rate of 6%. Both the Debtors and CIBC have retained experts to opine on the appropriateness of the interest rate and feasibility of the Plan. For purposes of Confirmation, both experts have based their expert reports on an assumed value of $41,000,000 for the Property and a secured Claim of approximately $38,000,000 representing principal and accrued non-default interest as of October 1, 2012.[2] The Debtors anticipate that they will be filing declarations in lieu of direct testimony as directed by the Scheduling Order for the following witnesses:

---

[2] CIBC has indicated that it will claim that its secured Claim is over $44,000,000 based on asserted default interest and late fees totaling over $6,000,000. Concurrently with this Trial Brief, the Debtors have filed their objection to CIBC's Claim. CIBC is not entitled to recovery of default interest under California law as an unenforceable liquidated damages provision and because its conduct forced the very defaults on which its Claim is based. This Objection is without prejudice to any of the Debtors' rights to raise affirmative claims against CIBC which may further reduce or eliminate liability of the Debtors under the loan. In response to the Debtors' requests for production of documents, CIBC produced over 27,000 pages of documents; however, 80% consisted of cumulative reports on real estate portfolios, documents unrelated to the Debtors and/or the Property, blank pages, etc. and did not include certain relevant documents which the Debtors, on information and belief, are in CIBC's possession. Thus, CIBC's production was a classic "document dump" forcing the Debtors to review 27,000 pages at a time when they were preparing for trial, and even then is demonstrably incomplete. On September 27 and 29, CIBC produced another 45,000 pages of documents consisting of over 1,400 documents of which 743 documents, consisting of over 9,000 pages were not previously produced or seen by Debtors' counsel. The Debtors are unable to review this additional production and prepare for trial on the confirmation of their Plan now scheduled for October 15 and 16.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp\Plan Obj v19.docx

2

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

1. <u>John Feece</u>.  Mr. Feece is a principal of the Debtors and will provide a declaration regarding the circumstances giving rise to the filing of these Cases, the terms and feasibility of the Plan, the value of the Property, and related matters.

2. <u>Tracy Nakagawa</u>.  Ms Nakagawa is the accounting manager of the Debtors and will, among other things, provide testimony regarding the preparation of the projections.

3. <u>Eric Mogensen</u>.  Mr. Mogensen is special counsel to the Debtors and will provide testimony regarding the circumstances leading to the issuance of the Note, the execution of the Extension and the filing of the Bankruptcy Cases.

4. <u>Doug Feece</u>.  Mr. Feece is an employee of the Debtors' management company and the principal of Feece Realty which acts as leasing agent for the Debtors.  He will testify as to the preparation and reasonableness of the projections.

5. <u>Donn Byrne</u>.  Mr. Byrne is a licensed real estate appraiser and a Member of the Appraisal Institute (MAI).  He prepared and certified an appraisal of the Property and opined that as of October 31, 2011, the Property had a fair market value of $41,000,000.  He will provide a declaration confirming that based on his review of the appraisal and his knowledge of comparable buildings, sales and leases figures since his appraisal, the recent state of the office market in downtown San Jose, and the leases which have transacted in the Property since his last appraisal, the market value of the Property is not less than $41,000,000 as of October 2012.

6. <u>Enrique Rodriguez</u>.  Mr. Rodriguez is founder and principal of Rodriguez and Associates Advisory Group, a Los Angeles based consulting firm that, for the past twenty years, has provided services to the legal, financial and real estate development communities, as well as not for profit and public sector organizations.  He will provide expert testimony regarding the current market conditions for financing of Class B office buildings in the Downtown San Jose market; an appropriate rate of interest for CIBC's secured loan to the Debtors; and the feasibility of the debtor's proposed plan and the fair and equitable treatment of secured Creditors under 11 U.S.C. §1129.

In addition, the Debtors have taken the deposition of former CIBC employee Kedist Tsadik and anticipate introducing her testimony and certain internal documents provided by CIBC in this

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

3

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 7 of
23

case through discovery through the submission of excerpts of her testimony. On October 4, 2012, the Debtors took the deposition of Lindsay Gordon, designated by CIBC as its Rule 30(b)(6) witness pursuant to stipulation. The Debtors may introduce excerpts of this deposition as well.

## II.     THE ISSUES

In opposition to Confirmation of the Plan, CIBC's Objection raises four issues[3]: (a) the Plan is not feasible in violation of section 1129(a)(11) of the Bankruptcy Code; (b) the Plan is not in the best interests of Creditors in violation of section 1129(a)(7) of the Bankruptcy Code; (c) the Plan does not comply with the applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code because it modifies the obligations of third parties under a guaranty; and (d) the Plan is not fair and equitable in violation of section 1129(b)(1) of the Bankruptcy Code to the extent the Plan sets an interest rate of 8.25% on the Note.

CIBC's objections are without merit. The Plan is feasible, is in the best interest of the Creditors, does not modify any third-party obligations and is fair and equitable. CIBC made the original loan in 2006 at a time when the Property was only 65% occupied, at 7% interest for three years based on the Debtor's plan to make capital improvements and improve occupancy rates to achieve stabilization. The Debtors were indeed successful in their efforts, fulfilling the projections and achieving stabilization of the Property at a 90% occupancy rate, investing nearly $20 million of their own funds to acquire and improve the Property. In so doing, the Debtors elevated the Property from a near Class C property to the top of Class B properties, substantially outperforming the market and enhancing the value of CIBC's collateral.

Instead of extending a permanent loan due to the collapse of the real estate market and banking industry as both parties had anticipated when the loan was initially made, CIBC instead now wanted the Debtors to sell the Property to repay the Note and imposed onerous terms and conditions designed to force the Debtors to sell as soon as possible in an extremely down market at a considerable loss. Due to the recession, occupancy rates decreased to about 80%. During these

---

[3] The Debtors anticipate that CIBC will file a brief prior to the confirmation hearing supplementing its objections, to which the Debtors will respond prior to the hearing in accordance with the Scheduling Order.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

4

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Cases, the Debtors have been able to achieve a 90% occupancy rate again as of the date of the Trial in a market that while improving has continued to experience negative absorption rates. The Debtors have demonstrated an ability to meet and fulfill a plan and indeed the Property is in a much better position now than it was in 2006. The proposed interest rate is appropriate. For the reasons set forth below, the Debtors submit that the Court should overrule CIBC's objections and confirm the Plan.

### III.     RELEVANT FACTS

**A.     Background**

**1.     The Property**

1.     In June of 2006, the Debtors purchased the two building, 305,000 square foot office complex located at 111 West Saint John Street and 111 North Market Street, San Jose, California (the "Property") for $41,500,000. The Property is located in the central part of downtown San Jose, surrounded by a mix of office, retail and residential properties and reflects an increasingly desirable area for business and residential locations. The Property is within walking distance of restaurants, hotels, public parks and open space, the San Jose Convention Center, San Jose State University, San Jose City Hall and the Santa Clara County Superior Court. The Property also is easily accessible to freeways and public transportation. The Property also enjoys its position in the downtown San Jose market which attracts businesses seeking more cost-effective rental rates than those offered in the costly San Francisco and Palo Alto area markets.

2.     John and Rosalie Feece are the ultimate principals of the Debtors. Beginning in 1973, they made numerous investments in residential rental units. Beginning in 1990 and through the present, John and Rosalie have been actively and extensively involved in real estate investment, operations and management, beginning with apartments and then moving on to commercial real estate.

3.     The office towers are vintage buildings constructed in the 1960's, and the Debtors have invested substantial effort and resources into renovations of its exterior and interior over the past six years. The Property is now at the very top of its class in terms of quality, and therefore has attracted, and will continue to attract and retain, tenants.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

5

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

### 2. Management of the Property

4. Community Towers Management, LLC, a California limited liability company ("CTM"), is the management company for the Property. John and Rosalie Feece are CTM's sole members. CTM employs 5 employees through its affiliate, Sierra Management First Street, LLC ("Sierra"), which is also wholly owned by John and Rosalie Feece. As the Property's management company, CTM collects rents and pays expenses on behalf of the Debtors and manages the Property's day-to-day operations.

5. John Feece is responsible for all day-to-day operations of the Subject Property, including the supervision of CTM and Sierra, leasing activities, supervision of real estate brokers, coordination of construction and maintenance activities, coordination of vendors required to keep the buildings operating smoothly, negotiations with tenants and third party vendors, coordinating with tenants to ensure their needs are being met, and other activities necessary to keep the Subject Property running in a professional and first class manner. Rosalie Feece is responsible for all accounting and finance functions associated with the Debtors and CTM, and she also assists in day-to-day operations and projects as needed.

### 3. The Initial Loan

6. To facilitate the transaction, the Debtors borrowed $33,500,000[4] from CIBC, a Chicago, Illinois based subsidiary of Canadian Imperial Bank of Commerce. The Debtors invested another $12,000,000 in the sale or exchange of prior real estate property held by John Feece and Rosalie Feece or affiliated entities to complete the acquisition of the Property.[5] CIBC immediately disbursed $29,500,000 to finance the acquisition and held back $4,000,000 to fund capital expenditures and tenant improvements. The loan was evidenced by the Note, which provided for an initial three-year term and required payments of interest only based on LIBOR plus 2% with a 7% floor.

7. The parties anticipated that if the Debtors completed certain improvements and leased

---

[4] The NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST recorded by CIBC on September 1, 2011 alleges an amount due of $38,905,806 as of August 31, 2011.

[5] CIBC's appraisal indicated that the Property had a stabilized market value of $50,000,000 as of April 22, 2006.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

6

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

the Property sufficiently to a certain capacity, the loan would be converted into a standard 10-year fixed rate loan issued by CIBC. Internal documents produced by CIBC confirm that it acknowledged that "the loan is expected to be refinanced through CIBC's permanent fixed rate loan program" and "it is anticipated that the Borrower will refinance this Loan through CIBC's permanent loan program once stabilized."

8.      In reliance on this understanding, the Debtors entered into the loan. Between 2006-2009, John and Rosalie Feece loaned almost $10,000,000 to the Debtors from funds they had received from the sale of certain properties and from proceeds of a line of credit from Focus Bank which the Debtors used to make substantial improvements to the Property and fund tenant improvements, of which approximately $6,700,000 remains outstanding. As a result, the Debtors improved and leased a significant amount of the vacant units of the Property, ultimately achieving and maintaining an occupancy rate that was well above that of competing properties in the area. In fact, during this period, the Debtors raised the occupancy rate of the Property from 65% to approximately 90%. Internal CIBC documents confirm that CIBC was "comfortable" with the Debtors' ability to reach its projections, and CIBC's own internal report dated February 18, 2009 concluded that "the borrower has successfully executed its plan to reach stabilization."

### 4.      The Extension of the Loan

9.      With the onset of the financial crisis of 2008 - 2009, the lending market for commercial loans evaporated. As the maturity date of the Note approached, the Debtors requested that CIBC issue a permanent fixed rate loan. It became apparent that despite its promise of permanent financing if the Property reached stabilization, CIBC was not going to offer permanent financing. Instead, CIBC now wanted the Debtors to sell the Property as soon as possible and embarked on a course of dealing designed to coerce the Debtors to sell the Property by imposing such onerous terms on an extension to extract and control all excess cash flow after debt service, to force the Debtors to sell the Property at a deep discount in a failing economy. It offered only a two-year extension subject to certain onerous and non-negotiable terms. Among other things, CIBC increased the interest rate to LIBOR + 4%, retained the 7% floor, imposed an arbitrary and

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

7

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 11 of 23

capricious "commission/tenant improvement" reserve (the "TI/LC Reserve") in the amount of $104,043 per month, imposed a $335,000 "extension fee" payable in full by July 31, 2009, and increased the "deferred commitment fee" from $251,250 to $1,005,000, which would be reduced to $335,000 in the event the loan was paid in full prior to December 10, 2009.[6]

10. Internal documents produced by CIBC in these Bankruptcy Cases confirm that CIBC was grossly overreaching in its demands. According to such documents, CIBC's underwriters recommended to CIBC's credit committee a proposal that would, among other things, establish a TI/LC Reserve of $59,043 per month and a monthly payment against the principal amount of $45,000 to be paid from excess cash.[7]

11. Even before the loan extension closed, CIBC knew that the Property's cash flow would not support the TI/LC Reserve requirements. Unknown to the Debtors, on June 8, 2009, just prior to the closing of the Amendment, CIBC's underwriters recommended that the TI/LC Reserve requirement be decreased to $80,000 per month, citing negative cash flow at then-current occupancy rates if the $104,000 requirement was imposed. Although the Debtors had achieved stabilization, CIBC refused to extend permanent financing. Instead, it is clear that CIBC wanted the Debtors to sell the Property and imposed these onerous terms to convert what was a successful, performing loan generating substantial cash flow into a non-performing loan to coerce the Debtors to sell at a time when the real estate market was extremely weak.

**5. The 2009 Financial Crisis**

12. The Debtors immediately felt the burdens of the additional requirements imposed by CIBC. At that time, the failing economy rendered some of the Property's tenants unable to meet the terms of their leases, causing revenue to drop and occupancy to decrease to approximately 80%. Some tenants started to request assistance while others completely shut down their businesses. The Debtors made the $335,000 "extension fee" payments as well as the first three payments into the

---

[6] The increase of the commitment fee to $1,005,000 and the "reduction" was presumably to "incentivize" the Debtors into selling the Property before the end of 2009.

[7] Subsequently, in May 2009, another CIBC senior executive apparently suggested adding the $45,000 principal pay down requirement to the TI/LC Reserve requirement, resulting in the monthly $104,043 TI/LC Reserve requirement which CIBC eventually imposed on the Debtors. This TL/LC Reserve requirement thus was not based on any analysis of what would be reasonably required.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

8

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

TI/LC Reserve account, but because CIBC would not promptly issue reimbursements from the TI/LC Reserve (or refused because certain requests did not meet all technical requirements for disbursement), accounts payable to vendors, contractors and real estate agents went unpaid. Since those vendors, contractors and real estate agents were essential to keep the business running smoothly, the Debtors ceased making payments to the TI/LC Reserve in October 2009 and instead used those funds to pay off the accounts payable which had fallen behind.

13. The Debtors attempted to engage CIBC in negotiations for a long-term resolution. Initially, CIBC simply refused to engage in good faith negotiations and insisted on a full and unconditional release from all claims as a condition to even discuss a resolution. Eventually, after the parties executed a pre-negotiation letter which did not contain such a release, the parties proceeded in discussions and the Debtors tendered, and CIBC accepted, payments and application of TI/LC Reserve as paying down what CIBC represented to be the outstanding unpaid interest balance on the loan as of October 2010. Negotiations continued through August 2011. CIBC did not declare any default and did not make any demand for payment of default interest or late charges.

14. By April 2011, the parties reached an agreement in principle regarding a further extension. Among the deal points was a term which would allow John and Rosalie Feece to make a paydown of the line of credit from Focus Bank from the cash flow of the Property. While the deal was being documented, the Feeces made a payment to Focus Bank. CIBC had been kept informed of the progress of the status of the Focus Bank negotiations, but apparently a senior CIBC executive became angered by the payment.

15. As a result, in August 2011, CIBC declared a default, recorded a notice of default (the "NOD"), filed a complaint for judicial foreclosure and moved for the appointment of a receiver, precipitating the filing of the Bankruptcy Cases. Prior to such time, CIBC had not declared any default, and all of its demands to the Debtors were limited to payment of contractual, non-default interest. Indeed, even up to the commencement of the Bankruptcy Cases, CIBC issued invoices to the Debtors setting forth the outstanding balance of the loan, none of which included accrued or

/ / /

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

9

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 13 of 23

calculations of default interest or late fees. The Debtors filed their Voluntary Petitions on September 26, 2011.

## IV. THE PLAN

16. The Plan accords treatment to CIBC's Allowed Claim under Class 2 as follows[8]:

        5.1    Class 2 (Allowed CIBC Claim).

        Pursuant to section 1129(b)(2)(A)(i), CIBC shall retain all liens, security interests and other encumbrances affecting property of the Debtors and the Reorganized Debtors granted in favor of CIBC prior to the Effective Date to the extent of the Allowed Secured Claim of CIBC.

        Commencing on the first day of the first calendar month following the Effective Date and continuing for five (5) years following the Effective Date, CIBC will receive monthly payments of interest only on its Allowed Secured Claim at the fixed rate of six percent (6%) per annum.

        CIBC will be paid the principal of its Allowed Secured Claim no later than five (5) years following the Effective Date.

        CIBC's Allowed Secured Claim may be paid in full at any time without penalty, and will be paid in all events no later than five (5) years following the Effective Date. The Subject Property may be transferred subject to the Allowed Secured Claim of CIBC. The foregoing is in full and final satisfaction of all Class 2 Claims.

17. With respect to other Creditors, the Plan proposes to pay all Allowed Claims in full and General Unsecured Creditors, with the exception of the unsecured Claims of John Feece and Rosalie Feece, shall receive equal monthly Distributions over twelve months.

18. The Plan accords treatment to the Allowed General Unsecured Claims of John and Rosalie Feece as follows[9]:

---

[8] The March 27 Plan provided for CIBC to retain all liens, security interests and other encumbrances to the extent of the its Allowed Secured Claim and for payment of CIBC's Allowed Secured Claim over ten (10) years with interest at the Prime Rate or such other rate as may be determined by the Court, adjusted annually and subject to a 3 1/4% floor, as follows: (i) for the first five (5) years following the Effective Date, CIBC will receive monthly payments of interest only, commencing on the first day of the first calendar month following the Effective Date, and (ii) for years 6 through 10 following the Effective Date, CIBC will receive monthly payments of principal and interest based on a thirty (30) year amortization schedule. In addition, the March 27 Plan provided that CIBC's Allowed Secured Claim may be paid in full at any time without penalty, and no later than ten (10) years following the Effective Date.

[9] The March 27 Plan provided for John Feece and Rosalie Feece to receive payment on account of their Allowed General Unsecured Claims over a ten-year period with interest at the prime rate quoted by Bank of America, N.A, adjusted annually and subject to a 3 1/4% floor.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

10

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

5.4     Class 7 (General Unsecured Claims of John and Rosalie Feece).

Class 7 consists of the Allowed General Unsecured Claims of John and Rosalie Feece.

Commencing on the first day of the first calendar month following the Effective Date and continuing for five (5) years following the Effective Date, John and Rosalie Feece will receive monthly payments of interest only on their Allowed General Unsecured Claims at the fixed rate of six percent (6%) per annum. John and Rosalie Feece will be paid the principal of their Allowed General Unsecured Claims no later than five (5) years following the Effective Date.

If the Debtors experience a cash shortfall in any given month that prevents them from making all payments pursuant to the Plan, the payment due to the Class 7 Creditors shall be reduced by the amount of the shortfall and deferred, and paid only at such time as the Debtors have sufficient cash to make up the shortfall deferral.

The foregoing is in full and final satisfaction of all Class 7 Claims.

## V.     DISCUSSION

### A.     The Plan Is Feasible

19.     11 U.S.C. § 1129(a)(11) does not require that a plan is guaranteed to succeed but only that it has a "reasonable probability of success" and is not a "visionary scheme." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  "The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility." *Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 674 (D. Ariz. 1994) (citation omitted).

### 1.     The Debtors' Financial Condition

20.     The Debtors have cash on hand, currently in the amount of $1,047,652.19 as of October 4, 2012, which will be sufficient to pay all Allowed Claims entitled to payment as of the Effective Date.

21.     The Debtors have filed their MONTHLY OPERATING REPORTS which indicate that over the course of these Bankruptcy Cases, the Debtors have operated at a profit.  The Debtors have

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

11

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 15 of 23

remained current on administrative expenses aside from certain professional fees which are not permitted to be paid from CIBC's cash collateral. In addition, the Debtors have made adequate protection payments to CIBC pursuant to the Adequate Protection Order since August 1, 2012.

22.     CIBC's expert has assumed the value of CIBC's Claim to be approximately $38,000,000. The Debtors' projections show that the Reorganized Debtors can make the Plan payments.

## 2.     The Projections

23.      In support of the March 27 Plan, the Debtors prepared and submitted projections attached as Exhibit "B" to the Disclosure Statement. To reflect the developments in the Bankruptcy Cases and economic conditions since the Debtors filed the March 27 Plan and the Disclosure Statement, the Debtors prepared and forwarded updated cash flow projections to their retained expert, Enrique Rodriquez, for his review. These projections were attached as Exhibit "C" to Mr. Rodriguez' report which was produced to CIBC in accordance with the Scheduling Order. Mr. Rodriguez' testimony will include an analysis of these projections and will state, among other things, that due to increased leasing activity and improved leasing market, the Debtors' projections reflect increased anticipated revenues as compared to the projections attached to the Disclosure Statement. They demonstrate that the Debtors will generate sufficient cash flow to fund all payments under the Plan and, furthermore, that the Reorganized Debtors will be adequately capitalized during the term of the Plan.

24.     CIBC criticizes the Debtors' projections, contending that revenues are overstated and expenses are understated. The projections have been examined by each side's experts who will testify as to their opinions and conclusions regarding feasibility. Because CIBC's expert opinion is based on faulty and outdated data, his testimony should not be given much weight by this Court.

### a)     The Rental Revenue Projections Are Reasonable

25.     Based on the Debtors' recent experience alone, it is apparent that market pricing has increased and the Debtors are able to ask and receive these higher current market rates. The Debtors' expert Enrique Rodriguez will corroborate. While CIBC's expert Richard Ferrell opined in

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

12

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

his report about factors which may affect rental rates negatively, the Debtors have consistently outperformed their competition and the submarket and are well suited to continue.  This is to be expected given the aptitude and attention to customer service provided by management and the customer goodwill it has cultivated.

26.    CIBC dismisses the Debtors' established history of outperforming generalized market data points and doubts the Debtors' projections for future performance.  The fact is that the Debtors are now well-positioned to achieve the revenues reflected in their projections and to execute the Plan.

> **b)    The Tenant Improvements And Leasing Commission Costs Projected By The Debtors Are Reasonable**

27.    CIBC contends that the Debtors' forecast of its TI and LC expenses lacks credibility, citing the costs of improvements incurred during these Cases.  However, Community Towers sought and obtained approval from CIBC to make the subject improvements, consulting with CIBC and responding to questions and comments regarding the recovery of these costs over the terms of the leases.  CIBC approved all of these expenditures.  While some improvements were costly, they were imperative, and the Debtors initiated them after consultation with and approval from CIBC.  Presently, because the Debtors' have addressed almost all features which required improvements, the need for future TIs will be considerably less.

28.    Once made, many of these expenditures will not have to be incurred again for a very long time, and certainly not within the time period contemplated by the Plan.  Further, it is misleading and inaccurate to attribute less revenue coming into the Property when in fact much of the costs of the improvements have been amortized into the lease rates, resulting in higher than market rental rates which will be received over the terms of the leases.

> **c)    The Debtors Have Demonstrated Ability To Generate Credible Projections**

29.    CIBC contends that this Court should disregard or give little weight to Debtors projections because they have revised projections during these Bankruptcy Cases.  However, the

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

13

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Debtors in good faith have responded to inquiries from CIBC and have prepared projections each time based on current conditions. Increases in tenant improvement costs have been the result of the Debtors being willing to take advantage of opportunities that have arisen for the Property, which have resulted in increased occupancy rates, considerable enhancements to the value of the Property and hence to CIBC's collateral. These improvements have been done in consultation with CIBC and Debtors should not be penalized by unwarranted assertions regarding their credibility. For example, the Kerio lease required higher than average TI costs due to Kerio's request for a more elaborate build out; however, these higher costs were amortized into an increased rental rate over a 10 year lease term, all of which was approved in advance by CIBC. In fact, in the initial years following the acquisition of the Property, the Debtors consistently performed to projections, to the point where CIBC servicers commented favorably upon the Debtors' performance and indicated that they were "comfortable" with the Debtors' ability to meet their projections.

**B.      The Plan Is Fair And Equitable**

30.      Section 1129(b)(2) provides as follows:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)      (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

14

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

Case: 11-58944     Doc# 194     Filed: 10/05/12     Entered: 10/05/12 17:20:40     Page 18 of 23

31.     Here, the Plan provides for CIBC to retain all liens, security interests and other encumbrances granted in favor of CIBC prior to the Effective Date to the extent of its Allowed secured Claim, pursuant to section 1129(b)(2)(A)(i).  Thus, the Plan needs only to provide deferred cash payments which total the Allowed amount of CIBC's secured Claim.

32.     As set forth by section 1129(b)(2)(A)(i), in order to determine whether a plan provides deferred cash payments which total the allowed amount of the secured claim, a court must first determine the allowed amount of the claim and second determine the value, as of the plan effective date, of the property to be distributed.[10] *E.g., Wells Fargo Bank N.W. v. Yett (In re Yett)*, 306 B.R. 287, 291 (9th Cir. BAP 2004).  The latter addresses the principle of the time value of money and therefore requires an examination as to the proposed interest rate.  *See Till v. SCS Credit Corp.*, 541 U.S. 465, 484-85 (2004) ("*Till*") (applying Section 1325(a)(5)(B)(ii) in the chapter 13 context).  "Thus, a plan need only propose an interest rate that will compensate a creditor for the fact that had he received the property immediately rather than at a future date, he could have immediately made use of the property." *Id.*

### 1.     Applicable Formula For Interest Rate Calculation

33.     In *Till,* a plurality of the Supreme Court held that courts should treat similar creditors similarly when selecting a cramdown interest rate and should apply an objective economic analysis.  *Id*. at 476-77.  Specifically, the *Till* plurality adopted a "formula approach" because it "entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." *Id*. at 479.  The formula approach uses the national prime rate and adds an appropriate risk adjustment "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id*.  Factors for consideration in determining the size of the risk adjustment include "the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan." *Id*.  The creditor's circumstances or its prior interactions with the debtor are not considered. *Id* at 479-80.  In addition, the creditor maintains the

---

[10] As noted above, the Debtors' expert opined that the value of the Property is not less than $41,000,000 and both sides experts have assumed this valuation in coming to their opinions.  CIBC has the burden of proving the value of its secured Claim.  It will not be submitting any evidence of the value of the Property for the purpose of supporting its asserted $44,000,000 Claim.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
Plan Obj v19.docx

15

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

burden to present evidence to establish the proper risk premium. *See id.* at 484-85. (*See also In re Fowler*, 903 F.2d 694, 698 (9th Cir. 1990), which articulates a similar method which starts with a standard measure of risk free lending, such as the Prime Rate or the rate on treasury obligations, and takes into consideration "the risks associated with a given debtor and the security associated with a specific debt.").

34.     In adjusting to the base rate, a court may consider a number of factors, including (a) circumstances of the estate, (b) nature of the security, (c) plan duration, and (d) plan feasibility. *Till* 541 U.S. 465, at 479. *See also In re Villa Diablo Assocs.*, 156 B.R. 650, 654-55 (Bankr. N.D. Cal. 1993) (listing size and term of the loan, whether loan is secured, quality of the security, risk of default, and effect of the confirmation process).

35.     Here, both sides' experts adopt *Till*'s formula approach.  Accordingly, the Court should apply the formula approach.  In their respective reports, both experts have based their opinions on the assumption that the Property is valued at $41,000,000 and the secured Claim is approximately $38,000,000.  The following discussion further addresses each factor in light of the arguments raised by CIBC and Mr. Ferrell.

### a)     Circumstances Of The Estate

36.     In analyzing this factor, Mr. Rodriguez assigns a .25% downward adjustment, citing the quality of the Debtors' management and demonstrated commitment to the Property.  Mr. Ferrell concedes that the Debtors have performed well in terms of leasing, maintaining and managing the Property.  Indeed, the Debtors' track record of outperforming its competitors and consistently exceeding market averages, as detailed above, speaks for itself.  For example, the Debtors' management companies have leased the Property to over 90% occupancy twice in the last six years and the Debtors have maintained levels above 80% since attaining that mark only two years after purchasing the Property in 2006.  In comparison, Legacy Civic Towers, one of the Debtors' main competitors in the area, has failed to reach occupancy above 50% over the last seven years.

37.     Instead, Mr. Ferrell assigns a 1.0% upward adjustment due to the lack of new cash commitment into the Property.  While the Debtors have not infused new cash during the Bankruptcy

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

16

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

Cases, their contributions and commitment are unquestionable. The Debtors invested $12 million and received a $7 million loan from John and Rosalie Feece to purchase and improve the Property to its current state. These significant contributions, which largely were used to satisfy CIBC's goals for refinancing to a standard fixed rate loan terms, evidence the Debtors' commitment and should not simply be disregarded as Mr. Ferrell has done. In addition, the Debtors' principals, John and Rosalie Feece, have agreed to defer payment on their Class 7 Claims in the event of any cash shortfall which prevents any Distribution under the Plan.

### b) Nature Of The Security

38. In reviewing this *Till* factor, the Debtors' expert Rodriguez analyzed such aspects as the location, condition and desirability of the Property, the status of its leases, market conditions and risk markers such as loan-to-value ("LTV") ratio. The Rodriguez Report explains that, while the other factors weigh heavily in favor of the Debtors, the LTV ratio exceeds industry standards and thus warrants a risk adjustment of 1.5%.

39. Mr. Ferrell makes an adjustment of 1.65% based on the high LTV and debt coverage ratio. However, he also adds 2.0% solely because the Property is an office building. While Mr. Ferrell attempts to justify making two adjustments for the nature of the security, based on his characterization of the "first mortgage portion" and the "higher risk portion" of the loan, both ultimately consider the same risk factors – LTV and debt service coverage ratio. In fact, in reaching the 200 point adjustment, Mr. Ferrell references a survey which lists office building LTV and DSCR as data points. He does not explain the direct applicability of the survey to his adjustment. The survey includes only one loan with a five year term which lists a 5.0% corresponding interest rate, while the others range from seven to ten years, amortized over 25 to 30 years. In effect, Mr. Ferrell has supplanted the *Till* ruling, substituting his estimate of a non-existent market rate which incorporates risks of non-payment in place of a "riskless rate".

### c) Duration Of The Plan

40. The parties also disagree on the adjustment to be provided based on the five-year term of the Plan. However, it is Mr. Rodriguez who assigns an upward adjustment of 0.50% while Mr.

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

17

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Ferrell assigns a 0.60% downward adjustment, noting that the Plan's shorter term reduces the risk of nonpayment.

### d) Feasibility Of The Plan

41. The experts agree, although through different reasoning, that the rate should be adjusted 100 basis points upward to account for the potential risk of failing to fulfill the Plan requirements.

### 2. Comparison Of Proposed Rates

42. When comparing the rates proposed by Mr. Ferrell and Mr. Rodriguez – 8.25% and 6.00% respectively - the two are not completely divergent. Both assign a 1.00% upward adjustment for feasibility and both assign approximately 1.50% for a high LTV ratio. The material differences are based on (a) the circumstances of the estate where Mr. Ferrell fails to credit the Debtors' managerial experience, success and unquestioned commitment to the Property (a 1.25% discrepancy) and (b) the nature of the security, where Mr. Ferrell has added on an extra 2.00% adjustment which appears duplicative, unfounded and contrary to applicable law. Furthermore, Mr. Rodriguez assigned a 0.50% upward adjustment based on a general risk for the Plan's term while Ferrell noted that the five-year term decreased risk.

43. In any event, it is clear that when all factual circumstances of these Bankruptcy Cases are considered – including the quality and revenue generating capacity of the Property, the Debtors' successes, the near stable, almost completely improved and near capacity buildings – the 6.0% interest rate is appropriate. Indeed, if one eliminates the duplicative adjustment made by Mr. Ferrell simply because of the fact that the Property is an office building, the two reports come to similar ultimate conclusion on the appropriate interest rate.

### C. The Plan Is In The Best Interests Of Creditors

44. Section 1129(a)(7) provides that each holder of an impaired claim must either vote in favor of a plan or receive on account of its claim at least the same return that it would get if the case were a liquidation under chapter 7. Here, CIBC is the only dissenting Creditor. Nonetheless, the Plan satisfies the "best interests" test with respect to all classes of Claims, including Class 2, as it

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp
CIBC Obj v19.docx

18

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S
OBJECTIONS TO CONFIRMATION OF THE DEBTORS'
JOINT PLAN

provides for the Debtors to reorganize their business operations and to maximize value for all Creditors in the most cost-effective manner.  The Debtors may pay Allowed Claims over time so long as interest is paid as compensation for the time value of money.  Here, the Plan provides for a payment in full on all Allowed Claims.

45.    Presumably, CIBC contends that it would receive more in a chapter 7 liquidation because it disputes that the rate of interest it will be paid under the Plan will compensate it for the five-year delay in payment proposed by the Plan.  However, the appropriate rate of interest proposed by the Debtors is 6.0%, and such rate will in fact compensate CIBC for the time value of its Allowed Secured Claim.

**D.    The Plan Complies With The Applicable Provisions Of The Bankruptcy Code**

46.    As set forth in the Statement and herein, the Plan complies with the applicable provisions of the Bankruptcy Code and satisfies section 1129(a)(1).  CIBC's Objection asserts that the Plan modifies the obligations of John and Rosalie Feece under a guaranty to CIBC.  This assertion is wrong as the Plan does not provide for any such modification.

**VI.    CONCLUSION**

47.    For the foregoing reasons, CIBC's objections should be overruled, and the Plan be confirmed under such terms and conditions as the Court deems appropriate.

Dated:  October 5, 2012                    **MURRAY & MURRAY**
                                            A Professional Corporation

                                    By:  */s/ Robert A. Franklin*
                                              Robert A. Franklin
                                              Attorneys for Debtors

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Resp CIBC Obj v19.docx

19

DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 194    Filed: 10/05/12    Entered: 10/05/12 17:20:40    Page 23 of 23