1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  THOMAS T. HWANG (218678)
   MURRAY & MURRAY
3  A Professional Corporation
   19400 Stevens Creek Blvd., Suite 200
4  Cupertino, CA 95014-2548
   Telephone:  (650) 852-9000; (408) 907-9200
5  Facsimile:  (650) 852-9244
   Email:  jwmurray@murraylaw.com
6  Email:  rfranklin@murraylaw.com
   Email:  thwang@murraylaw.com
7
8  Attorneys for Debtors

9              UNITED STATES BANKRUPTCY COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12 | In re: | ) | Chapter 11 |

13 | | ) | Cases Jointly Administered |

14 | **COMMUNITY TOWERS I, LLC,** | ) | Case No. 11-58944-SLJ-11 |
   | A Delaware Limited Liability Company, | ) | |
15 | Employer Tax I.D. No. 75-2456729, | ) | |

16 | **COMMUNITY TOWERS II, LLC,** | ) | Case No. 11-58945-SLJ-11 |
   | A Delaware Limited Liability Company, | ) | |
17 | Employer Tax I.D. No. 75-2560662, | ) | |

18 | **COMMUNITY TOWERS III, LLC,** | ) | Case No. 11-58948-SLJ-11 |
   | A Delaware Limited Liability Company, | ) | |
19 | Employer Tax I.D. No. 32-0065635, | ) | |

20 | **COMMUNITY TOWERS IV, LLC,** | ) | Case No.  11-58949-SLJ-11 |
   | A Delaware Limited Liability Company, | ) | |
21 | Employer Tax I.D. No. 77-0379075, | ) | Date:     October 15 - 16, 2012 |

22 | Debtor(s). | ) | Time:     9:00 a.m. |
   | | ) | Place:    United States Bankruptcy Court |
23 | 111 W. Saint John Street, Suite 705 | ) |            280 S. First St., Room 3099 |
   | San Jose, California 95113 | ) |            San Jose, CA  95113 |
24 | | ) | Judge:    Honorable Stephen L. Johnson |

25
26              **DEBTORS' REPLY BRIEF IN SUPPORT OF**
                **CONFIRMATION OF THE DEBTORS' JOINT PLAN**

27
28

Case: 11-58944   Doc# 208   Filed: 10/10/12   Entered: 10/10/12 17:37:58   Page 1 of
22

# **TABLE OF CONTENTS**

Page(s)

I.    **INTRODUCTION** ......................................................................................1

II.   **REPLY** ......................................................................................................1

    **A.**    The Plan Does Not Violate Section 1129(a)(1). ...........................1

    **B.**    Modifications to the Plan .............................................................1

    **C.**    The CIBC Claim ..........................................................................2

          1.    Principal And Contractual-Non Default Interest .............2

          2.    Default Interest And Late Fee ..........................................2

          3.    Inequitable Conduct .........................................................5

          4.    Waiver/Estoppel ..............................................................7

          5.    CIBC Has The Burden To Prove That It Is Oversecured. ..........7

    **D.**    The Plan ........................................................................................8

          1.    Plan Modifications ............................................................8

          2.    Feasibility ........................................................................9

              a.    Tenant Improvement Costs ...................................9

              b.    The Debtor's Projections ....................................10

              c.    Concerns of Fairness and Equity .......................11

              d.    Interest Rate .......................................................15

        i)    Circumstances of the Estate ...............................................16

        ii)    Nature of the Security .......................................................16

        iii)    Duration ...........................................................................17

        iv)    Feasibility .........................................................................17

III.   **CONCLUSION**........................................................................................18

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

i

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 2 of 22

# **TABLE OF AUTHORITIES**

Page(s)

### CASES

*Foss v. Broadwalk Partners (In re Broadwalk Partners)*,
   171 B.R. 87 (Bankr. D. Ariz. 1994)........................................................5

*General Electric Capital Corp. v. Future Media Productions. Inc.*,
   536 F.3d 969 (9th Cir. 2008) ................................................................2

*Howard J. White, Inc. v. Varian Associates*,
   178 Cal. App. 2d 348 (Cal. App. 1st Dist. 1960)...................................7

*In re Cliftondale Oaks, LLC*,
   357 B.R. 883 (Bankr. N.D. Ga. 2006) ...................................................5

*In re Consolidated Properties Ltd. Partnership*,
   152 B.R. 452 (Bankr. D. Md. 1993)........................................................5

*In re Jack Kline Co.*,
   440 B.R. 712 (Bankr. S.D. Tex. 2010) ...................................................8

*In re Kalian*,
   178 B.R. 308 (Bankr. D.R.I. 1995) .........................................................5

*In re Market Center East Retail Property, Inc.*,
   433 B.R. 335 (Bankr. D.N.M. 2010) ......................................................4

*In re Peterson*,
   95 B.R. 663 (Bankr. W.D. Mo. 1988).....................................................14

*In re Terry Ltd. P'ship*,
   27 F.3d 241 (7th Cir. 1994) ....................................................................5

*In re Valley View Shopping Ctr., L.P.*,
   260 B.R. 10 (Bankr. D. Kan. 2001) .......................................................14

*In re Layman*, 958 F2d 72, 75 (5th Circuit 1992) ....................................5

*Lona v. Citibank, N.A.*,
   202 Cal. App. 4th 89 (Cal. App. 6th Dist. 2011) ...................................6

*Poseidon Development, Inc. v. Woodland Lane Estates, LLC*,
   152 Cal. App. 4th 1106 (Cal. App. 3d Dist. 2007) ................................5

*Ridgley v. Topa Thrift & Loan Assn.*,
   17 Cal. 4th 970, 981 (Cal. 1998),..........................................................3

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

ii

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

*Sutherland v. Barclays American/Mortgage Corp.*,
    53 Cal. App. 4th 299 (Cal. App. 2d Dist. 1997) ........................................................6

**STATUTES**

Section 506(b) of the Bankruptcy Code ........................................................................7

California Civil Code § 1671 ........................................................................................6

California Code of Civil Procedure Section 1265.225 ...................................................2

**OTHER AUTHORITIES**

Rule 30(b)(6) ................................................................................................................2

Section 1129(a)(1) ........................................................................................................1

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

iii

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

# I.    INTRODUCTION

The debtors and debtors in possession in the above-captioned jointly administered cases, Community Towers I, LLC, Community Towers II, LLC, Community Towers III, LLC and Community Towers IV, LLC (collectively the "Debtors"), hereby submit their reply (the "Reply") to CIBC'S OPENING BRIEF IN OPPOSITION TO CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN (the "CIBC Brief"). The Reply also supports the DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN (the "Trial Brief")[1] and the Plan. Concurrently herewith, the Debtors have filed declarations (the "Declarations") of the following witnesses in support of the Plan: John Feece, Tracy Nakagawa, Eric Mogensen, Doug Feece, Donn Byrne and Enrique Rodriguez. The Reply addresses the objections raised in the CIBC Brief and identifies additional modifications to the Plan as follows:

# II.    REPLY

## A.    The Plan Does Not Violate Section 1129(a)(1).

1.    CIBC insists that the Plan violates section 1129(a)(1) by reducing the interest that John and Rosalie Feece are required to pay under their third party guaranty, by one percent. In fact, the Plan does not modify and does not intend to modify any third party obligations. Indeed, paragraph 6 of the Payment Guaranty executed by John and Rosalie Feece provides that:

> Neither Guarantor's obligations under this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of the Borrower under the Note, the Security Instrument or other Loan Documents or by reason of the bankruptcy of the Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against the Borrower.

## B.    Modifications to the Plan

2.    John and Rosalie Feece, the holders of the Allowed Class 7 Claim, have consented to a modification of the Plan that will provide that there will be no payments on account of the Class 7 Claim unless and until the Allowed Class 2 Claim of CIBC is paid in full.

3.    In addition, the Plan will be modified to provide that no draws will be paid by the Debtors to its members, with the exception that the Debtors may make a distribution at the end of

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Trial Brief.

RAF/esg
K:\Community Towers I\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

1

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

each year commencing in 2013 to the extent there remains a minimum of $500,000 in the Debtors' general account after payment of each such distribution.

4. If approved by the Court at the Confirmation Hearing, the proposed modifications set forth hereinabove will be incorporated into any Order of Confirmation proposed to the Court.

**C. The CIBC Claim**

**1. Principal And Contractual-Non Default Interest**

5. The Debtors calculate that the total amount of principal and contractually non-default interest as of October 1, 2012 is $37,643,261.80. This includes application of all credits and adequate protection payments. A summary of the calculation is Debtors' Exhibit 20 and is attached as Exhibit "A" to the Declaration of Eric Mogensen.

**2. Default Interest And Late Fee**

6. In *General Electric Capital Corp. v. Future Media Productions. Inc.*, 536 F.3d 969, 974 (9th Cir. 2008), the Ninth Circuit held that "the bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law." California Civil Code § 1671 provides that a liquidated damages provision is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made. All the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract. Law Revision Comment to § 1671. Other relevant considerations in determining whether the amount of liquidated damages is so high as to be unreasonable include the relative equality of the bargaining power of the parties, whether they were represented by counsel and whether they anticipated proof of damages would be difficult. *Id.*

7. Through admissions set forth in CIBC's answers to interrogatories, Debtors will show that CIBC's range of harm consisted only of "increased efforts" of CIBC staff in monitoring the file, loss of use of capital required to be reserved by reason of the default and loss of opportunity for earning interest on the missing interest payments. As to the administrative costs, deposition testimony of CIBC's Rule 30(b)(6) designee showed no increased cost to CIBC that was incurred

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

2

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

because of these efforts. CIBC points to an average interest rate of 6% on which its other loans were making in 2006, which were even lower in 2009 at the time of the Extension. In other words, CIBC contends its damages are at most based on its lost opportunity costs of 6% of the interest it did not timely receive. In this case, even assuming an interest rate of 6%, and assuming that CIBC was able to re-loan the interest on the day it received it (both assumptions of which are highly favorable to CIBC), the **_total_** "lost" interest on the missed interest payments is less than $272,000. (See Debtors' Exhibit 20). This amount bears no reasonable relationship to the default interest provision which calculates default interest on *the entire unpaid principal sum due and which accrues at $140,000 a month.* Further, the CIBC Brief erroneously states that the default rate of 5% is below their lending rate; however, they fail to mention that the 5% default rate is above and beyond the 7% contract rate. If it was receiving interest at an average rate of 6% in 2006 and 2009, then the contract rate on its own more than compensates CIBC for its alleged damage. The 5% add-on is clearly just punitive. Since interest rates have dropped dramatically since 2009, the existing contract rate is substantially above what CIBC would otherwise receive. CIBC's statements in the CIBC Brief are simply misleading and incorrect.

8. Further, default interest is chargeable on any event of default and is not limited to the circumstances identified by CIBC in its answers to the Debtors' interrogatories. Here, CIBC's calculation also includes default interest of over $1,500,000 arising from the Debtors' nonpayment into a reserve account consisting of monies that could not be re-lent. Under the provision, a borrower shall be charged default interest on the entire principal amount no matter how material the event of default. It is clear that there was no attempt to reasonably estimate the range of harm given that default interest shall be charged no matter how material the event of default is. Therefore, there could have been no reasonable anticipation of damages to CIBC based on such amounts, and it should not be entitled to default interest thereon.

9. In *Ridgley v. Topa Thrift & Loan Assn.*, 17 Cal. 4th 970, 981 (Cal. 1998), Defendant loaned plaintiffs $ 2.3 million for two years, secured by real property plaintiffs had improved and intended to sell. Plaintiffs sold the property before the loan matured and, on defendant's demand, repaid the loan principal, together with a prepayment fee of about $ 113,000, equal to six months'

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

3

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

interest. Under the parties' loan agreement, plaintiffs owed defendant a prepayment fee at the time of sale only if plaintiffs had been more than 15 days late with any scheduled interest payment or had defaulted on any other contractual obligation to defendant; the fee was imposed here because plaintiffs had been late with an interest payment. The California Supreme Court held the prepayment penalty to be an unenforceable late fee charge because the charge of six months' interest on the entire principal, imposed for any late payment or other default, could not be defended as a reasonable attempt to anticipate damages from default.

> Under these circumstances, however the charge is formally characterized, it is, in substance, an unenforceable penalty for late payment. "If the sum extracted from the borrower is designed to exceed substantially the damages suffered by the lender, the provision for the additional sum, whatever its label, is an invalid attempt to impose a penalty inasmuch as its primary purpose is to compel prompt payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred by the lender."

*Id.* at page 981.

10. The total of default interest and late charges being asserted by CIBC is nearly $7,000,000 - more than 28 times the actual amount of damages. The fact that default interest could be charged on the entire principal balance no matter how or what the event of default is, further confirms that it does not represent a reasonable attempt to anticipate the losses to be suffered. *Id.* The default interest and late fees charged here were intended to be and are being asserted here as a penalty with no reasonable relationship to actual damages.

11. CIBC also includes approximately $1.6 million for a late fee. The provision provides as follows:

> If any installment payable under this Note (including the final installment due on the Maturity Date) is not received by Lender prior to the calendar day after the same is due (without regard to any applicable cure and/or notice period), Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such amount shall be secured by the Loan Documents.

The case law is unequivocal that oversecured creditors may not receive payment of both default interest and late charges under § 506(b). *See, e.g., In re Market Center East Retail Property, Inc.,*

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

4

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

433 B.R. 335, 365 (Bankr. D.N.M. 2010); *In re Cliftondale Oaks, LLC*, 357 B.R. 883, 887 (Bankr. N.D. Ga. 2006); *In re Consolidated Properties Ltd. Partnership*, 152 B.R. 452, 458 (Bankr. D. Md. 1993); *In re Kalian*, 178 B.R. 308, 312 n. 9 (Bankr. D.R.I. 1995) (*citing cases*). The reason for this is because both are designed to compensate for the same injury, *Cliftondale Oaks, supra*, 357 B.R. at 887. Here, the late fee provision indicates that it is intended "to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment . . ." Thus, the late fee purports to include <u>both</u> administrative costs <u>and</u> a double-counting of the amounts allegedly covered by the default interest. In addition to being duplicative of default interest, the late fee bears no reasonable relationship to the administrative costs that CIBC could have contemplated it would incur based on late payment. *See, e.g., Poseidon Development, Inc. v. Woodland Lane Estates, LLC*, 152 Cal. App. 4th 1106, 1115 (Cal. App. 3d Dist. 2007) (disallowing late fee as unenforceable penalty because, based on the disproportionate amount charged, there could not have been any reasonable attempt to estimate administrative costs, and adding that late fee could not be duplicative of enhanced interest rate).

### 3. Inequitable Conduct

12. *Future Media* does not render this Court unable to exercise its discretion in considering the equities of the case in determining whether to allow default interest and late fees. There, the 9th Circuit cited with approval and indicated that it was following several other cases which did allow for equitable considerations, noting that its rule had "been applied in many bankruptcy courts and in two of our sister circuits. *See, e.g. In re Layman*, 958 F2d 72, 75 (5th Circuit 1992) (holding 'that when an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest,' subject to examination of 'the equities involved in [the] bankruptcy proceeding'), *cert. den.* 506 U.S. 917, 113 S.Ct. 328 (1992); *In re Terry Ltd. P'ship,* 27 F.3d 241,243 I7th Cir. 1994) (noting the general rule that there is a 'presumption in favor of the contract rate subject to rebuttal based on equitable considerations')." *Id.* at 974, n.2. *See also Foss v. Broadwalk Partners (In re Broadwalk Partners)*, 171 B.R. 87, 92 (Bankr. D. Ariz. 1994) ("claim of an oversecured creditor . . . may include interest calculated at a post-maturity default rate, depending

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

5

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

upon the equities of the case.").

13. In addition to being unenforceable under California Civil Code § 1671, California law precludes CIBC from receiving default interest or late fees because CIBC caused the Debtors' default when CIBC knowingly imposed terms that it knew would cause a default. The evidence will show, by admissions set forth in documents produced by CIBC, that CIBC expected and anticipated that it would extend permanent financing to the Debtors on stabilization of the Property. The evidence will further show that the Debtors accepted the loan and invested nearly $19,000,000 based on that understanding and expectation. The Debtors successfully achieved their plan, again as confirmed by internal documents of CIBC.

14. CIBC, however, refused to extend an offer of permanent financing. It offered only a two-year extension with the imposition of an oppressive and arbitrary reserve requirement that would eliminate any cash flow from the Property and, in fact, cause a negative cash flow. CIBC also knew that the Property was John and Rosalie Feece's primary source of income. The evidence will show that CIBC's underwriters did not believe that the reserve requirement could be met prior to entering into the Extension. It therefore, by implication, knew there would be insufficient cash flow to meet John and Rosalie Feece's personal living expenses. CIBC's actions were intentional, designed to create a default either with respect to the CIBC loan or John and Rosalie Feece's personal loans, and to render circumstances so onerous as to force the Debtors to sell the Property into the worst real estate market in modern history in order to repay the debt, which would have resulted in devastating losses to the Debtors.

15. This conduct falls squarely under the doctrines of unconscionability and breach of the covenant of good faith and fair dealing, *e.g.*, *Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89 (Cal. App. 6th Dist. 2011) (reversing summary judgment based on evidence of unequal bargaining power and that loan payment terms were impossible to satisfy by borrower, and opining that the loan agreement could be void *ab initio*), and the implied covenant of good faith and fair dealing, *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (Cal. App. 2d Dist. 1997) ("The covenant . . . not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

6

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

to do everything that the contract presupposes that he will do to accomplish its purpose."). CIBC should not receive a windfall recovery based on an event of default which it created.

16. CIBC has continued to persist in bad faith conduct during the term of these proceedings. The Debtors propounded discovery and document requests to CIBC. CIBC responded very late, producing 27,000 pages of largely irrelevant, non-responsive and duplicative documents, including multiple copies of spreadsheets each containing hundreds of blank pages. On September 30, 2012, approximately two weeks prior to trial, CIBC provided additional documents responsive to the request that it had not previously provided, which consisted of over 45,000 pages, including 743 additional documents and consisting of over 9,000 pages of non-spreadsheet documents which CIBC admitted the Debtors had never before seen. Obviously, it was impossible to review those documents in time for the trial so it is unknown at this time what additional evidence those documents will provide. However, it shows CIBC's continued bad faith in dealing with the Debtors, both in the loan process and in connection with these proceedings.

### 4. Waiver/Estoppel

17. California law recognizes the equitable doctrine of waiver. Waiver may be shown by conduct, and it may be the result of an act which, according to its natural import, is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished. *Howard J. White, Inc. v. Varian Associates*, 178 Cal. App. 2d 348, 355 (Cal. App. 1st Dist. 1960). CIBC's conduct evinced its intent not to assert default interest while negotiations were ongoing. The evidence will show that the Debtors reasonably believed that the parties had an agreement in principle in the summer of 2011. The evidence will also show that CIBC never assessed or asserted default interest or late charges as late as August 2011. It was only when negotiations broke down and CIBC filed its action for foreclosure that CIBC asserted its punitive default interest. The Debtors should not be punished further by accrual of default interest while they attempted good faith negotiations. No demand was made and invoices did not itemize any accrual.

### 5. CIBC Has The Burden To Prove That It Is Oversecured.

18. The Debtors' appraisal during the Bankruptcy Cases evidences that the Property's value was $41,000,000 as of October 2011. Section 506(b) of the Bankruptcy Code limits post-

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

7

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 11 of
22

petition interest and reasonable costs to the extent that a creditor is oversecured, and CIBC must prove that its Claim is oversecured, if that is indeed its position. *See In re Jack Kline Co.*, 440 B.R. 712, 732 (Bankr. S.D. Tex. 2010) (*citing Fin. Sec. Assurance, Inc. v. T-H New Orleans, L.P. (In re T-H New Orleans, L.P.*), 116 F.3d 790, 798 (5th Cir. 1997) ("Over-secured creditors ultimately bear the burden of proving, by a preponderance of evidence, that their claim is over-secured.").

19.     In any event, to the extent that the Claim exceeds the $41,000,000 valuation, it would not accrue post-petition interest, and CIBC's Allowed Secured Claim would be capped at such amount.  Regardless, for the reasons discussed herein and the Debtors' objection to the Claim, the Claim is not entitled to any default interest and late fees.

**D.     The Plan**

20.     Much of what has been argued by CIBC in its Opening Brief has been anticipated and addressed in the Trial Brief.  While these are detailed in the Declarations and set forth in the Debtors' Trial Brief, certain points are emphasized below. The Debtors in addition will be making additional modifications to the Plan in response to certain points raised by CIBC as follows:

**1.     Plan Modifications**

21.     While not expressly discussing them, CIBC mentions two aspects of the Plan which it contends are inequitable. First, CIBC objects on the ground that the Plan allows for prepayment of John and Rosalie Feece's General Unsecured Claims prior to payment to CIBC.  In fact, the Plan provided for the Debtors to defer payment on John and Rosalie Feece's General Unsecured Claims in the event of a shortfall that prevents the Debtors from making all required Plan payments.  The prepayment language was to permit prepayment of all Claims prior to the expiration of the Plan term in the event the Property was sold or refinanced.  In response to CIBC's concerns, the Debtors propose to add a provision to the Plan providing that there will be no payments on account of the Class 7 Claim unless and until the Allowed Class 2 Claim of CIBC is paid in full.

22.     Second, CIBC objects to the extent the Plan enables the members of the Debtors to receive distributions from cash flow without restrictions.  The Debtors again propose to add a provision providing that no draws will be paid by the Debtors to its members, with the exception that the Debtors may make a distribution at the end of each year commencing in 2013 to the extent there

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

DEBTORS' REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

remains a minimum of $500,000 in the Debtors' general account after payment of each such distribution.

## 2. Feasibility

### a. Tenant Improvement Costs

23. CIBC's reliance on only historical tenant improvement and lease commission costs is shortsighted and misleading. As noted in the Trial Brief and as will be demonstrated at trial, the Debtors capitalized on several opportunities for the Property resulting in long-term leases and increased occupancy rates. All were done in consultation with and with the approval of CIBC. Due to the Debtors' efforts, CIBC's collateral has been enhanced. Indeed, CIBC's expert agreed that the property was "well maintained" and stated that he "was particularly impressed by the behind-the-scenes part of the building" and that the "[Property] was very well done."

24. The Property's current high occupancy now points to a reduction of improvement and leasing costs. Doug Feece, the Debtors' leasing agent and project manager, will testify regarding the trends of the costs of improvements versus occupancy rates for the Property. He will note that historically, such costs increased prior to increasing occupancy of the Property because much of the space had not previously been improved for a long period, and each particular space must incorporate a number of non-recurring improvements before a tenant can occupy it. The Debtors increased the occupancy of the Property most substantially in the June 2008 timeframe and again, largely due to tenants who were lost in the recession, in the August 2012 timeframe. With these periods of leasing activity, the Debtors' costs would first increase and then, subsequent to each lease up period bringing the Property to around 90% full, drop dramatically. The Property now is approaching full vacancy and stability as it did prior to the recession. Further, most of the non-recurring tenant improvement costs have already been spent. It follows that tenant improvement costs will decrease.

25. The Debtors' expert has prepared a cash flow forecast projecting revenues and expenses over the term of the Plan (the "Forecast"). Among other assumptions, as set forth in his Declaration, he assumes an average of $500,000 for tenant improvements per year, which is consistent with Doug Feece's deposition testimony. He also assumes 10% vacancy/collection rate

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

9

similar to that used by both appraisers and a conservative lease rate of $1.70 adjusted over the term of the Plan. The forecast confirms that the Debtors will be able to service CIBC's Class 2 Claim at the 6.00% interest rate and to execute the Plan.

26. CIBC also surmises that because the market has a 20-25% vacancy rate, the Debtors will need to lower their lease rates to compete with other lessors. This is not the reality. Asking rents have gone from $1.50 to $1.75 per square foot, and short term or month-to-month tenants have renewed with 3-5 year terms. The Debtors have been able to re-lease several improved spaces with minimal, if any, tenant improvements because they are now up-to-date and easily leased with minimal changes. The Debtors also have completed common area improvements which will attract tenants and reduce operational costs. The need for future improvements is substantially decreased and related costs will be considerably less, certainly for the term of the Plan.

27. Because the Debtors have accounted for improvement costs when negotiating leases, much of the cost has been amortized into leasing rates, resulting in higher than market rental rates which will be received over the terms of the respective leases, throughout the duration of the Plan. CIBC has relied on the March Projections in arguing that the Plan is not feasible. However, due to the continued increase in leasing activity, the Debtors have increased occupancy from 82% in March 2012 to 90% in September 2012, representing an increase of almost $400,000 in annual revenues.

28. At the end of the Plan term, there is no question that the Property will achieve a value which will enable the Debtors to refinance or sell the Property, and satisfy its obligations to CIBC. In fact, CIBC's expert, using understated revenue and cash available for debt service from the March Projections, calculated the Debtors' implied value at the end of the Plan's term and concedes that the Property's implied value will be sufficient to pay the loan balance at that time. Mr. Rodriguez's cash flow forecast also indicates that the Property will have a capitalized value at the end of the Plan term sufficient to satisfy the loan balance.

### b. The Debtor's Projections

29. CIBC questions the Debtors' September Projections. However, they are based on actual data when available to the Debtors as well as their intimate knowledge of tenants, their leases and the condition of the Property. Also, as occupancy continues to grow, estimating future leasing

RAF/esg
K:\Community Towers Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

10

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 14 of 22

costs is simplified as there is simply less space to rent. Increased occupancy also enables the Debtors to be more aggressive with lease rates going forward.

30.     In sum, CIBC's entire argument that the Plan is not feasible is based on draconian like assumptions - *e.g.*, tenant improvement costs must increase or lease rates must drop to remain competitive with the market, the Debtors will need to make improvement expenditures at the same or greater rates, negative absorption will cause occupancy to drop, the Debtors have made and must continue to make exorbitant, "lavish" improvements, etc. – which do not reflect the reality of what has occurred and will occur. By ignoring reality, CIBC has shown that it has been, and still is, fundamentally out of touch with the Property, both in its physical and operational condition. The fact is that the Debtors have invested substantial capital, time and resources, with CIBC's approval, to accomplish what the parties intended – establish a well maintained, first class property continuing to outperform the market, which is now near stability.

### c.     Concerns of Fairness and Equity

31.     CIBC argues that the Plan shifts the risk of loss onto CIBC and points to the high LTV ratio of the restructured loan under the Plan, as the indicator of the risk to be borne by CIBC. The application of the *Till* analysis to develop an appropriate interest rate is intended to account for CIBC's risk. The *Till* plurality explained that the appropriate interest rate should be high enough to compensate the creditor for its risk but not so high that it will doom a plan. *Till*, 541 U.S. at 480. In other words, the secured creditor is not entitled to a windfall at the expense of the success of a proposed plan. Both experts address the LTV ratio in arriving at their respective proposed interest rates, and both assign approximately the same upward adjustment based on the high ratio, yet CIBC apparently believes it is entitled to more based on the same consideration.

32.     No party can dispute the Debtors' exemplary track record of managing the Property, but CIBC still portrays management as untrustworthy and a risk, based in large part on a few inadvertent errors in reporting during the Cases, even though the Debtors have always been transparent with their intentions and transactions. CIBC's example of the payment to Focus Bank is illustrative. Throughout their discussions with Focus Bank, the Debtors informed CIBC of all developments. CIBC agreed to a term which would allow John and Rosalie Feece to pay down the

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

11

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 15 of
22

line of credit from Focus Bank, and they made the payment to Focus Bank only after insuring there was sufficient cash on hand for the payment required under the Debtors' deal with CIBC. Similarly, while the unsecured Claims of John and Rosalie Feece were inadvertently overlooked in preparing Schedule F, the Debtors amended Schedule F as soon as the omission was discovered. CIBC has always been aware, through financial statements provided to CIBC, of the debt owed to John and Rosalie Feece, and the Debtors have produced backup documentation for the Claim to CIBC during these Cases. Internal documents produced by CIBC from early in the loan cycle make it clear that CIBC was fully aware of the loan well before any dispute arose between CIBC and the Debtors, and CIBC never made any objections or raised any issues related thereto. The errors identified by CIBC are not reflected in the Debtors' accounting records and are not at all indicative of management's ability to manage the Property, but were inadvertent omissions which resulted from the manual transfer of information from a computerized system to the forms required by the Bankruptcy Court.

33. Management has always been upfront with CIBC and the Court about its transactions and adhered to all applicable rules. As CIBC notes, the Debtors did request authority from the Court to release funds for Mr. Feece during the Bankruptcy Cases, which was denied. CIBC would have the Court believe that the Debtors' management will start to violate the terms of the Plan once confirmed. There is no reason to distrust management or to doubt its abilities to execute the Plan. Indeed, CIBC's own internal reports attributed a *zero* risk score to the Debtors' management and indicate that it was comfortable in management's ability to meet projections. This newfound "distrust" of management is solely a litigation strategy rather than a reality.

34. CIBC dramatically asserts that a Plan provision pertaining to the potential acquisition by eminent domain of a strip of land by the City of San Jose Redevelopment Agency (the "RDA") is inequitable and as indicia of management's greed. As the Debtors have stated, that contract with the RDA is no longer in effect, and they do not anticipate that the taking of the land by the RDA will go forward, but even if it were to do so, CIBC is not necessarily entitled to the proceeds.

California Code of Civil Procedure Section 1265.225 provides as follows:

/ / /

/ / /

RAF/esg
K:\Community Towers I\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

(a)     Where there is a partial taking of property encumbered by a lien, the lienholder may share in the award only to the extent determined by the court to be necessary to prevent an impairment of the security, and the lien shall continue upon the part of the property not taken as security for the unpaid portion of the indebtedness.

(b)     Notwithstanding subdivision (a), the lienholder and the property owner may at any time after commencement of the proceeding agree that some or all of the award shall be apportioned to the lienholder on the indebtedness.

35.     Therefore, CIBC would only be entitled to proceeds from the taking by the RDA if the Property is impaired and its value is diminished. The taking of the portion of the Property would amount to a minimal loss of parking spaces for the buildings, but would result in providing two way street access to the Property. Therefore, if the taking by the RDA does come to fruition, it may actually enhance the value of the Property. In any event, the Debtors propose to modify the Plan to indicate that CIBC will receive its allocation of proceeds, if any, from the RDA transactions to which it is entitled under applicable California law. If approved by the Court at the Confirmation Hearing, such modification will be incorporated into any order of confirmation proposed to the Court. Further, contrary to CIBC's implications that this will somehow inure to the benefit of John and Rosalie Feece, in fact, the Debtors would be retaining those funds as working capital reserves. To the extent that is not clear in the Plan, the Debtors are agreeable to modify the Plan to so provide.

36.     CIBC objects to the elimination of reserves under the Plan, focusing on its purported need to control cash during the Plan due to the "marginal" feasibility of the Plan and its newly invented distrust of the Debtors' management. As set forth in the Debtors' objection to CIBC's Claim, however, the TI/LC Reserve foisted on the Debtors was unconscionable and certainly does not warrant inclusion in the Plan. The Debtors have demonstrated that the Plan is feasible and that the risk to CIBC is minimal. CIBC apparently would like to control the Debtors' cash under the terms of the confirmed Plan and ostensibly control the Debtors' ability to execute the terms of the Plan. CIBC's past conduct evidences its mindset. After the Extension, the Debtors made the first three payments into the TI/LC Reserve, but because CIBC would not promptly issue reimbursements from the TI/LC Reserve (or refused because certain requests did not meet all technical requirements for disbursement), the Debtors were required to cease making payments to the reserve so they could

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

13

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

instead use those funds to pay off outstanding accounts payable to vendors, contractors and real estate agents essential to keep the business running. Thus, it was CIBC who favored itself while controlling the Debtors' funds, forcing the Debtors to take action on behalf of its creditors and its business operations. Moreover, as the Debtors have established, improvements and leasing commissions will be substantially reduced during the term of the Plan so any TI/LC Reserve is no longer needed. At any rate, the Plan already provides for payments to CIBC with an interest rate to compensate it for its risk.

37. With respect to reserves for property taxes, the Plan provides for payments to Santa Clara County for property taxes under Class 1. In fact, in the past, on at least two occasions, CIBC issued payment to Santa Clara County late. One such late payment resulted in late charges being imposed while the other required John and Rosalie Feece to personally loan the required funds to the Debtors so the payment could be made timely, and such loan was repaid only when CIBC released the property tax funds from its escrow. Consequently, there is justifiable concern on the Debtors' part that CIBC would fail to make payments when required, which could jeopardize the Plan.

38. CIBC proffers a blanket argument that a material extension of an original obligation to a creditor is not fair and equitable, relying on *In re Peterson*, 95 B.R. 663, 664 (Bankr. W.D. Mo. 1988), a case in which the subject loan was for $25,000 and does not appear to involve real property. Contrary to CIBC's conclusion, the *Peterson* decision does not mention the term of the loan nor does it indicate that a matured note is "inherently, a short term note" or conclude that a matured note may not be extended for any substantial duration. It does, however, explain that "the principle of extension is the quintessential substance of chapter 11 reorganization" and that "the extension of the indebtedness owed to such creditor must be within 'reasonable' limits." *Id*. at 664. In a commercial real property case, one bankruptcy court made clear that "[n]othing in § 1129(b)(2) prohibits the modification of secured claims by extending or deferring the contract term for repayment." *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 37 (Bankr. D. Kan. 2001). As noted therein:

///

///

///

RAF/esg
K:\Community Towers I\Pl\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

14

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 18 of 22

> Given that the marketplace offers loans secured by realty for much longer amortization, courts typically allow debtors to extend the terms of real estate loans, to the extent the term does not exceed what the marketplace offers. For example, 30 year amortization is available for residential and some commercial property; thus, extending a mortgage for another 30 years is often viewed as fair and equitable.

Id at 38.

39. Here, the Plan proposes to extend the loan for only five years with an interest rate intended to compensate CIBC for its risk and for the time value of its money. Even CIBC's own expert notes that the term of the Plan is minimal and assigns a downward adjustment in his interest rate analysis.

### d. Interest Rate

40. Both experts agree that there is no mainstream market for the loan contemplated by the Plan and that the *Till* formula-based approach to determine the proper rate of interest is appropriate. They disagree on application of the formula. The Debtors therefore only highlight some of the issues raised by CIBC below.

41. Mr. Rodriguez discusses the divergence between his and Mr. Ferrell's philosophies in determining an appropriate rate of interest. As Mr. Rodriguez explains, on the one hand, Mr. Ferrell views CIBC is entitled to a yield from the perspective of an investor who paid cash for the Property while, on the other hand, Mr. Rodriguez views CIBC as a lender entitled to a fair rate of interest and repayment. Mr. Rodriguez's view is substantially more aligned with what the *Till* plurality intended when arriving at its formula rate calculation:

> [F]rom the point of view of a creditor, the cramdown provision mandates an objective rather than a subjective inquiry. That is, although § 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cramdown loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cramdown terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cramdown" loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose.

*Till*, 541 U.S. at 476.

/ / /

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

15

DEBTORS' REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

### i) Circumstances of the Estate

42. CIBC complains that Mr. Rodriguez makes a downward adjustment for circumstances of the estate because of his assessment of the Debtors' quality of management, business plan and investment in the Property. Yet its own expert has agreed that management has done a good job. The Debtors commitment to the Property is unquestioned. They have invested nearly $19,000,000 into the Property, representing the results of a lifetime of work and investment results of John and Rosalie Feece. It is also outrageous that CIBC questions the Debtors' commitment to the Property and to Creditors when it has invested so much time and effort into developing the Property and goodwill with tenants and vendors, including during the pendency of these bankruptcy proceedings. CIBC has approved all proposals made by the Debtors during these bankruptcy proceedings, and have not questioned the management or effort being expended by the Debtors in preserving and enhancing the value of this asset. This simply illustrates CIBC's litigation posturing rather than an objective view required under the formula approach. *Till*, 541 U.S. 465, 476-477 (U.S. 2004) ("the cram down provision mandates an objective rather than a subjective inquiry . . . a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose.").

### ii) Nature of the Security

43. With respect to this factor, CIBC notes that an upward adjustment of 1% is warranted although Mr. Ferrell concludes that a 3.65% adjustment is appropriate and Mr. Rodriguez concludes that a 1.50% adjustment is appropriate. CIBC also notes that "the reason Debtors have been able to offer high TIs is that they have not been paying CIBC" but fails to acknowledge that the Debtors initiated tenant improvements, only after consultation with and approval from CIBC, which have resulted in considerable enhancements to the value of the Property and hence to CIBC's collateral. Tenant improvements costs above what would be considered standard have been amortized into higher lease rates over longer terms, making cash flow from the Property higher and more stable, which actually enhances the ability of the Debtors to perform the Plan.

44. Mr. Ferrell attributes an upward adjustment of 2.00% based on the fact that the

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

DEBTORS' REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Property is an office building.  As discussed in greater detail in Mr. Rodriguez's declaration, this adjustment appears to be (a) calculated using a "market" rate as the base rate, and not a risk free rate as required by *Till*, (b) supported by a survey of lenders who themselves did not report a 2.00% spread based on the fact that the asset being financed was an office building, and (c) based on a blended rate analysis which is not espoused by *Till*.  It also appears to be duplicative to Mr. Ferrell's 1.65% adjustment to the extent it considers LTV and debt service coverage ratios, and to other risk factor adjustments made by Mr. Ferrell under the *Till* analysis.  The arbitrary 2.00% add-on is therefore not justifiable.  If that 2.00% add-on is eliminated, both experts arrive at approximately the same rate, albeit through different paths.

### iii)  Duration

45.     CIBC questions Mr. Rodriguez's application of a 0.5% upward adjustment for this factor because he references an article which he used as guidance to arrive at his number, and labels his approach "entirely artificial and unsubstantiated."  Mr. Rodriguez is a qualified expert and has been retained to provide his opinion which he has done, regardless of CIBC's dismissive statements and non-expert opinions.  In fact, Mr. Rodriguez indicated that his inclination was not to provide any adjustment (and indeed, Mr. Ferrell assigned a 0.60% downward adjustment) but that he thought it would be appropriate under the letter and spirit of *Till*.  Moreover, Mr. Rodriguez has further substantiated his adjustment as set forth in his Declaration.

### iv)  Feasibility

46.     Both parties' experts have assigned a 1.00% upward adjustment based on this factor.  Several salient points discussed by Mr. Rodriguez in his Declaration warrant mentioning here.  First, Mr. Ferrell's adjustment was based at least in part on his assumption that the Plan proposes a floating rate of interest which it does not.  Second, Mr. Ferrell's consideration of competing inventory in the market was also included in his consideration of the nature of the security so it is duplicative.  Third, Mr. Ferrell makes unwarranted conclusions.  For example, he ignores current market reports and actual leasing activity in concluding that the Property supports a market rate between $1.50-$1.60 per square foot and he over emphasizes the rollover risk when the Debtors' experience indicates that this has not been a significant problem.  Given that Mr. Ferrell's analysis

RAF/esg
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Reply\v12.docx

17

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

assumed a variable loan based on the prime rate, Mr. Ferrell's adjustment stands to be decreased from the 1.00% originally proposed.

### III.     CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should overrule CIBC's objections and confirm the Plan.

Dated:  October 10, 2012

**MURRAY & MURRAY**
A Professional Corporation

By:    */s/ Robert A. Franklin*
Robert A. Franklin
Attorneys for Debtors

RAF/esg
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan
Confirmation\Reply\v12.docx

18

DEBTORS' REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF THE DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 208    Filed: 10/10/12    Entered: 10/10/12 17:37:58    Page 22 of 22