JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  jwmurray@murraylaw.com
Email:  rfranklin@murraylaw.com
Email:  thwang@murraylaw.com

Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| | Cases Jointly Administered |
| **COMMUNITY TOWERS I, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 75-2456729, | Case No. 11-58944-SLJ-11 |
| **COMMUNITY TOWERS II, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 75-2560662, | Case No. 11-58945-SLJ-11 |
| **COMMUNITY TOWERS III, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 32-0065635, | Case No. 11-58948-SLJ-11 |
| **COMMUNITY TOWERS IV, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 77-0379075, | Case No.  11-58949-SLJ-11 |
| Debtor(s). | Date:      December 5, 2012 Time:      10:00 a.m. Place:     United States Bankruptcy Court             280 S. First St., Room 3099             San Jose, CA  95113 Judge:    Honorable Stephen L. Johnson |
| 111 W. Saint John Street, Suite 705 San Jose, California 95113 | |

## DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

TTH/sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\v14.docx

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 1 of
33

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   REQUEST FOR JUDICIAL NOTICE ................................................................ 1

III.  DISCUSSION ...................................................................................................... 2

      A.    11 U.S.C. § 1129(a)(1) - PLAN COMPLIANCE WITH CHAPTER 11. ................. 2
      B.    11 U.S.C. § 1129(a)(2) – PROPONENTS' COMPLIANCE WITH CHAPTER 11 ... 4
      C.    11 U.S.C. § 1129(a)(3) - PLAN PROPOSED IN GOOD FAITH ............................ 5
      D.    11 U.S.C. § 1129(a)(4) - DISCLOSURE OF PAYMENTS ................................... 5
      E.    11 U.S.C. § 1129(a)(5) - INSIDERS ...................................................................... 6
      F.    11 U.S.C. § 1129(a)(6) - RATE CHANGE APPROVED BY REGULATORY
            COMMISSION ........................................................................................................ 6
      G.    11 U.S.C. § 1129(a)(7) - ACCEPTANCES/BEST INTEREST ............................. 6
      H.    11 U.S.C. § 1129(a)(8) - ACCEPTANCES/UNIMPAIRED .................................. 13
      I.    11 U.S.C. § 1129(a)(9) - ADMINISTRATIVE EXPENSES/OTHER .................... 14
      J.    11 U.S.C. § 1129(a)(10) - ACCEPTANCE BY ONE IMPAIRED CLASS ............. 14
      K.    11 U.S.C. § 1129(a)(11) - FEASIBILITY OF THE PLAN .................................... 14
      L.    11 U.S.C. § 1129(a)(12) - BANKRUPTCY FEES ............................................... 20
      M.    11 U.S.C. § 1129(a)(13) through (16) – INAPPLICABLE .................................... 20
      N.    11 U.S.C. § 1129(b)(1) and (2) - CRAMDOWN ................................................... 20
      O.    11 U.S.C. § 1129(c) - TWO OR MORE PLANS. ................................................... 21
      P.    11 U.S.C. § 1129(d) - AVOIDANCE OF TAXES ................................................. 21
      Q.    OBJECTION TO CONFIRMATION. ..................................................................... 21
      R.    CIBC IS NOT ENTITLED TO DEFAULT INTEREST OR LATE FEES ............... 22

            1.    The Default Interest and Late Fee Provisions Are Unenforceable
                  Under Applicable Nonbankruptcy Law. ....................................................... 22
            2.    Equitable Grounds Under California Law ..................................................... 25

IV.   CONCLUSION ................................................................................................... 28

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\v14.docx

-i-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 2 of
33

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*,
9 Cal.3d 731 (1973) ................................................................................................ 24

*General Electric Capital Corp. v. Future Media Productions. Inc.*,
536 F.3d 969 (9th Cir. 2008) ................................................................................. 21

*GreenTree Financial Group v. Execute Sports, Inc.*
163 Cal. App. 4th 495 (2008) ................................................................................ 24

*Harbor Island Holdings v. Kim*,
107 Cal. App. 4th 790, 132 Cal. Rptr. 2d 406 (2003) .................................... 23, 24

*In re Acequia, Inc.*,
787 F.2d 1352 (9th Cir. 1986) ............................................................................... 14

*Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*,
169 B.R. 669 (D. Ariz. 1994) ................................................................................ 14

*Ridgley v. Topa Thrift & Loan Assn.*,
17 Cal. 4th 970 (Cal. 1998) ........................................................................ 22, 23, 24

*Sutherland v. Barclays American/Mortgage Corp.*,
53 Cal. App. 4th 299 (Cal. App. 2d Dist. 1997) ................................................... 25

*Till v. SCS Credit Corp.*,
541 U.S. 465 (2004) ................................................................................................ 7

*Varela v. Wells Fargo Bank*,
15 Cal. App. 3d 741 (Cal. App. 3d Dist. 1971) .................................................... 25

### STATUTES

11 U.S.C. § 507(a) ........................................................................................................ 14

11 U.S.C. § 507(a)(2), § 507(a)(3) and § 507(a)(8) ..................................................... 2

11 U.S.C. § 1121 ............................................................................................................ 5

11 U.S.C. § 1122 ............................................................................................................ 3

11 U.S.C. § 1123(a)(6) ................................................................................................... 3

11 U.S.C. § 1125 ............................................................................................................ 5

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-ii-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

11 U.S.C. § 1129(a) ............................................................................................................. 20

11 U.S.C. § 1129(a)(1) ...................................................................................................... 2, 4

11 U.S.C. § 1129(a)(2) ...................................................................................................... 4, 5

11 U.S.C. § 1129(a)(3) ......................................................................................................... 5

11 U.S.C. § 1129(a)(4) ......................................................................................................... 5

11 U.S.C. § 1129(a)(5) ......................................................................................................... 6

11 U.S.C. § 1129(a)(6) ......................................................................................................... 6

11 U.S.C. § 1129(a)(7) ...................................................................................................... 6, 13

11 U.S.C. § 1129(a)(8) ..................................................................................................... 13, 20

11 U.S.C. § 1129(a)(9) ........................................................................................................ 14

11 U.S.C. § 1129(a)(9)(A) ................................................................................................... 14

11 U.S.C. § 1129(a)(9)(B) ................................................................................................... 14

11 U.S.C. § 1129(a)(9)(C) ................................................................................................... 14

11 U.S.C. § 1129(a)(10) ...................................................................................................... 14

11 U.S.C. § 1129(a)(11) ................................................................................................... 12, 14

11 U.S.C. § 1129(a)(12) ...................................................................................................... 19

11 U.S.C. § 1129(a)(13) ...................................................................................................... 20

11 U.S.C. § 1129(a)(14) ...................................................................................................... 20

11 U.S.C. § 1129(a)(15) ...................................................................................................... 20

11 U.S.C. § 1129(b) ............................................................................................................ 20

11 U.S.C. § 1129(b)(1) and (2) ............................................................................................ 20

11 U.S.C. § 1129(c) ............................................................................................................ 21

11 U.S.C. § 1129(d) ............................................................................................................ 21

28 U.S.C. § 1930 ................................................................................................................ 19

California Civil Code § 1671 ................................................................................................ 22

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\v14.docx

-iii-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 4 of
33

| | |
|---|---|
| **OTHER AUTHORITIES** | |
| Rule 9017 of the Federal Rules of Bankruptcy Procedure .................................................... 1 | |
| Rule 201 of the Federal Rules of Evidence ........................................................ 1 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-iv-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

# I.    INTRODUCTION

Community Towers I, LLC; Community Towers II, LLC; Community Towers III, LLC; and Community Towers IV, LLC; the debtors and debtors in possession herein (the "Debtors"), hereby submit their post-trial brief (the "Brief") in support of the DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) (the "March 27 Plan" and, as modified by the FIRST MODIFICATION TO DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) filed on August 31, 2012, the "Plan").[1]  This Brief is supported by the DECLARATION OF ERIC MOGENSEN IN SUPPORT OF DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN (the "Mogensen Supplemental Declaration") filed concurrently herewith and the REQUEST FOR JUDICIAL NOTICE below.

The Debtors submit this Brief pursuant to the Court's direction at the hearing on the Confirmation of the Plan and CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN held on October 15 and 16, 2012 (the "Trial").  In this Brief, the Debtors will review the requirements for Confirmation, explain how these requirements have been satisfied, and discuss CIBC's objections in the context of these requirements.

## II.    REQUEST FOR JUDICIAL NOTICE

1.    Rule 201 of the Federal Rules of Evidence ("Fed. R. Evid."), made applicable to bankruptcy proceedings pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), allows a court to take judicial notice of facts that are not subject to reasonable dispute because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. Rule 201.  Pursuant to Fed. R. Evid. Rule 201, the Debtors request that this Court take judicial notice of the Wall Street Journal article dated October 18, 2012, attached as Exhibit "A" to the Mogensen Supplemental Declaration.

/ / /

---

[1]  Capitalized terms used herein but not separately defined shall have the meanings ascribed to them in the Plan and the DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN (the "Trial Brief") filed on October 5, 2012.  A term that is not defined herein, in the Plan or in the Trial Brief, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules.

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 6 of 33

# III.    DISCUSSION

## A.    11 U.S.C. § 1129(a)(1) - PLAN COMPLIANCE WITH CHAPTER 11

2.    The Plan complies with the applicable provisions of title 11, United States Code, as follows:

a.    § 1123(a)(1) - The Plan designates seven (7) classes of Claims other than claims of the kind specified in 11 U.S.C. § 507(a)(2), § 507(a)(3) and § 507(a)(8), and a class of Interests [Plan, Article II].

b.    § 1123(a)(2) - The Plan specifies classes of Claims and a class of Interests that are not impaired under the Plan [Plan, Article III] as follows: Class 1 (Allowed Secured Claim of the Santa Clara County Tax Collector), Class 3 (Priority Claims), Class 4 (Pre-Paid Rent Claims) and Class 8 (Interests).

c.    § 1123(a)(3) - The Plan specifies classes of Claims which are impaired under the Plan and their treatment under the Plan as follows [Plan, Article V]: Class 2 (Allowed Secured Claim of CIBC), Class 5 (Lease Deposit Claims), Class 6 (Allowed General Unsecured Claims), and Class 7 (General Unsecured Claims of John and Rosalie Feece).

d.    § 1123(a)(4) - The Plan provides the same treatment for each Claim and Interest of a particular class. [Plan, Articles III, IV and V].

e.    § 1123(a)(5) – This Plan provides adequate means for the Debtors to execute and implement the Plan by, among other things: (i) authorizing the Reorganized Debtors to continue to operate the Property and to use cash on hand and cash generated from business operations to perform their obligations under the Plan [Plan, Section 6.1]; (ii) in the event that the Reorganized Debtors do not have sufficient funds on the Effective Date to make the payments provided for in the Plan to the holders of Allowed Administrative Claims, Tax Claims and Class 3 Priority Claims, providing that any Member of any Debtor or any affiliate of any Debtor may, in their discretion, loan sufficient funds to the Reorganized Debtors to make such payments, with any such loans to be accorded treatment as Class 6 Claims [Plan, Section 6.2]; (iii) in the event that the Reorganized Debtors do not have sufficient funds to make any payments provided in the Plan, providing that any Member of any Debtor or any affiliate of any Debtor may, in their discretion, loan sufficient funds to

the Reorganized Debtors to make such payments, with any such loans to be accorded treatment as Class 6 Claims [Plan, Section 6.4.4]; (iv) designating a Responsible Person and a Disbursing Agent, and authorizing the Reorganized Debtors and the Responsible Person to employ or contract with Persons and other Entities to perform, or advise and assist in the performance of, the obligations of the Debtors under the Plan, and as otherwise necessary in the Cases [Plan, Sections 6.5, 6.6 and 6.11]; and (v) providing for the application and entry of the Final Decree at such time as the Bankruptcy Cases are in a condition to be closed [Plan, Section 6.16.3].

        f.     § 1123(a)(6) - The order confirming the Plan will direct that, if required, the Debtors' articles and charter will be amended as of the Effective Date to comply with the requirements of section 1123(a)(6) of the Bankruptcy Code.

        g.     § 1123(a)(7) - The Plan contains only provisions that are consistent with the interests of Creditors and Interest Holders and with public policy with respect to the manner of selection of any officer, director, manager or the Responsible Person under the Plan and any successor to such person. The Plan outlines the authority and responsibilities of the Responsible Person and provides a mechanism for parties in interest to remove him. [Plan, Section 6.5].

        h.     § 1123(b)(1) - The Plan impairs Classes 2, 5, 6 and 7 of Claims and leaves unimpaired Classes 1, 3, and 4 of Claims and Class 8 of Interests. [Plan, Articles III and V].

        i.     § 1123(b)(2) - The Plan provides for the assumption or rejection of executory contracts and unexpired leases of the Debtors. [Plan, Article VII].

        j.     § 1123(b)(3) - The Plan provides for the preservation of certain Retained Claims by the Reorganized Debtors. [Plan, Article X].

        k.     § 1123(b)(5) – The Plan modifies the rights of the holders of Allowed Claims in Classes 2, 5, 6 and 7, and leaves unaffected the rights of the holders of Allowed Claims in Classes 1, 3, and 4 and the Allowed Interests in Class 8. [Plan, Articles III and V].

        l.     § 1122(a) – The Plan does not purposefully organize and/or segregate classes to artificially impair them. Instead, the Plan places a Claim or Interest in a particular class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. [Plan, Article II]. Therefore, section 1122 of the Bankruptcy Code is satisfied.

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-3-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

m.   CIBC's Objections

(1)   CIBC contends that the Plan modifies third-party guarantees in violation of section 1129(a)(1).  The Plan does not modify any third party obligations.  The payment guaranty executed by John and Rosalie Feece provides neither guarantor's obligations are impaired or changed by reason of the Debtors' bankruptcy.  To the extent this requires any further clarification, the Debtors are willing to modify the Plan to so clarify.

(2)   CIBC objects to the elimination of reserve accounts under the Plan. However, the tenant improvement ("TI") and leasing commission reserve (the "TI/LC Reserve") provision under the loan extension was arbitrary, capricious, unconscionable and oppressive when CIBC imposed it on the Debtors, and does not warrant inclusion in the Plan.  In addition, CIBC has demonstrated its willingness to unreasonably and arbitrarily control the Debtors' funds in the reserve accounts to the detriment of the Debtors and third parties. [John Feece Dec. at ¶27].  At any rate, improvements and leasing commissions will be substantially reduced during the term of the Plan so any TI/LC reserve is unnecessary.

(3)   The Debtors have proposed modifying the Plan to address CIBC's other purported concerns about fairness and equity.  Specifically, (1) John and Rosalie Feece, the holders of the Allowed Class 7 Claim, have consented to a modification of the Plan that will provide that there will be no payments on account of the Class 7 Claim unless and until the Allowed Class 2 Claim of CIBC is paid in full; (2) the Plan will be modified to provide that no draws will be paid by the Debtors to their Members until the Allowed Class 2 Claim of CIBC is paid in full, with the limited exception that the Debtors may make a distribution to their Members at the end of each year commencing in 2013 as long as there remains a minimum of $500,000 in the Debtors' general account after payment of each such distribution; and (3) the Plan will be modified to provide that CIBC will receive that portion of the proceeds from any transaction with the San Jose Redevelopment Agency to which it is entitled under applicable California law[2].

**B.   11 U.S.C. § 1129(a)(2) – PROPONENTS' COMPLIANCE WITH CHAPTER 11**

3.   Section 1129(a)(2) of the Bankruptcy Code requires that "the proponent of the plan

---

[2] CIBC's rights in this regard would therefore be the same as they were as of the Petition Date.

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\v14.docx

-4-

complies with the applicable provisions of this title" and focuses on the applicable activities of a plan proponent under the Bankruptcy Code. The "applicable provisions" of title 11 are section 1121 of the Bankruptcy Code (regarding who may file a plan) and section 1125 of the Bankruptcy Code (regarding the solicitation of acceptances of a plan). Here, the Debtors are the proponents of the Plan, are entities entitled to file a plan pursuant to section 1121 of the Bankruptcy Code, and have complied with the applicable provisions of title 11 of the United States Code. On April 4, 2012, the Bankruptcy Court entered its FIRST AMENDED ORDER APPROVING DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) AND FIXING TIME FOR FILING ACCEPTANCES OR REJECTIONS OF PLAN AND OBJECTIONS TO CONFIRMATION OF PLAN, COMBINED WITH NOTICE THEREOF (the "Disclosure Statement Order"), approving the Disclosure Statement and establishing the procedures and deadlines pursuant to which the Debtors could solicit votes on the Plan. The Debtors have complied with the Disclosure Statement Order as modified, as evidenced by the CERTIFICATES OF SERVICE filed on the docket in these Bankruptcy Cases. [Docket Entry Nos. 130, 134, 138, 139 170 and171]. Therefore, the Debtors have complied with the provisions of section 1129(a)(2) of the Bankruptcy Code.

## C. 11 U.S.C. § 1129(a)(3) - PLAN PROPOSED IN GOOD FAITH

4. The Debtors have proposed the Plan in good faith and not by any means prohibited by law. The Plan will achieve a result consistent with the Bankruptcy Code. The Debtors have proposed the Plan (a) with the legitimate purpose of conducting an orderly reorganization of the Debtors' business affairs, (b) which provides the means to preserve and maintain the viability of Debtors' business going forward and the continued operation and leasing of units in the Property, and (c) which provides for payment in full of all Creditors. No party in interest has raised any issue as to the Debtors' good faith in proposing the Plan, although CIBC has submitted its objections to the Plan which the Debtors addressed at Trial and in their various pleadings in support of the Plan, including this Brief.

## D. 11 U.S.C. § 1129(a)(4) - DISCLOSURE OF PAYMENTS

5. The terms of employment of all professionals have been disclosed by the Debtors and have been approved by the Bankruptcy Court throughout the Bankruptcy Cases. Payments made or

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

to be made by the Debtors for services or costs and expenses in connection with the Bankruptcy Cases, or in connection with the Plan and incident to the Bankruptcy Cases, have been approved by the Bankruptcy Court as reasonable or are subject to the approval of this Bankruptcy Court as reasonable. Post-Confirmation, the Plan provides for notice and an opportunity to object and be heard regarding fees and expenses incurred. [Plan, Section 6.12]

**E.    11 U.S.C. § 1129(a)(5) – INSIDERS**

6.    The Debtors have disclosed the identity and affiliation of the individual proposed to serve, after Confirmation of the Plan, as the Responsible Person and to act as the Estate representative of the Reorganized Debtors. [Plan, Section 6.5]. As set forth in the Disclosure Statement, John L. Feece, the proposed Responsible Person for the Reorganized Debtors under the Plan, was appointed on October 7, 2011 by the Bankruptcy Court as the Responsible Individual of the Debtors in the Bankruptcy Cases. [Disclosure Statement, Section 7.2]. In addition, the Disclosure Statement discloses that John L. Feece shall serve as the Reorganized Debtors' Chief Executive Officer and that Community Management will continue to manage the Property post-Confirmation. [Disclosure Statement, Article XXIII].

**F.    11 U.S.C. § 1129(a)(6) - RATE CHANGE APPROVED BY REGULATORY COMMISSION**

7.    The Plan does not provide for any changes of regulated rates subject to the jurisdiction of a regulatory commission, and no governmental agency regulates prices of any products of the Debtors. Accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**G.    11 U.S.C. § 1129(a)(7) - ACCEPTANCES/BEST INTEREST**

a.    Best Interests of Creditors.

8.    The Plan provides for the payment in full to all Creditors. As such, each holder of an Allowed Claim will receive property of a value, as of the Effective Date of the Plan that is not less than the amount that such holder would so receive if the Debtors were liquidated under chapter 7 of title 11, United States Code**.**

9.    CIBC, the holder of the Secured Claim in Class 2, voted to reject the Plan. Nonetheless, the Plan satisfies the "best interests" test with respect to all classes of Claims, including

Class 2, as it provides for the Debtors to reorganize their business operations and to maximize value for all Creditors in the most cost-effective manner. The Debtors may pay Allowed Claims over time so long as interest is paid as compensation for the time value of money. Here, the Plan provides for payment in full on all Allowed Claims with interest.

                  **b.** <u>Interest Rate</u>

10. CIBC contends that it would receive more in a chapter 7 liquidation because it disputes that the rate of interest it will be paid under the Plan will compensate it for the five-year delay in payment proposed by the Plan. However, the appropriate rate of interest proposed by the Debtors is 6.0%, and such rate will in fact compensate CIBC for the time value of its Allowed Secured Claim.

11. The Debtors' expert witness, Rick Rodriguez, submitted his expert report and his supporting Declaration which establish why the 6.0% interest rate proposed in the Debtors' Plan is appropriate using the analysis set forth in *Till v. SCS Credit Corp.*, 541 U.S. 465, 484-85 (2004) ("*Till*"). CIBC argues that Mr. Rodriguez does not understand the *Till* decision and misstates his position to require courts to ascertain an interest rate to make a plan confirmable. This implication, however, is not supported. Mr. Rodriguez testified that *Till* guides this Court to determine an interest rate that is on one hand fair to the lender and on the other hand allows the debtor an opportunity for a fresh start. [Transcript, p. 143, lines 4-13]. This is precisely what the U.S. Supreme Court intended in stating "[t]ogether with the cram down provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Till*, 541 U.S. at 480. Mr. Rodriguez also has explained the fundamental difference between his and Mr. Ferrell's (CIBC's expert witness) philosophies in determining a fair rate of interest. As Mr. Rodriguez explains, on the one hand, Mr. Ferrell's view is that CIBC is entitled to a yield from the perspective of an investor who paid cash for the Property while, on the other hand, Mr. Rodriguez views CIBC as a lender entitled to a fair rate of interest and repayment. [Rodriguez Dec. ¶¶79-81]. Mr. Rodriguez's understanding, therefore, is substantially more aligned with what the *Till* plurality intended when arriving at its formula rate calculation:

       [F]rom the point of view of a creditor, the cramdown provision

mandates an objective rather than a subjective inquiry. That is, although § 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cramdown loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cramdown terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cramdown" loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose.

*Till*, 541 U.S. at 476.

A secured creditor is not entitled to any upside. The Plan's success is not defined by the creditor sharing in the upside. The Plan is successful if the creditor's claim is paid in full. Mr. Ferrell backed off considerably from his comment that the Debtors would receive a "windfall" should they be allowed to share in any appreciation of the Property, acknowledging the significant sums that have been put into the Property by Mr. and Mrs. Feece, and the commitment and confidence they have shown to the success of the Plan in light of their willingness to defer Distributions until CIBC has been paid in full.

(1) Circumstances of the Estate

12. It is indisputable that the Debtors have done an exemplary job in managing the Property. Mr. Rodriguez has explained that a 0.25% downward adjustment to the interest rate is appropriate, in light of management's track record of outperforming the market, even during the recession, and given the fact that they accomplished this notwithstanding unreasonable and unconscionable terms imposed by CIBC. As Mr. Rodriguez points out, the family run character of the Debtors' business allows for more flexibility and the development of personal relationships with their tenants. This leads to more retention of tenants, less rollover, and reduced TI's and leasing commissions.

13. On the other hand, Mr. Ferrell proposes a 1.00% upward adjustment due to his perception that John and Rosalie Feece have not committed any new value and based on the Debtors' financial position. He chooses to ignore the $19 million invested by John and Rosalie Feece into the Property and their agreement to defer payment on their Class 7 Claims, among other contributions. Although he admits that these modifications increase the principal's commitment to

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-8-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

the Plan and incentivizes them to make the Plan work, he makes no further adjustment. In explaining his upward adjustment for this fact at Trial, Mr. Ferrell testified that he had not seen any financial statements of John and Rosalie Feece or any reaffirmation of Mr. Feece's guaranty. [Transcript, p. 253 at lines 2-18]. The Plan, however, does not alter such guaranty. Mr. Ferrell's upward adjustment is unwarranted.

14.     Now that CIBC is in litigation with Mr. Feece, it attempts to denigrate and question management's abilities. CIBC has always known and has accepted the fact the revenues from the Property have been the sole source of income for John and Rosalie Feece from the time the Property was acquired. Further, Mr. and Mrs. Feece have provided nearly $19 million to acquire and improve the Property and have been able to lease it to stabilization not once, but now two times. The Property was in a much worse position in 2006 with 65% occupancy and most of the square footage not having been renovated or touched since the 1960's. Yet, through John and Rosalie Feece's investment in the Property, it has been transformed into a high Class B property with a 90% occupancy rate, dominating its competition. Given its cash flow and Mr. Feece's role as a developer, it is not surprising that Mr. Feece valued the Property at $60 million; he did so after the Debtors had achieved an all-time high occupancy of over 90% around the beginning of 2009. Mr. Feece could not have predicted that the worst real estate market in recent memory would grow and endure like it did. Certainly, it is not unreasonable or unrealistic for the owner-developer of a building to have an optimistic view of the value of his property.

15.     It is clear that in 2006 when the loan was originally made, both parties expected and anticipated that the Debtors would achieve stabilization within three (3) years based on Mr. Feece's track record, and, at that time, permanent ten-year financing would be offered. [Debtors' Ex. 25, p. CIBC0000255]. The Debtors achieved what they set out to achieve, which CIBC specifically acknowledged several times. [*E.g.*, Debtors' Ex. 27, p. CIBC0001394]. Even at CIBC's valuation in 2009 of $43.5 million, the loan-to-value ("LTV") was around 76% which was still well below what had been the underwriting standard of 80% loan to value. Instead of honoring its commitment, however, CIBC imposed a short-term extension with extremely onerous terms in an attempt to make performance of the Debtors' and Mr. Feece's individual obligations impossible, apparently with the

intent of forcing the Debtors to sell the Property into a market which had very few buyers. Had CIBC not taken its bad faith approach with respect to extending the Note in 2009 by attempting to squeeze every drop of cash flow out of the Property and instead honored its commitment from 2006, the Debtors would be halfway through the permanent loan term, CIBC would have a performing loan, and it is highly probable that the bankruptcy would never have occurred.

16.     CIBC is simply reaching to invent ways to cast doubt on management. Management has always been upfront with CIBC and the Court about its transactions, and adhered to all applicable rules and regulations. Indeed, CIBC's expert recognizes management's efforts as "admirable" and CIBC's own internal reports prepared in a non-litigation context attributed a zero risk score to the Debtors' management and indicate that it was comfortable in management's ability to meet projections. [John Feece Dec. ¶ 41; Debtors' Ex. 32]. During the pendency of the Bankruptcy Cases, the Debtors have continued their impeccable management of the Property. CIBC has approved all proposals made by the Debtors during the Bankruptcy Cases and has not questioned the management or the effort being expended by the Debtors in preserving and enhancing the value of this asset. CIBC's allegations in this regard amount to no more than litigation posturing which runs counter to the objective view required under *Till*, 541 U.S. at 476-477 ("the cram down provision mandates an objective rather than a subjective inquiry . . . a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose.").

(2)     Nature of the Security

17.     Along with the circumstances of the estate, this *Till* factor stands as the most significant difference in the experts' opinions. Mr. Rodriguez performed a true *Till* analysis and arrived at his 1.5% upward adjustment after mitigating risk based on (i) management's track record of leasing, and (ii) the reliability of projected tenant rollover estimates by the Debtors' leasing agent who has established strong relationships with, and maintains intimate knowledge of, the Debtors' tenants. [Rodriguez Dec. ¶57; Doug Feece Dec. ¶5]. Mr. Ferrell came to a similar conclusion, but then attributed an additional 2.0% adjustment because of the fact that the Property is an office building. In his expert report, Mr. Ferrell cites a survey he performed. Mr. Ferrell claims that this

Case: 11-58944     Doc# 220     Filed: 10/30/12     Entered: 10/30/12 13:58:02     Page 15 of 33

portion of the analysis relates only to the 70% LTV portion of the loan, yet the chart includes a mezzanine and equity portion and arrives at a blended 6.9% interest rate which, presumably, would represent the total rate under Mr. Ferrell's analysis based on *North Valley Mall, LLC* (discussed below). Further, Mr. Ferrell uses a market-based analysis which is rejected by *Till* and is duplicative of the formula approach since the survey includes such factors as LTV and debt service coverage ratio as data points. Moreover, the survey references a very limited number of loans and lenders which are of various sizes and amortized over different ranges from 25 to 30 years, all but one of which have loan terms over five (5) years. In addition, the 5.25% interest rate based on the survey which Mr. Ferrell employs as his base rate, in contravention to the risk free rate required under *Till*, is highly questionable.[3] A recent article from the October 18, 2012 Wall Street Journal website indicates that interest rates in the commercial mortgage-backed securities ("CMBS") market are 3.5% to 4%. A true and correct copy of this article is attached as Exhibit "A" to the Mogensen Supplemental Declaration, and is incorporated herein by reference. It is also telling that CIBC chose not to introduce any evidence of its current lending rates in support of Mr. Ferrell's "market" rate. Had Mr. Ferrell used a more realistic 4% rate in his analysis instead of 5.25%, the resulting interest rate calculation would have been 6%, which is exactly what the Debtors are proposing.

18.     At Trial, Mr. Ferrell explained that he arrived at this adjustment based on his analysis of the capital markets. [Transcript, p. 259 at line 17 through p. 260 at line 17]. CIBC has argued that Mr. Ferrell's 2.0% adjustment was based on *North Valley Mall*, *LLC*, 432 B.R. at 831-32, wherein the bankruptcy court applied a blended rate which is not espoused by *Till*. In that case, however, both experts divided the loan into tranches in their analyses, and the court noted that "[b]oth the debtor and the bank in their briefs accept the blended rate approach in concept." *Id.* at 832. In other words, there, both parties agreed not to follow *Till* and the court based its analysis on their blended analyses. Here, both parties agree that *Till* is applicable. Following Mr. Ferrell's reasoning, a stabilized class A office building presents the same risk (2.00% over Prime Rate) as a class C half-leased office building in a completely different market simply because both assets are

---

[3] Indeed, Mr. Ferrell cites a chart of U.S. Treasury rates (which are generally accepted as a measure for risk-free rates) from Bloomberg which indicates that the 5-year yield for a security maturing in 2017 is 0.74%. [CIBC's Ex. Q, p. 32 at ¶5].

office buildings. *Till* mandates a rate that is both fair and equitable. Mr. Ferrell's decision to use a combined *Till/North Valley Mall* approach results in considering the same risk factors twice and results in an unreasonably high rate. If one eliminates the arbitrary 2.00% upward adjustment for the fact that the Property is an office building, the two experts arrive at essentially the same interest rate.

(3)     Duration

19.     Mr. Rodriguez's applied a 0.5% upward adjustment for this factor which he explains in his declaration. [Rodriguez Dec. ¶¶ 60-65]. Notably, Mr. Ferrell acknowledged the relatively short-term of the Plan reduces the risk to CIBC and assigned a 0.60% downward adjustment. Mr. Ferrell, however, applied this adjustment against his determination of "market" rate rather than prime rate, which is expressly prohibited by *Till*.

(4)     Feasibility

20.     This factor ties directly with section 1129(a)(11) of the Bankruptcy Code which requires that the Plan be feasible, and is discussed in greater detail below. A few points in the context of the experts' analysis warrant mentioning here. Both parties' experts have assigned a 1.00% upward adjustment based on this factor; however, Mr. Ferrell's adjustment should be decreased for several reasons. First, Mr. Ferrell's adjustment was based, at least in part, on his assumption that the Plan proposes a floating rate of interest which it does not. Mr. Ferrell testified that his opinion would not change based on the non-adjustable six percent rate because of the new risk that rate presents, as shown by a low debt service coverage ratio which is essentially one to one. [Transcript, p. 251 at line 24 through p. 252 at line 4]. However, as set forth in Mr. Rodriguez's report and discussed below with respect to feasibility of the Plan, the debt service coverage ratio is in fact higher through the term of the Plan.

21.     Second, Mr. Ferrell's consideration of competing inventory in the market was also included in his consideration of the nature of the security so it is duplicative. [Rodriguez Dec. ¶¶ 106-109, 113]. Third, Mr. Ferrell makes unwarranted conclusions. For example, he ignores current market reports and actual leasing activity in concluding that the Property supports a market rate between $1.50-$1.60 per square foot, and he over emphasizes the rollover risk when the Debtors' experience indicates that this has not been a significant problem. His TI analysis is overstated. In

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\v14.docx

-12-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

this case, historical TI expenses are not indicative of TI expenses going forward. The Kerio TI expense was a one-time cost and the added cost has been amortized into the rent escalation over the ten year term of the lease. Mr. Ferrell even erroneously concludes that "each tenant lease will expire at least once prior to proposed Plan termination, thus exposing Lender to significant revenue rollover risk." [CIBC's Ex. Q, p. 32]. In fact, four leases alone which comprise approximately 17% of the Property will extend beyond the Plan Term. [Debtors' Ex. 7].

c.  Chapter 7 Scenario

22.     In a chapter 7 liquidation, a trustee's costs in liquidating the Bankruptcy Estates would be substantial. Moreover, the impaired Class 7 Claims of John and Rosalie Feece would not be deferred and would receive treatment with all other General Unsecured Claims, and therefore the total General Unsecured Claim pool would be increased accordingly. A CIBC foreclosure would cause an instantaneous reduction in value and a "tainting" of the Property. Moreover, it is highly unlikely that CIBC could maintain the same relationships the Debtor has established with tenants, and would most likely be unable to maintain increasing occupancy rates, further devaluing the Property. A CIBC foreclosure would likely result in inadequate assets available from which to pay Pre-Paid Rent Claims, Lease Deposit Claims or General Unsecured Claims in full.

23.     At any rate, with the exception of CIBC, all Creditors have voted to accept the Plan, and, in light of the 6.0% interest rate to be accorded to CIBC's Allowed Class 2 Claim, members of each impaired class will receive on account of their Allowed Claims property of a value, as of the Effective Date that is not less (and likely is significantly more) than the amount they would receive if the Debtors were liquidated under Chapter 7 on such date or if CIBC were permitted to foreclose. The requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

## H.     11 U.S.C. § 1129(a)(8) - ACCEPTANCES/UNIMPAIRED

24.     Classes 1, 3, 4 and 8 are not Impaired under the Plan. As set forth in the BALLOT TABULATION AND SUBMISSION OF BALLOTS RE DEBTORS' PLAN OF REORGANIZATION (DATED MARCH 27, 2012) filed on May 25, 2012 [Docket No. 144] (the "Ballot Tabulation"), all members of impaired Class 5, Class 6 and Class 7 who returned a Ballot voted in favor of the Plan. CIBC, the holder of the Secured Claim in Class 2, was the only creditor who rejected the Plan. The Ballot

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-13-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

Tabulation demonstrates that the Plan has been accepted in writing by three (3) of the four (4) impaired classes entitled to vote on the Plan: Class 5 (Allowed Lease Deposit Claims), Class 6 (Allowed General Unsecured Claims), and Class 7 (Allowed General Unsecured Claims Of John and Rosalie Feece).

## I.  11 U.S.C. § 1129(a)(9) - ADMINISTRATIVE EXPENSES/OTHER

25.  The Plan provides treatment to Administrative Claims in accordance with section 1129(a)(9)(A) of the Bankruptcy Code. [Plan, Section 4.1].  The Plan provides treatment to Tax Claims in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. [Plan, Section 4.2]

26.  As of the Effective Date, there will not be any additional Claims entitled to priority under section 507(a) of the Bankruptcy Code; however, to the extent there are any such priority Claims, they are afforded treatment in Class 3 under the Plan in accordance with section 1129(a)(9)(B) of the Bankruptcy Code. [Plan, Section 3.2].

## J.  11 U.S.C. § 1129(a)(10) - ACCEPTANCE BY ONE IMPAIRED CLASS

27.  Impaired Class 5 (Allowed Lease Deposit Claims) and impaired Class 6 (Allowed General Unsecured Claims) accepted the Plan without the inclusion of any acceptance of the Plan by any insider.

## K.  11 U.S.C. § 1129(a)(11) - FEASIBILITY OF THE PLAN

28.  11 U.S.C. § 1129(a)(11) does not require that a plan is guaranteed to succeed but only that it has a "reasonable probability of success" and is not a "visionary scheme." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).  "The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required.  The mere potential for failure of the plan is insufficient to disprove feasibility." *Mutual Life Ins. Co. v. Patrician St. Joseph Partners, Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 674 (D. Ariz. 1994) (*citation omitted*).

29.  The Plan provides for the reorganization of the Debtors' finances and the continued operation of and lease of the Property.  As indicated in their most recent MONTHLY OPERATING REPORTS for the month ending September 2012, the Debtors' cash receipts for the month were

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-14-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

almost $617,000[4] and their cash balance was $1,178,934 which will be sufficient to pay all Allowed Claims entitled to payment on of the Effective Date.

30.     The Debtors have filed their MONTHLY OPERATING REPORTS which indicate that over the course of these Bankruptcy Cases, the Debtors have operated at a profit.  The Debtors have remained current on administrative expenses aside from certain professional fees which are not permitted to be paid from CIBC's cash collateral.  In addition, the Debtors have made adequate protection payments to CIBC pursuant to the Adequate Protection Order since August 1, 2012.

31.     The Debtors submitted their updated September Projections as Debtors' Exhibit 3 wherein they projected conservative growth in lease revenue through the life of the Plan to ensure that the terms of the Plan were feasible.  The projections show that the Reorganized Debtors will be able to make the payments under the Plan.  Mr. Rodriguez has testified that the Plan is feasible based both on the Debtors' September Projections and on his own independent analysis projecting future cash flows (the "Forecast").  The Plan provides for the Reorganized Debtors to use cash on hand and cash revenues from future operation of the Property to perform their obligations under the Plan, including making Distributions to Creditors.  Nonetheless, CIBC questions the Debtors' projections and therefore the feasibility of the Plan.

a.     CIBC's Claim

32.     The Debtors' Exhibit 20 sets forth their calculation of the amount of CIBC's Claim, including interest at the non-default rate, and offset amounts for application of reserves and adequate protection payments.  As indicated therein, the total amount of principal and contractual non-default interest as of October 1, 2012 is $37,643,261.80.  The Debtors' contend that such amount represents the maximum amount that the Court should consider with respect to Plan Confirmation because CIBC is not entitled to any default interest or late penalties as it asserts.  These issues are discussed in greater detail below.

b.     The September Projections Are Reliable

33.     In criticizing the accuracy of the Debtors' September Projections, CIBC relies on draconian expectations and worst case scenarios to bolster their pessimistic predictions of future

---

[4] This amount includes $150,000 contributed by Kerio for its TI costs. [Doug Feece Dec. ¶8]

performance.  For example, Mr. Ferrell discusses a scenario where every tenant whose lease terminates during the Plan fails to renew. [*E.g.*, CIBC's Ex. Q, p. 32 at ¶2 and p. 36-37 at ¶5].  Not only does this run completely counter to the Debtors' experience with the building, it also defies all logic.  It is not an easy or inexpensive proposition for a tenant to relocate; their inclination is to stay where they are unless there is some compelling reason to move.  Assuming all tenants will make that determination is the real estate equivalent of assuming nuclear Armageddon and is completely unrealistic.  The Debtors have used conservative projections and the latest information regarding leasing activities and market performance, and have demonstrated that the Plan is viable. The Debtors have developed their budgeting system over 40 years and it has proven to be reliable. [John Feece Dec. ¶¶ 48-52].

34.    The Debtors have substantially completed repairs, renovations and tenant improvements which were necessary and approved by CIBC.  These included improvements to infrastructure which are non-recurring costs and which are transferrable to any new tenant.  [Doug Feece Dec. ¶9].  Associated costs therefore will be reduced during the term of the Plan.  This is based on plain logic and is supported by historical data. [Doug Feece Dec. ¶10; Debtors' Ex. 23].

35.    Due to the Debtors' efforts, the Property has increased occupancy from 82% in March of 2012 to 90% in September of 2012, representing an increase of almost $400,000 in annual revenues for which CIBC did not account. [Doug Feece Dec. ¶7; Debtors' Ex. 7].  In addition, the Debtors are in discussions with a well-known established company for a 15,000 square foot space which would bring occupancy up to 95% and would further increase revenues which are not currently reflected in the Forecast. [Transcript p. 109, lines 14-15].  If this potential lease transaction closes, the Debtors will have more than sufficient cash on hand to complete any required TIs. [Transcript p. 110, line 6 through p. 111, line 3].

36.    As a result of increased occupancy, the Debtors may be more aggressive with lease rates going forward. [Doug Feece Dec. ¶17].  CIBC presumes that because the market has a 20-25% vacancy rate, the Debtors will need to lower their lease rates to compete with other lessors.  This is not the reality.  In fact, lease rates for space in the Property continue to grow.  Recent leases have been signed at $1.75 per square foot, only $.08 lower than the average of existing tenants on the

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-16-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 21 of 33

September 2012 rent roll. [Doug Feece Dec. ¶16].  The Debtors' tenants tend to renew their leases rather than relocate because they are comfortable in their spaces which have been modified to their specifications. [Doug Feece Dec. ¶16].  They also predictably want to avoid the cost and inconvenience of moving.

37.    In addition, the high occupancy enables the Debtors to project future costs with more accuracy because there is simply less space to rent. [John Feece Dec. ¶52]. CIBC's expert agreed that the Debtors' tenant improvements have resulted in increasing occupancy which in turn will decrease the need for improvements going forward.  [Transcript p. 248, lines 3-11].  It is important to bear in mind that the term of the Plan is only five years.  It is unreasonable to argue, as CIBC has, that over that duration, the Debtors will need to expend substantial, unanticipated and non-projected amounts to re-lease and improve the Property, when the Property is already improved and 90% occupied, especially in light of the fact that the Kerio, Pacific Business Centers, Rockwell Automation and Habitec leases, each of which will extend beyond the Plan term, already cover 17% of the Property.  [Debtors' Ex. 7].  Mr. Ferrell, in fact, made an adjustment in his *Till* analysis because the short duration of the Plan reduces any risk to CIBC. [CIBC's Ex. Q, p. 33].

38.    The Debtors have capitalized on opportunities for the Property resulting in long-term leases and increased occupancy rates.  The costs associated with a particular lease are amortized throughout the term of the lease.  The Kerio lease which CIBC has cited provides an excellent example.  There, the Debtors worked with Kerio to build out its space – which had been neglected for years before the Debtors purchased the Property.  All improvements and costs were done with CIBC's approval, and Kerio contributed in covering some of the costs.  As a result, Kerio entered into a 10-year lease at a higher lease rate (which amortized the increased TI costs over the term of the lease) with above-market five percent (5%) increases over the full ten (10)-year term of the lease, and will require no further tenant improvements during the life of the Plan.  Consequently, the Debtors will reap the benefit of the increased revenues during the term of the Plan, with the costs of such tenant improvements having already been incurred. [Doug Feece Dec. ¶8]; [John Feece Dec. ¶54].  CIBC's own expert's testimony supports this outcome. [Transcript p. 256, lines 8-14].

/ / /

TTH/sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-17-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

39.     In his declaration, Mr. Rodriguez provided the Forecast projecting future cash flows which confirm that the Plan is feasible. [Debtors' Ex. 4; Rodriguez Dec. ¶67]. As Mr. Rodriguez explained, he prepared his Forecast with a more conservative approach, from the viewpoint of an underwriter. [Transcript, p. 149 at lines 23-25]. The Forecast incorporates certain conservative assumptions including (a) an average lease rate of $1.62 per square foot for non-maturing leases during the Plan term, (b) an average lease rate of $1.70 per square foot for leases which did mature during the Plan term, (c) a cap on the occupancy level, which includes collection loss, of 90 percent, and (d) a capitalization rate of 8%. [Rodriguez Dec. ¶70]. As set forth in the Forecast, the debt-service coverage ratio over the term of the Plan will be 1.30, 1.31, 1.33, 1.36 and 1.23. [Debtors' Ex. 4]. While CIBC questioned the calculation of these ratios at Trial because they do not account for leasing and capital costs, which is how Mr. Ferrell calculated the ratios [CIBC's Ex. Q, pp. 6-7], as explained by Mr. Rodriguez, the calculation of debt-service coverage does not include such costs. This is because the numerator in the calculation should be based on net operating income, and not cash flow available for debt service as employed by Mr. Ferrell. [Transcript p. 238 at lines 8-15]. In addition, under the Plan there will be no reserves and the Property leasing agent, Doug Feece, has agreed to defer payment on earned commissions to the extent the Reorganized Debtors are unable to make any Distributions. Consequently, inclusion of reserves and commissions is not appropriate in any circumstance. Accordingly, the Debtors will have adequate cash flow to make all Distributions to CIBC over the term of the Plan.

40.     CIBC also questioned Mr. Rodriguez's calculation of the Property's terminal value which ultimately Mr. Rodriguez testified would be $39,652,000 [Transcript p. 235 at lines 5-12], an amount sufficient to pay CIBC's Claim at that time. Notably, Mr. Ferrell's report projects the implied value of the Property after five years at $40.3 million and indicates that such amount will be sufficient to pay CIBC's claim. [CIBC's Ex. Q, p. 15 at ¶1].

41.     While both experts project that the Property will have an adequate terminal value to satisfy CIBC's Claim, they both also project a value of less than the appraised $41 million value from October 2011. This demonstrates that both experts have based their projections on extremely

conservative numbers in light of the fact that the market conditions have unquestionably improved since a year ago, and all indications are that it will continue to do so. Mr. Rodriguez used an 8% capitalization rate in reaching his conclusions and Mr. Ferrell used an 8.25% capitalization rate in reaching his conclusions, both of which are extremely conservative given that the Debtors' appraiser also used an 8% capitalization rate over a year ago in his appraisal. [Debtors' Ex. 13, p. 28] If a more realistic lower capitalization rate is used, there will be plenty of equity to pay all CIBC's claims and all Class 7 Claims. Further, the appraisal from a year ago did not take into account the increased occupancy which the Debtors have achieved and the extensive improvements made to the Property over the past year. Indeed, the Debtors' appraisal forecasted that rents could be expected to increase 3% to 5% per year. [Debtors' Ex. 13, p. 27]. In that instance, assuming operating expenses increase at the same rate, the Debtors' net operating income will increase 3% to 5% per year, and the value of the Property will consequently increase 3% to 5% per year. Even assuming, arguendo, only a 2% per year increase from October 2011, the value of the Property at the end of the Plan's term will exceed $46 million. At that value, there is sufficient equity to pay off all creditors and, if underwriting standards return to an 80% LTV, it is very close to supporting a refinance of the CIBC claim at the end of the Plan term. It is clear, then, that based on any valuation, the Property's terminal value will be sufficient to satisfy the Plan at the end of the term.

        d.   <u>Commitment of Principals</u>

42.     The likelihood that the Debtors will execute the Plan is further bolstered by the unquestionable commitment of their principals to see it succeed. John and Rosalie Feece have invested nearly $20 million of their own funds to acquire and improve the Property, and they have continued to make sacrifices to ensure that the Plan is feasible, including deferring payment on their Class 7 Claims, which will further incentivize them to ensure that all Plan obligations are satisfied. In addition, they have agreed to assume leasing responsibilities over the Plan term, while Doug Feece has agreed to defer payment of his earned commissions as necessary. Time and again, the Debtors' principals have demonstrated their desire to ensure the success of the Plan and the continued success of the Property. This factor further ensures the probability of the Plan's success.

/ / /

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-19-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

## L.  11 U.S.C. § 1129(a)(12) - BANKRUPTCY FEES

43.  The Plan provides for the payment of fees to the United States Trustee pursuant to 28 U.S.C. § 1930.  Such fees will be paid by the Reorganized Debtors for each calendar quarter that ends after the Effective Date (including any fraction thereof) until the Bankruptcy Cases are converted, dismissed or closed pursuant to a Final Decree. [Plan, Section 6.16.1].

## M.  11 U.S.C. § 1129(a)(13) through (16) – INAPPLICABLE

44.  These provisions are inapplicable.  Section 1129(a)(13) of the Bankruptcy Code pertains to retiree benefits programs, which the Debtors do not maintain and are not obligated to pay. Section 1129(a)(14) of the Bankruptcy Code applies to domestic support obligations.  Section 1129(a)(15) of the Bankruptcy Code applies to individuals.  Section 1129(a)(16) pertains to transfers of property by nonprofit corporations.

## N.  11 U.S.C. § 1129(b)(1) and (2) – CRAMDOWN

45.  Only Class 2 (Secured Claim of CIBC) has rejected the Plan, but the Plan may be confirmed over CIBC's rejection if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code (with the exception of section 1129(a)(8) – i.e., each class has accepted the Plan), and (i) is fair and equitable to the impaired dissenting class, and (ii) does not unfairly discriminate against the impaired dissenting class. 11 U.S.C. § 1129 (b).

46.  CIBC has raised concerns of fairness and equity with respect to the Plan, particularly with respect to (a) the potential acquisition by eminent domain of a strip of land by the San Jose Redevelopment Agency, (b) potential unchecked distributions to the Debtors' Members, and (c) payments to John and Rosalie Feece on account of their Class 7 Claims on par with CIBC's Allowed Class 2 Claim.  The Debtors have proposed modifying the Plan to address each of these concerns. Specifically, (a) the Plan will be modified to provide that CIBC will receive that portion of the proceeds from any transaction with the San Jose Redevelopment Agency to which it is entitled under applicable California law; (b) the Plan will be modified to provide that no draws will be paid by the Debtors to their Members, with the exception that the Debtors may make a distribution at the end of each year commencing in 2013 to the extent there remains a minimum of $500,000 in the Debtors' general account after payment of each such distribution; and (c) John and Rosalie Feece, the holders

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 25 of 33

of the Allowed Class 7 Claim, have consented to a modification of the Plan to provide that there will be no payments on account of the Class 7 Claim unless and until the Allowed Class 2 Claim of CIBC is paid in full.

47.    CIBC has also objected to the Plan as inequitable to the extent that the Plan shifts the risk of loss to CIBC without receiving any yield to which it is entitled.  This illustrates a fundamental divergence from what *Till* contemplates, where the appropriate interest rate should be high enough to compensate CIBC for its risk but not so high that it will doom the Plan. *Till*, 541 U.S. at 480.  In other words, CIBC is not entitled to a windfall at the expense of the success of the Plan and to the detriment of all other creditors.  It is entitled to be paid a fair rate.  Mr. Rodriguez also has noted this difference in philosophies. [Rodriguez Dec. ¶¶80-81].  In any event, in their respective *Till* analyses, both experts account for the risk to CIBC, including the high LTV ratio, in recommending their proposed rates.  Moreover, as the Forecast demonstrates, the cash flow available for debt service will increase over the term of the Plan so CIBC will remain adequately protected. [Rodriguez Dec. ¶71; Debtors' Ex. 4].

**O.    11 U.S.C. § 1129(c) - TWO OR MORE PLANS**

48.    The Debtors are the only parties to submit a Plan in these Bankruptcy Cases.

**P.    11 U.S.C. § 1129(d) - AVOIDANCE OF TAXES**

49.    The principal purpose of the Plan is not to avoid taxes or securities laws.  No governmental entity has objected to the Plan.

**Q.    OBJECTION TO CONFIRMATION**

50.    CIBC filed the only objection to the Plan, and the Debtors have thoroughly addressed all issues raised by CIBC.  The Debtors have demonstrated that the Plan is feasible, complies with the applicable provisions of the Bankruptcy Code, and is fair and equitable to CIBC.  Accordingly, Confirmation of the Plan should not be precluded due to CIBC's objection, and the Debtors request that the Court overrule the objection.

/ / /

/ / /

/ / /

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 26 of 33

## R.     CIBC IS NOT ENTITLED TO DEFAULT INTEREST OR LATE FEES

### 1.     The Default Interest and Late Fee Provisions Are Unenforceable Under Applicable Nonbankruptcy Law.

51.     CIBC is not entitled to default interest or late fees on its Claim because they are unenforceable under California law. *General Electric Capital Corp. v. Future Media Productions. Inc.*, 536 F.3d 969, 974 (9th Cir. 2008).

52.     California Civil Code § 1671 provides that a liquidated damages provision is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made. The California Supreme Court has enunciated standards for the application Cal. Civ. Code § 1671: "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citation.] In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.' [Citation.]" *Ridgley v. Topa Thrift & Loan Assn.*, 17 Cal. 4th 970, 977 (Cal. 1998).

53.     Applying Cal. Civ. Code § 1671, the California Supreme Court in *Ridgley* held that a prepayment penalty constituted an unenforceable late fee charge because the charge of six months' interest on the entire principal, imposed for any late payment or other default, could not be defended as a reasonable attempt to anticipate damages from default:

> Under these circumstances, however the charge is formally characterized, it is, in substance, an unenforceable penalty for late payment. "If the sum extracted from the borrower is designed to exceed substantially the damages suffered by the lender, the provision for the additional sum, whatever its label, is an invalid attempt to impose a penalty inasmuch as its primary purpose is to compel prompt payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred by the lender."

*Id.* at p. 981.

54.     The only damages cited by CIBC as arising from a failure to make an interest

TTH/sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 220    Filed: 10/30/12    Entered: 10/30/12 13:58:02    Page 27 of 33

payment to CIBC are damages incurred for its lost opportunity to re-lend unpaid amounts.[5] Lindsey Gordon, CIBC's Executive Director of Special Loans, testified that CIBC could have earned 6% per annum on such missed interest payments. CIBC failed to cite any damages it would sustain arising from a failure to make any reserve payment. Yet, the default provision here required the borrower to pay default interest at 5% above the stated interest rate *on the principal balance* of the loan during the existence of any event of default, be it a missed interest payment, a missed reserve payment, a covenant breach or any other myriad events of default listed in the loan documents. [Transcript, p. 197 at lines 7-11]. Thus, for example, CIBC's lost opportunity damages for the missed interest payment of $193,781 on November 10, 2010 were $969 for the one-month period from November 10, 2010 to December 10, 2010. [*See* CIBC's Ex. P]. Instead, it is seeking to recover $138,415 in default interest for that same month. [*See* CIBC's Ex. O].

55. This is illustrated in CIBC's Exhibit "P" which indicates that if 5% interest was charged on each monthly payment, the total amount of interest charged up to the maturity date of the loan would be $35,000. CIBC's Exhibit "O" indicates that during the same time period as the interest payments indicated on Exhibit "P" where CIBC charged 5% of the principal amount, it charged a total of $1,402,000.00 which is far in excess of what could reasonably relate to any actual costs. At Trial, Mr. Gordon agreed that similar calculations resulting in the enormous divergence between the two amounts are accurate. [Transcript, p. 198 at line 4 through p. 202 at line 21]. CIBC's calculation also included over $1,500,000 in default interest arising from the Debtors' nonpayment of reserves including the TI/LC Reserve. Those funds, however, do not constitute funds that could have been re-lent to other parties. Therefore, CIBC could not have incurred any damages based on such amounts.

56. These facts fall squarely within the holding in *Ridgley* and its progeny. In *Harbor Island Holdings v. Kim,* 107 Cal. App. 4th 790, 796, 132 Cal. Rptr. 2d 406 (2003), the court concluded that a contract provision that, "in the event of breach, any breach, the rent would more than triple," lacked the necessary proportional relation to the damages which may actually flow from

---

[5] In its responses to the Debtors' Interrogatories, CIBC referred to additional potential harm arising from an event of default, but it did not provide any quantifiable amount. [Debtors' Ex. 34, p.4].

the failure to perform under the contract; therefore, the provision was a penalty and was not

enforceable.

> A penalty provision operates to compel performance of an act [citation] and usually becomes effective only in the event of default [citation] upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach [citation]. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." (*Ridgley v. Topa Thrift & Loan Assn.*, supra, 17 Cal.4th at p. 977.) Here, the lack of a proportional relationship between the $240,912 amount sought and the actual damages Harbor Island suffered on account of the breach of the covenant to maintain and repair could not be more obvious.

*Harbor Island Holdings v. Kim*, 107 Cal. App. 4th 790, 797 (Cal. App. 4th Dist. 2003).

57.    Similarly, in *GreenTree Financial Group v. Execute Sports, Inc.* 163 Cal. App. 4th 495 (2008), the court held unenforceable a liquidated damages provision applicable in case of default on payment of settlement funds which was over three times the total amount of settlement and was thus an unreasonable penalty; see also *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731, 740 (1973) (interest amount charged on entire obligation instead of solely on missed installment is an unenforceable penalty).

58.    The fact that this was a commercial lease negotiated by seasoned business entities, not a consumer lease between unsophisticated individuals, has no bearing on the result. The court in *Ridgley, supra,* 17 Cal.4th 970, addressed the suggestion that "a different set of rules [should] apply because [it] was an 'arm's-length commercial transaction.' [Citation.]" *Id.* at p. 981, fn. 5. It dispelled that notion, stating, "That [the obligors] are . . . business owners rather than consumers, however, does not deprive them of section 1671's protection against unreasonable penalties . . ." *Ibid.*

59.    Here, the default interest provisions require the borrower to be charged 5% over the non-default rate on the unpaid principal balance during the existence of any event of default. The only reasonably anticipated damages cited by CIBC resulting from a missed interest payment consist of an opportunity to earn 6% per annum on any missed interest payment, or, in the case of a $200,000 interest payment, $1,000 a month. Yet, the default interest rate here allows CIBC to charge 5% on the principal balance or $140,000 a month. As in *Harbor Island,* the lack of a

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-24-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

proportional relationship could not be more obvious. Mr. Gordon's testimony that when negotiations with the Debtors failed in the summer of 2011, CIBC then charged the default interest starting from October 2009 further confirms that default interest provision to be an unenforceable penalty. It is an invalid attempt to impose a penalty inasmuch as its primary purpose is to compel prompt payment through the threat of imposition of charges bearing little or no relationship to the amount of the actual loss incurred by the lender. The provision is unenforceable.

### 2. Equitable Grounds Under California Law

60. Finally, when set in the context of the factual circumstances existing when the loan extension was signed in June of 2009, the default and late fee provisions are unconscionable and should not be enforced by the Court. Default interest and late fees may be precluded based on equitable theories such as waiver, unconscionability, and the duty of good faith and fair dealing, all of which are recognized under California law. [*See, e.g.*, Restat 2d of Contracts, § 208 ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result"); *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 311 (Cal. App. 2d Dist. 1997) (acknowledging oral modification of contract and good faith and fair dealing claim where mortgagor agreed to "stop" a loan account for three months and then attempted to charge excused payments in the fourth month); *Varela v. Wells Fargo Bank*, 15 Cal. App. 3d 741, 749 (Cal. App. 3d Dist. 1971) (acceptance of payments by secured creditor precluded secured creditor from exercising remedies).

61. The original loan was made pursuant to an interim loan program offered by CIBC. Pursuant to the program, CIBC would extend a short term, three (3) year note to the Debtors. If the Debtors brought the Property up to stabilization, CIBC would offer permanent financing for ten years at a fixed rate. CIBC would then sell the note in the CMBS market.

62. The loan closed in 2006 with the Debtors investing another $12 million to acquire the Property. The Debtors fulfilled their side of the program - through hard work and loans from Mr. and Mrs. Feece totaling over $6 million, they invested $6.5 million to bring the Property up to over 90% occupancy in early 2009.

TTH/sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-25-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF
CONFIRMATION OF DEBTORS' JOINT PLAN

63.     However, the CMBS market had collapsed by the time of the maturity date of the original loan.  CIBC backed off from its commitment and representations it used to obtain the loan in the first place.  Instead of offering permanent financing, CIBC then wanted out of the CMBS market; they were no longer making such loans.  In 2006, when the Property was 65% occupied, the Property was valued at $50,000,000 stabilized.  In 2009, when the Property was over 90% occupied, the value was appraised by CIBC at $43,750,000.

64.     CIBC only "reluctantly" offered an extension.  Under the proposal, CIBC demanded that the Debtors pay $104,043 into a monthly TI reserve.  CIBC knew that such an amount would leave the guarantor with insufficient income to meet his expenses.  CIBC certainly knew that this type of drain from the Property's cash flow would result in a default somewhere, either in the Property or by the guarantor on his other debts. [Debtors' Ex. 28, p. CIBC00001477; Transcript, p. 189 at lines 10-13;Transcript, p. 191 at lines 20-24; Debtors' Ex. 30, p. CIBC0002823].

65.     There were no negotiations on this issue; no justification was ever provided. [Mogensen Dec. at ¶6; John Feece Dec. at ¶25].  CIBC's records indicate that the figure was arbitrary, arrived at only after a senior executive suggested adding a proposed principal pay down requirement to the TI reserve in an effort to control cash flow. [Debtors' Ex. 30, p. CIBC0002606].  CIBC knew that the excess cash flow was the primary source of the guarantor's income and that such restrictions would not allow the guarantor to meet both his expenses and that of the Property. [Debtors' Ex. 28, p. CIBC00001477; Transcript, p. 189 at lines 10-13;Transcript, p. 191 at lines 20-24; Debtors' Ex. 30, p. CIBC0002823].

66.     In sum, CIBC expected and anticipated that it would extend permanent financing to the Debtors upon stabilization of the Property, and the Debtors accepted the loan and invested nearly $19,000,000 in reliance on that understanding and expectation.  Even after the Debtors successfully achieved their plan, CIBC leveraged its unequal bargaining power to force the Debtors to accept impossible onerous terms and to force a default during the worst recession since the Great Depression.  CIBC knowingly imposed oppressive terms that it knew would cause the Debtors to default.  It spent almost two years in negotiations with the Debtors without raising the default interest and only imposed it as a penalty after CIBC took exception to a $200,000 payment to Focus

TTH/sb
K:\Community Towers\Pf\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\v14.docx

-26-

DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Bank, a payment of which it was aware would be made prior to any payment to CIBC, and a payment which it had agreed could be made. [Mogensen Declaration at ¶¶8 and 9; Transcript, p. 213 at line 11 through p. 215 at line 15].

67.    CIBC has attempted to paint a picture that the circumstances in developing the loan and then in the extension, including its onerous terms, were rather ordinary. CIBC has stated that the analysis of the loan worked through its internal originator through to its credit committee which overruled the red flags pointed out by internal agents. [Transcript, p. 203 at line 24 through p. 205 at line 23]. But this process somehow resulted in the renewal terms which CIBC knew would result in a negative cash flow, which was anything but ordinary. As Mr. Gordon testified, such a deal is not in fact customary for CIBC. [Transcript, p. 215, line 20 through p. 216, line 7]. The fact is that the parties had a deal and the Debtors upheld their end of the bargain, to the tune of $19 million. CIBC subsequently changed its underwriting standards, reneged on its end of the deal, and instead presented the renewal with its onerous terms to force the default. [Transcript, p. 195 at line 19 through p. 196 at line 5]. CIBC should not profit from its oppressive actions, and therefore, should not receive default interest and late fees. Under the authorities set forth above, this Court should exercise its equitable powers under applicable California law to preclude enforcement of late fees and default interest provisions. CIBC's own actions caused the default. Had CIBC honored its 2006 commitment to extend permanent financing, the Debtors would be half way through the term of the permanent financing and would be fully-conforming with its terms, and the Bankruptcy Cases would likely never have been necessary. CIBC should not be allowed to hide behind its failure to abide by its commitments, and its oppressive loan documents, with full knowledge that imposition of the onerous terms would create a default.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.    CONCLUSION

68.    For the foregoing reasons, CIBC's objections should be overruled and the Plan confirmed under such terms and conditions as the Court deems appropriate.

Dated:  October 30, 2012

**MURRAY & MURRAY**
A Professional Corporation


By:  */s/ Robert A. Franklin*
Robert A. Franklin
Attorneys for Debtors

-28-