JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Cases Jointly Administered |
| **COMMUNITY TOWERS I, LLC,** | ) | Case No. 11-58944-SLJ-11 |
| A Delaware Limited Liability Company, | ) | |
| Employer Tax I.D. No. 75-2456729, | ) | |
| | ) | |
| **COMMUNITY TOWERS II, LLC,** | ) | Case No. 11-58945-SLJ-11 |
| A Delaware Limited Liability Company, | ) | |
| Employer Tax I.D. No. 75-2560662, | ) | |
| | ) | |
| **COMMUNITY TOWERS III, LLC,** | ) | Case No. 11-58948-SLJ-11 |
| A Delaware Limited Liability Company, | ) | |
| Employer Tax I.D. No. 32-0065635, | ) | |
| | ) | |
| **COMMUNITY TOWERS IV, LLC,** | ) | Case No. 11-58949-SLJ-11 |
| A Delaware Limited Liability Company, | ) | |
| Employer Tax I.D. No. 77-0379075, | ) | |
| | ) | Date: December 5, 2012 |
| Debtor(s). | ) | Time: 10:00 a.m. |
| | ) | Place: United States Bankruptcy Court |
| 111 W. Saint John Street, Suite 705 | ) | 280 S. First St., Room 3099 |
| San Jose, California 95113 | ) | San Jose, CA 95113 |
| | ) | Judge: Honorable Stephen L. Johnson |

## DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

1

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 1 of 24

# **TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ........................................................................................1

II.      REPLY ......................................................................................................1

     A.      Equitable Considerations. ....................................................................1

     B.      The Loan Extension ............................................................................4

     C.      California Civil Code Section 1671 .....................................................7

     D.      CIBC's Proposed 8.25% Interest Rate ................................................9

     E.      The Debtors' Proposed 6.00% Interest Rate .....................................11

     F.      Feasibility .........................................................................................15

     G.      Guaranty of John and Rosalie Feece; Disbursements to John and Rosalie Feece .16

     H.      Reserve Account ................................................................................17

III.      CONCLUSION .......................................................................................19

TTH:sb

K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

i

*Casa Blanca Project Lenders, L.P. v. City Commerce Bank*
  *(In re Casa Blanca Project Lenders)*,
  196 B.R. 140 (B.A.P. 9th Cir. Cal. 1996) ................................................................2

*Farmer v. Moser (In re Moser)*,
  2011 Bankr. LEXIS 2667 (Bankr. N.D. Cal. July 9, 2011) ...............................18

*General Electric Capital Corp. v. Future Media Productions. Inc.*,
  536 F.3d 969 (9th Cir. 2008) ...........................................................................2, 7

*Graves v. Myrvang (In re Myrvang)*,
  232 F.3d 1116 (9th Cir. 2000) .............................................................................1

*Harbor Island Holdings v. Kim*,
  107 Cal. App. 4th 790 (Cal. App. 4th Dist. 2003) ..............................................9

*In re Bashas' Inc.*,
  437 B.R. 874 (Bankr. D. Ariz. 2010) ...................................................................2

*In re D & F Constr., Inc.*,
  865 F.2d 673, 676 (5th Cir. Tex. 1989) .............................................................18

*In re Entz-White Lumber and Supply, Inc.*,
  *850 F.2d 1338 (9th Cir. 1988)* ...........................................................................2

*In re Fowler*,
  903 F.2d 694 (9th Cir. 1990) ...............................................................................9

*In re Grandfather Mt. Ltd. Pshp.*,
  207 B.R. 475 (Bankr. M.D.N.C. 1996) ..............................................................18

*In re Linda Vista Cinemas, LLC*,
  442 B.R. 724 (Bankr. D. Ariz. 2010) ...................................................................9

*In re N. Valley Mall, LLC*,
  432 B.R. 825 (Bankr. C.D. Cal. 2010) .....................................................9, 17, 20

*In re Riverbend Leasing LLC*,
  458 B.R. 520 (Bankr. S.D. Iowa 2011) ..............................................................18

*In re Sandy Ridge Dev. Corp.*,
  881 F.2d 1346 (5th Cir. La. 1989) .....................................................................18

*In re Seasons Partners, LLC*,
  439 B.R. 505 (Bankr. D. Ariz. 2010) ...................................................................9

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

ii

D<small>EBTORS</small>' P<small>OST</small>-T<small>RIAL</small> R<small>EPLY</small> B<small>RIEF</small> I<small>N</small> S<small>UPPORT</small>
<small>OF</small> C<small>ONFIRMATION OF</small> D<small>EBTORS</small>' J<small>OINT</small> P<small>LAN</small>

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 3 of
24

*In re SM 104 Ltd.*,
  160 B.R. 202 (Bankr.S.D.Fla. 1993) .................................................................17

*Camino Real Landscape Maint. Contractors, Inc.*,
  818 F.2d 1503, 1508 (9th Cir. 1987) .................................................................9

*Larsen v. Johannes*,
  7 Cal. App. 3d 491 (Cal. App. 1st Dist. 1970) ...............................................4

*Ridgley v. Topa Thrift & Loan Assn.*,
  17 Cal. 4th 970 (Cal. 1998) ...............................................................................8

*Till v. SCS Credit Corp.*,
  541 U.S. 465 (2004) .........................................................................................18

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
  549 U.S. 443 (2007) ...........................................................................................2

## STATUTES

11 U.S.C. § 1123(d) ...............................................................................................2

11 U.S.C. § 1129(a) ...............................................................................................2

11 U.S.C. § 1129(a) and (b) .................................................................................19

11 U.S.C. § 1129(b) ...............................................................................................2

11 U.S.C. § 1129(b)(2)(A)(ii) ..............................................................................18

11 U.S.C. § §1129(a)(11) .....................................................................................20

§ 105(a) of the Bankruptcy Code ....................................................................1, 2

§ 506(b) of the Bankruptcy Code ...........................................................2, 18, 19

Cal. Civ. Code § 1717 ..........................................................................................18

California Civil Code § 1542 .............................................................................3, 4

California Civil Code § 1671 .............................................................................7, 8

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

iii

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

# I. INTRODUCTION

The debtors and debtors in possession in the above-captioned jointly administered cases, Community Towers I, LLC, Community Towers II, LLC, Community Towers III, LLC and Community Towers IV, LLC (collectively the "Debtors"), hereby submit their reply (the "Reply") to CIBC'S POST TRIAL BRIEF (the "CIBC Post-Trial Brief"). This Reply also supports the DEBTORS' TRIAL BRIEF AND RESPONSE TO CIBC'S OBJECTIONS TO CONFIRMATION OF THE DEBTORS' JOINT PLAN (the "Trial Brief"), the DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN (the "Post-Trial Brief")[1] and confirmation of the Plan.

In the CIBC Post-Trial Brief, CIBC, as it has throughout the Plan confirmation process, manipulates facts and invents theories in order to portray itself as the "good guy" while depicting the Debtors' management as unreliable and untrustworthy and their expert witness as not credible. However, amidst the baseless arguments and *ad hominem* attacks, what is most significant is that which CIBC fails to address, including its flawed and exorbitant default interest calculation, the operational and physical state of the Property as supported by actual numbers, its inequitable and egregious conduct, and the prejudice which will be suffered by other creditors if CIBC gets what it desires (as opposed to what is equitable). The Plan should be confirmed and CIBC's objections overruled.

## II. REPLY

### A. Equitable Considerations.

1. CIBC insists that the Court may not consider the equities of the cases in connection with confirmation of the Plan. The reason for this is obvious – the record in these Bankruptcy Cases overwhelmingly evidences CIBC's inequitable conduct. CIBC cites *Graves v. Myrvang (In re Myrvang) ("Graves")*, 232 F.3d 1116 (9th Cir. 2000) in support of its position, a chapter 7 case converted from a chapter 13 case involving a debt incurred in a divorce proceeding. There, the district court decided that the bankruptcy court could not exercise its powers under section 105(a) of the Bankruptcy Code to assess a late payment penalty in the event payments on the nondischargeable debt were not made timely pursuant to the court's order. As the court found, the imposition of such

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Post-Trial Brief.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

1

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

a penalty was not linked to any provision of the Bankruptcy Code. *Id*. at 1125.

2.    For obvious reasons, *Graves* is of limited, if any, applicability to the instant case.  It is indisputable that a court may entertain equitable considerations in the context of confirming a plan. *See In re Bashas' Inc.*, 437 B.R. 874, 914 (Bankr. D. Ariz. 2010) (in explaining cramdown process, "[t]hen, if all of the other § 1129(a) factors are satisfied, the case may proceed to the fair and equitable considerations of § 1129(b)"); *see also Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders)*, 196 B.R. 140, 143 (B.A.P. 9th Cir. Cal. 1996).

3.    CIBC's argument is also premised on its misinterpretation of *General Electric Capital Corp. v. Future Media Productions. Inc.*, 536 F.3d 969 (9th Cir. 2008) ("*Future Media*") which applies to the consideration of whether to allow default interest under section 506(b) of the Bankruptcy Code.  CIBC's reasoning is based on its conclusion that *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) represents a "species" of the rule which it espouses. [CIBC Post-Trial Brief, p. 4, n.3].[2]  However, as already set forth [*see* DEBTORS' REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN ¶12], a complete reading of *Future Media* makes clear that equitable considerations do factor into whether default interest should be allowed.  In fact, the heading of the applicable paragraph from *Future Media* reads: "2.  The Bankruptcy Court, on Remand, Should Evaluate the Viability of the Default Rate Under the Rule Adopted by *the Majority of Federal Courts*", *id*. at 974, and the decision then cites to the two "sister circuit" cases noting that both allow examination of equities and adds a footnote explaining that "[t]he *majority rule* is *consistent with the Supreme Court's decision in Travelers* as well as with the plain language of 11 U.S.C. § 1123(d) . . ." *Id*. at 974, n.2 (*emphasis added*).  CIBC's entire argument fails as equitable consideration are, in fact, at play.

4.    It is no wonder why CIBC's focus has largely been on insisting its conduct was not inequitable.  In summing up its argument with the heading "No Promise, No Misconduct," [CIBC Post-Trial Brief, p. 4, Sec. III], CIBC demonstrates its limited comprehension of the issues.  The

---

[2] In *Future Media*, the Ninth Circuit cites *Travelers* in connection with its analysis of *In re Entz-White Lumber and Supply, Inc.*, 850 F.2d 1338 (9th Cir. 1988) and the issue of a chapter 11 plan which proposes to cure defaults, which is not an issue here.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

2

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 6 of 24

Debtors' legal theories regarding CIBC's misconduct do not all require a written obligation or promise as CIBC argues. As the Debtors explained in their objection to CIBC's Claim [OBJECTION TO PROOFS OF CLAIM NOS. 4, 5, 6 AND 7 (the "Objection to Claim") ¶17], the question solely with respect to promissory estoppel is not whether or not a promise was expressly written into the loan documents, but whether a promise was made which CIBC reasonably should have expected to induce the Debtors to act and which did in fact induce the Debtors to act. Restat 2d of Contracts, § 90. While CIBC disingenuously claims that its loan originator disclosed the details of its loan program described in the Debtors' Exhibit 36, as demonstrated at Trial, the parties intended that CIBC would refinance the loan if the Debtors met certain benchmarks, [Debtors' Ex. 25, p. CIBC0000255; transcript p. 82 at line 16 through p. 83 at line 25], which benchmarks the Debtors achieved as CIBC acknowledged [*e.g.*, Debtors' Ex. 27, p. CIBC0001394]. Based on this understanding, the Debtors made their commitment to upgrade the Property and invested over $19 million to acquire and improve the Property, only to find CIBC then unwilling to honor its commitments. [Mogensen Dec. ¶¶2-4].

5. CIBC argues that integration clauses in the loan documents render all of the Debtors' equitable arguments invalid. This is not so. The Debtors are asserting that CIBC's misconduct is one of the factors which render the default interest and late fees provisions unenforceable. The integration clauses do not affect these arguments; indeed, they specifically state that they "do not modify the rights remedies and obligations of the parties" [*e.g.*, CIBC Ex. I, p. 3, Sec. 10]. Similarly, the release provisions apply, at most, only to claims; they do not apply to defenses to enforcement of the agreement [*e.g.*, CIBC Ex. I, p. 3, Sec. 9].

6. CIBC also argues, again without any legal authority, that release provisions in the Note and amendment thereto mandate a release of all claims the Debtors would have against CIBC without any qualification. It is noteworthy that neither provision included an express waiver of California Civil Code Section 1542. At the time of the extension, the parties continued their discussions and the Debtors were unaware of what future claims it would have against CIBC.[3] The Debtors were hopeful that a long-term deal would be reached, and CIBC evinced a willingness in

---

[3] In fact, as set forth in the Objection to Claim, the Debtors still are evaluating their claims against CIBC.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

3

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 7 of 24

that regard. Thus, the release provisions, to the extent they are effective, would not apply to the Debtors' claims which were not known or not existing at the time.[4]

7. At any rate, whether or not the Debtors have already proved up a claim for promissory estoppel or any of the other equitable theories under California law is not dispositive of the issues at hand which pertain to the amount of CIBC's Claim and the interest rate to be paid in the context of Plan confirmation.

8. As set forth above, the Court may account for factors embodied under such equitable theories of unconscionability, good faith and fair dealing, estoppel and waiver. When these factors are considered together, CIBC's arguments fail. For example, CIBC contends that it had no obligation to provide any extension to the Debtors because there was no promise. Even if this were true, since CIBC did provide the extension and engaged in discussions, it had an obligation to act in good faith in doing so. It had an obligation not to impose unconscionable terms, and it had an obligation to not lead the Debtors to believe that a resolution would be reached and that punitive default charges would not be retroactively applied. Instead, CIBC leveraged its unequal bargaining power to impose terms it knew the Debtors and John and Rosalie Feece could not satisfy.

### B. The Loan Extension.

9. It is clear that CIBC knew that the terms of the loan extension were unconscionable and would result in default. CIBC cannot dispute this fact regardless of what internal hierarchy led to the ultimate decision. If, in fact, a higher level officer overruled a junior loan originator, it would have done so with the knowledge that the Debtors could not meet the requirements of the extension. While CIBC downplays the conclusions of its originators as merely "opinion," there is no other logical reasonable conclusion to be drawn from the documents presented at Trial. [Debtors' Ex. 28, p. CIBC00001477; Transcript, p. 189 at lines 10-13;Transcript, p. 191 at lines 20-24; Debtors' Ex. 30, p. CIBC0002823]. Further, CIBC failed to produce any person with any knowledge of why the

---

[4] In *Larsen v. Johannes*, 7 Cal. App. 3d 491 (Cal. App. 1st Dist. 1970), the California Court of Appeal found that although the release there did not expressly waive Cal. Civ. Code § 1542, it "effectually waived" it. That case, however, involved a release in a settlement agreement, and the court noted that the release was not a general release, that there were no public policy concerns (such as in the case of a personal injury tort) and that the release was mutual. *Id.* at 504-05. Here, the releases were only as to CIBC by the Debtors, and as asserted by CIBC, pertain to general claims and potentially could pertain to tort damages.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

4

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

originators were overruled, and its designated representative, E. Lindsay Gordon, could only speculate as to why this occurred[5]. CIBC stated that it would not consummate a transaction with such terms [Transcript, p. 215 at line 20 through p. 216 at line 7]; however, if such terms existed – terms that would prevent CIBC from consummating the transaction - it would only make sense that they must have been considered by the ultimate decision maker, particularly in light of the fact that CIBC's underwriters, who were closest to the transaction, specifically pointed out the problem. It is therefore unquestionable that these terms were considered and that the decision maker went forward regardless of CIBC's alleged policy against consummating such transactions.

10.     CIBC poses the rhetorical question of why it would make any deal at all as it had no obligation to do so. Then, it offers one answer by portraying itself as the "good guy" because it did in fact "offer" the loan extension to the Debtors providing them "another two years to find an exit" as opposed to forcing them to accept their only other option, bankruptcy. This is disingenuous. CIBC already knew at the time that the extended loan terms were not sustainable by the Debtors for the short-term, much less for two years. CIBC knew that the real estate market had collapsed and that property values had depressed markedly, such that no buyers existed other than vulture capitalists looking to buy properties at absurdly low prices. On the other hand, the Debtors were left only with the option to accept the extension and attempt to meet its onerous terms with the hope of engaging CIBC in negotiations to reach a resolution, especially if their only other option was bankruptcy as CIBC has stated. [CIBC'S COMBINED REPLY TO THE DEBTORS' CONFIRMATION BRIEF AND OBJECTIONS TO PROOFS OF CLAIM, p. 4, lines 7-12]. Indeed, CIBC led the Debtors to believe that it was willing to negotiate as it never indicated that it was accruing default interest and late charges (and, in fact, all correspondence provided by CIBC to the Debtors never assessed late charges), and it accepted the $22,000 pay down from the Debtors. The Debtors relied, to their detriment, on CIBC's waiver by continuing to negotiate in good faith instead of considering other options, including their affirmative claims against CIBC or bankruptcy. It was only after the

---

[5] It is possible that the reason is contained in the over 47,000 pages of discovery CIBC improperly provided to the Debtors a mere two weeks prior to Trial.; something this Court should consider when weighing the equities of the case and CIBC's conduct. Due to the extremely late production and the sheer volume of documents, it was impossible for the Debtors to effectively review that material. The Court may recall that it denied the Debtors' request to continue the Trial to enable them to review the late production of documents.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

5

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944     Doc# 226     Filed: 11/30/12     Entered: 11/30/12 15:15:21     Page 9 of 24

Debtors commenced the Bankruptcy Cases that CIBC assessed retroactive late charges and default interest. The obvious answer to CIBC's rhetorical question, therefore, is that it was trying to force a sale of the Property to extricate itself from the loan during the recession, while avoiding the obvious bad faith allegations that would come with simply foreclosing. In other words, CIBC was, in fact, obligated.

11. CIBC presented no contrary evidence.[6] While CIBC explains that senior personnel overruled the originator regarding the reserve requirement [CIBC Post-Trial Brief, p. 7, n. 5], there is no written evidence indicating why. CIBC never produced or identified the senior officer who overruled the originator, and the originator, Jim Armstrong, retired, disappeared and is nowhere to be found notwithstanding the Debtors' extensive attempts to locate him. CIBC made no attempt whatsoever to locate Mr. Armstrong or disclose his location to the Debtors although, without a doubt, someone at CIBC is aware of his location despite his retirement since, due to his longevity with CIBC, he undeniably retains ties with CIBC through retirement plans, health plans or similar post-retirement benefits.

12. CIBC's argument regarding the pay down to Focus Bank falls in line with its pattern of arguing that because there was no final signed writing, the Debtors have no recourse under any theory. While the Debtors and CIBC disagree on whether there were any open terms remaining regarding the restructuring [Transcript p. 89 at line 15 through p. 90 at line 1], any such remaining terms did not pertain to the Focus Bank pay down. [Transcript p. 212 at line 23 through p. 213 at line 1]. Thus, when the proposed payment to Focus Bank was disclosed to CIBC, it only expressed concern that the Debtors have cash sufficient to pay accrued interest under the modified agreement. It did not raise any objections whatsoever with the proposed payment. [Mogensen Dec. ¶8]. While CIBC acquiesced to the payment at the time, it now argues that the Prenegotiation Letter eliminates

---

[6] CIBC also counters the Debtors' argument that CIBC could benefit by keeping a performing loan on its books because it could not also intend that the loan be destined for default. However, CIBC could continue to classify the loan as "performing" even though reserve payments were not made; it could not be classified as "performing" if interest or principal payments were missed. This is likely why the $104,000 amount was categorized as a reserve rather than partial principal as originally intended. However, Mr. Gordon did not have first-hand knowledge why the change was made and could only "presume" that senior staff disagreed with the originator, and if CIBC did produce any evidence whatsoever as to why the change was made, it would have been in the over-47,000 page, late document production dumped on the Debtors two weeks prior to Trial.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

6

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 10 of 24

obligations CIBC had to the Debtors, and precludes any claims the Debtors could have against CIBC based on their reliance on CIBC's statements. [Transcript, p. 215 at 6-9]. The Debtors are not asserting a breach of contract claim against CIBC – they are attempting to confirm the Plan. Considerations embodied under the duty of good faith and fair dealing and waiver still apply, and CIBC is bound under both.

### C. California Civil Code Section 1671.

13. As previously discussed, CIBC is not entitled to default interest or late fees on its Claim because they are unenforceable under California law and when considering the equities of the case. *Future Media*, 536 F.3d at 974. Thus, while the CIBC Post-Trial Brief characterizes the Debtors' Cal. Civ. Code § 1671 argument as a "lesser issue," the Debtors believe it warrants discussion here in conjunction with equitable considerations and the issue of default interest. The CIBC Post-Trial Brief fails to discuss Cal. Civ. Code § 1671, instead positing a cavalcade of irrelevant red herrings: no actual negotiation between the parties was required; the original loan had the same default provision as the extension; equitable considerations are not permitted; and CIBC stated that there were other elements of damage that would be hard to quantify.[7] [CIBC Post-Trial Brief, Sec. V-E].

14. At any rate, the Debtors do not dispute that CIBC *could have* contemplated at the time of contracting that default could lead to lost opportunity to re-lend and earn interest on missed payments. CIBC, however, completely fails to address how its computation of default interest equates to such a lost opportunity, even though the Debtors have clearly set forth the calculations based on CIBC's own numbers. [DEBTORS' REPLY BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN ¶¶ 6-11; Debtors' Post-Trial Brief ¶¶ 54-59]. CIBC's silence on this issue is

---

[7] These arguments are not only irrelevant, they are wrong. For example, (a) CIBC does not address the requirement under California law that there must be some demonstration by the lender that the default rate bears some relationship to actual damages, because there was no such analysis done by CIBC - the only "analysis" provided by CIBC was produced in the DECLARATION OF KARIN O'CALLAHAN filed in preparation for the Trial which opines about non-default interest based on a variety of historical data [CIBC Ex. R-2]; (b) the fact that the default interest provisions also were included in the original loan documents do not make them any less unenforceable; (c) the Court may consider equitable considerations as discussed above, and CIBC's statement that "there was no CIBC conduct upon which the Debtors justifiably and predictably relied to their detriment," [CIBC Post-Trial Brief, p. 24 at lines 1], is clearly untrue; and (d) CIBC has not provided any evidence to support any "other elements of damage" that it contemplated; it is not the Debtors' burden to do so.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

7

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 11 of 24

revealing but not surprising. The numbers simply do not add up to any reasonable calculation of lost

damages. Indeed, while CIBC mentions in passing that the cases cited by the Debtors "involved

truly staggering modifications" such as the tripling of rent and tripling of a settlement amount, it

does not address its staggering attempt to charge interest on principal, at amounts 142 times greater

than what the calculation purports to be. [Post Trial Brief ¶54]. Instead, CIBC asserts that "if"

interest was charged on the missed payment, instead of the principal, the difference is less.

15. CIBC also consistently and erroneously refers to the "default interest rate" as 5% and

compares this to the 6% return it could have earned. Section 6 of the Promissory Note [CIBC Ex.

C], however, specifically defines the default rate as being 5% *above* the current rate in effect, which

makes the default rate 12%, not 5%. Further, the loan documents provide, and CIBC actually

charged, the 12% default interest rate on the *entire principal balance* for each missed payment

instead of on the amount of the payment not received. This results in a default charge which is 142

times greater than the amount of CIBC's admitted damage and obviously bears no reasonable

relationship whatsoever to the damages sustained.

16. CIBC also fails to explain why it calculated interest at the default interest rate based

on the Debtors' nonpayment of reserves, which are funds which do not belong to CIBC and could

not have been re-lent. [Post Trial Brief ¶55].

17. In Exhibit P to the DECLARATION OF E. LINDSAY GORDON IN SUPPORT OF CIBC'S

OPPOSITION TO CONFIRMATION OF THE DEBTORS' JOINT AMENDED CHAPTER 11 PLAN [CIBC Ex. P],

Mr. Gordon attempts to calculate the "default amount" based on missed payments (including the

principal payment due at the end of the term) and justify this as an appropriate amount. Again,

however, Mr. Gordon erroneously applies the "default interest rate" of 5% instead of the true rate of

12%. Had the correct default rate been applied, the true amount would have been twice the amount

of CIBC's admitted damages of 6% lost opportunity cost.

18. The truth is that CIBC cannot provide any explanation to justify its default interest

calculations. The provision is intended to be purely a penalty intended to compel prompt payment

through the threat of imposition of charges bearing little or no relationship to the amount CIBC's

actual loss, and its enforcement is prohibited by Cal. Civ. Code § 1671. *Ridgley v. Topa Thrift &*

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

8

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 12 of
24

*Loan Assn.*, 17 Cal. 4th 970, 977 (Cal. 1998); *see also Harbor Island Holdings v. Kim*, 107 Cal. App. 4th 790, 797 (Cal. App. 4th Dist. 2003).

### D. CIBC's Proposed 8.25% Interest Rate.

19. In attempting to justify the 3.65% upward adjustment of its expert, Richard W. Ferrell, based on the "nature of the security" *Till* factor, CIBC now argues that Mr. Ferrell's "capital stack" approach is based on the blended approach from *In re N. Valley Mall, LLC*, 432 B.R. 825 (Bankr. C.D. Cal. 2010) ("*North Valley Mall*"), and contends that such approach is one method contemplated under *Till*. CIBC's explanation is wrong but is necessary because Mr. Ferrell, as did Mr. Rodriguez, indicated that he applied the formula approach mandated by *Till*. [CIBC Ex. Q, p. 10].

20. The Ninth Circuit applied the formula approach even prior to the decision. *In re Seasons Partners, LLC*, 439 B.R. 505, 518 (Bankr. D. Ariz. 2010) (*citing Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1508 (9th Cir. 1987) and *In re Fowler* ("*Fowler*"), 903 F.2d 694, 697-99 (9th Cir. 1990) ("For at least the last 20 years, the Ninth Circuit Court of Appeals has instructed bankruptcy courts to assess, and whenever possible use a 'formula approach,' and consider the risks associated with a given debtor and the security associated with a specific debt."). In *Fowler*, the Ninth Circuit opined that there are two methods to determine a market cramdown rate of interest – one is to determine the current market rate for similar loans in the region and the other is to apply the formula approach. *Fowler*, 903 F.2d at 967. The *North Valley Mall* decision is clear that it did not adopt the formula method espoused by *Till* and *Fowler* and explains that the goal of its blended approach was not "to mirror an actual market that exists . . . but . . . to create a proxy for a market extrapolated from current data such that the court can reach the ultimate question of 'present value.'" *North Valley Mall*, 432 B.R. at 834.[8] Other courts have noted that the two approaches are distinct. *See, e.g.*, *In re Linda Vista Cinemas, LLC*, 442 B.R. 724, 749 (Bankr. D. Ariz. 2010) (discussing *North Valley Mall* approach and then adopting the formula approach under *Fowler*); *Seasons Partners, LLC, supra*, 439 B.R. at 518 (same).

---

[8] As the Debtors noted previously, both parties in *North Valley Mall* agreed to use the blended rate approach and therefore presented evidence in that vein. The court there acknowledged as such. [Debtors' Post-Trial Brief ¶18]. Here, both parties indicate they applied the formula approach under *Till*, but now CIBC indicates otherwise.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

9

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 13 of 24

21.     Therefore, assuming *arguendo* that CIBC appropriately employed a "capital stack" approach, the purpose of such approach is to ascertain an estimate or "proxy" for market value, *in lieu of* the *Till* (and *Fowler*) formula approach. In *North Valley Mall*, the blended rate was determinative of the applicable plan interest rate there. Here, CIBC uses its capital stack approach to further adjust the interest rate solely with respect to a single *Till* factor – the nature of the security. It then adds an additional 2.0% adjustment, and, *on top of that*, makes upward adjustments for all of the other *Till* factors with the exception of the factor based on the duration of the Plan. This misapplication of *North Valley Mall* on top of *Till* constitutes overreaching at its most extreme. Even if the capital stack approach were permitted, on a stand-alone basis, Mr. Ferrell's analysis results in a rate of 6.9%, not 8.25%. However, as applied by Mr. Ferrell, it simply makes no sense in the context of a *Till* analysis.

22.     Had he followed the formula approach, Mr. Ferrell would have arrived at a significantly lower adjustment. Mr. Ferrell's expert report explicitly states that his 2.0% upward adjustment was based on the fact that the Property is an office building. [CIBC Ex. Q, p. 21]. CIBC now contends that the adjustment is mandated because "that's what the market says is the going rate for such loans," but misses the mark on several counts. First, the "market rate" approach is specifically rejected by *Till*. Second, the effect of CIBC's approach is that, contrary to the formula approach mandated by *Till*, Mr. Ferrell did not start with a risk free rate such as the 3.25% prime rate. Instead, he started at a 2.0% higher rate based on an adjustment to "market." Any market-based rate would already account for the risks of the loan under the Plan and would not be in addition to the *Till* factors. On top of that, Mr. Ferrell adjusted again based on his capital stack analysis.[9]

23.     CIBC admonishes the Debtors[10] while attempting to explain Mr. Ferrell's implication that CIBC should be compensated from the perspective of an owner of the Property as opposed to a

_____

[9] As the Debtors have already established, Mr. Ferrell based his further adjustment on a survey which already included risk factors such as "loan to value" and "debt service coverage ratio" as data points and which is of dubious applicability as it references a very limited number of loans and lenders which are of various sizes and amortized over different ranges from 25 to 30 years, all but one of which have loan terms over five (5) years. [Post-Trial Brief ¶17].

[10] Contrary to CIBC's representation, the Debtors did not "attack" Mr. Ferrell on this issue. Mr. Rodriguez, in his expert opinion, opined about the divergent mindsets between he and Mr. Ferrell based on Mr. Ferrell's expert report, not simply on this "analytical experiment." [Rodriguez Declaration ¶¶80-82].

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944     Doc# 226     Filed: 11/30/12     Entered: 11/30/12 15:15:21     Page 14 of 24

lender, by stating that Mr. Ferrell was merely conducting an "analytic experiment" for his conclusion.[11] CIBC also criticizes the Debtors for pointing out Mr. Ferrell's reliance on scenarios where no tenants will renew leases. [Post-Trial Brief ¶33]. If CIBC's explanations are true, i.e., that Mr. Ferrell does not take the perspective that CIBC is entitled to a yield as an investor and that he did not, in fact, intend to predict that no renewals would occur, then Mr. Ferrell's opinions in these scenarios are irrelevant. More significantly, however, they beg the question of why Mr. Ferrell would invent such illogical scenarios to predict future occurrences in the first place.

24. CIBC also persists in depicting the Debtors' management as unreliable. The Debtors have already addressed most of CIBC's alleged "markers" for concern, which CIBC has invented to cast doubt on management. [Post-Trial Brief ¶16]. In addition, CIBC's contention that it had concerns about the Debtors' management after June of 2009 is false. Up through that time, CIBC rated management at zero risk. [John Feece Dec. ¶ 41; Debtors' Ex. 32]. Mr. Gordon never stated he had any issue with the Debtors' management during his testimony at Trial. At no time during the entire pendency of the Bankruptcy Cases has CIBC objected to any aspect of the Debtors' management of the Property. CIBC's novel imaginary facts which it now states is a cause for concern, such as the Debtors' "willingness to blame others (in this instance, CIBC) for their own misfortunes" and "willingness to sign whatever suits them for the moment while feeling free to ignore what they have signed if it does not get them what they want" [CIBC Post-Trial Brief, p. 14 at lines 1-5], are merely a litigator's "spin" on the Debtors' arguments, have no support in the record, and hold no evidentiary weight whatsoever.

### E. The Debtors' Proposed 6.00% Interest Rate.

25. Mr. Ferrell previously maintained that the "debt service coverage ratio" metric is calculated based on cash flow available for debt service. [CIBC Ex. Q, p. 7]. Mr. Rodriguez testified that it is calculated based on net operating income. [Transcript p. 238 at lines 8-15]. CIBC now explains that it is in fact based on net operating income, but that net operating income should deduct for all operating expenses including capital costs. Operating expenses do not, however, include

---

[11] On the contrary, Mr. Rodriguez conducted his own "experiment" by testing his proposed interest rate from a *more conservative viewpoint* of a loan underwriter, which CIBC nonetheless criticized as discussed below

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

11

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 15 of 24

items such as tenant improvements and leasing commissions which are capitalized, not expensed. Thus, they should not be included in any calculation.

26. Indeed, CIBC criticizes Mr. Rodriguez's calculation of debt service coverage ratio without informing the Court that CIBC calculates such ratio in the same way; i.e., without including capital costs such as leasing commissions and tenant improvements. This is evident, for example, in CIBC's internal Quarterly Report for May 2011. [Debtors' Ex. 33, p. CIBC0073766].[12] Therefore, regardless of how the calculation is characterized, Mr. Rodriguez's calculations (1.30:1 for 2013, 1.31:1 for 2014, 1.33:1 for 2015 and 1.36:1 for 2016, respectively) are accurate. [Debtors' Ex. 4].

27. CIBC also questions Mr. Rodriguez's credibility due to his corrected calculation of the Property's terminal value at Trial. There, Mr. Rodriguez projected a terminal value of $39.65 million assuming an 8% capitalization rate, opining that capitalization rates could very well be more favorable and that his assessment was conservative and from a lender's perspective. [Transcript, p. 167 at line 17 through p. 168 at line 18]. While CIBC emphasizes the "vagaries of real property valuation," it faults Mr. Rodriguez for essentially stating the same, yet it fails to address Mr. Ferrell's projected terminal value of $40.3 million and indication that such amount will be sufficient to pay CIBC's claim at the end of the Plan's term. [CIBC's Ex. Q, p. 15 at ¶1]. Moreover, CIBC has not and cannot refute the Debtors' argument that both experts have used extremely conservative estimates and capitalization rates. [Post Trial Brief ¶41]. This is clear from the fact that the only appraisal in evidence values the Property at $41,000,000 as of a year ago [Debtors' Ex. 13] and the undeniable fact that market conditions have improved since then and are continuing to improve. [CIBC Ex. Q, p. 18]. Consequently, common sense would dictate that any true terminal valuation will be substantially in excess of those projected under the conservative assumptions utilized by both experts.

28. CIBC's disapproval of Mr. Rodriguez's use of a $1.70 lease rate also is unwarranted. At Trial, CIBC hand-selected specific leases from the rent roll and asked Doug Feece to read the

---

[12] CIBC does, however, account for "structural reserves" in its Quarterly Report. Reserves may be appropriate for computing operating expenses; however, as the Debtors have noted previously, under the Plan, there will be no reserves and the Property's leasing agent's earned commissions will be deferred to the extent the Reorganized Debtors are unable to make any distributions under the Plan. Consequently, inclusion of reserves and commissions is not appropriate. [Post Trial Brief ¶39].

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

12

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 16 of 24

corresponding lease rates onto the record, and it now argues that because Mr. Feece "demonstrated numerous recent renewals in the $1.50-$1.65 range," Mr. Rodriguez's use of a $1.70 lease rate means he "did not look at what the Debtors were actually achieving." CIBC ignores the fact that the Debtors' recent leases were signed at $1.75 per square foot, only $.08 lower than the average of existing tenants on the September 2012 rent roll. [Doug Feece Dec. ¶16]. Indeed, Doug Feece also testified to a lease rate of $2.23, yet CIBC fails to include it in its analysis. [Transcript, p. 107 at lines 3-9]. Even a cursory review of the first page of the rent roll shows that the two largest leases, both with the County of Santa Clara, *start* at a rate of $1.75. [Debtors' Ex. 7]. Moreover, CIBC disregards the fact that lease rates will receive percentage increases over their terms based on the lease. For Kerio, which CIBC cites as an example of a lease rate below $1.70, the Debtors negotiated a deal (which CIBC approved) wherein Kerio agreed to a reduction of its free rent period by two months, which eventually will provide above-market lease rates over the last half of the lease term. [Transcript, p. 114 at lines 1-16]. As has been its pattern, CIBC persists in ignoring the facts, data and realities which the Debtors have set forth

29. CIBC also does not address the fact that the Debtors' have already upgraded and completed tenant improvements for most of the Property which had been largely neglected for many years pre-dating the Debtors' purchase, instead adhering to its economic hypotheses that the Debtors will need to continue to spend at "historic" levels for tenant improvements, notwithstanding the facts that the Property is almost fully-occupied, that the Debtors have demonstrated that tenant improvement costs will continue to decrease going forward, and that CIBC's baseless theory contradicts both the Debtors' experience and common sense. [Doug Feece Dec. ¶¶10, 11 and 14; Debtors' Ex. 23 and 24].

30. While Mr. Rodriguez selected a lower leasing commission rate than Doug Feece in his Forecast, commissions will be deferred if the Debtors cannot meet their payment obligations under the Plan, including those to CIBC. Still, CIBC condemns Mr. Rodriguez for using numbers which diverge from those provided by Doug Feece. CIBC fails to recall that, to address CIBC's criticisms of his expert report, Mr. Rodriguez applied an alternate, more conservative methodology to further evaluate his conclusions that the Plan is feasible and that the 6% interest rate is

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

13

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 17 of 24

appropriate. Therefore, Mr. Rodriguez confirmed his conclusions with both methodologies, one which relied on his Forecast and one that used the projections provided by Doug Feece.

31. Instead, CIBC points to Mr. Rodriguez's alternate, more conservative methodology to further its agenda to discredit him, again extrapolating that it indicates that he, and now the Debtors as well, misunderstand *Till*. No reasonable interpretation of Mr. Rodriguez's testimony can justify CIBC's conclusion, and both the Debtors and Mr. Rodriguez have made absolutely clear their understanding of *Till*. [Post-Trial Brief ¶11; Rodriguez Declaration ¶37; Transcript, p. 143, at lines 6-20].

32. Similarly, CIBC clings to its baseless conclusion that Mr. Rodriguez "reverse engineered" an appropriate interest rate. In fact, the rate at which he arrived is remarkably close to Mr. Ferrell's rate, after discounting Mr. Ferrell's unjustified upward adjustment based on his duplicative *Till/North Valley* adjustment and his "market value" adjustment. This is without taking into account the several unwarranted adjustments made by Mr. Ferrell based on the feasibility factor as pointed out by the Debtors, which CIBC has failed to address. [Post-Trial Brief ¶¶20-21]. Absent these adjustments, Mr. Ferrell's analysis may well result in a lower interest rate than that proposed by Mr. Rodriguez.

33. With respect to vacancy and collection rates, CIBC inexplicably accuses Mr. Rodriguez of making assumptions without any corroborating facts. [CIBC Post-Trial Brief, p. 19 at lines 1 through 10]. Mr. Rodriguez thoroughly clarified the basis for his use of both rates [Transcript, p. 148 at line 19 through p. 152 at line 3], and even explained that he employed the second methodology from a lender's viewpoint in large part to respond to CIBC's criticisms. [Transcript, p. 149 at lines 22-25]. Yet CIBC now faults Mr. Rodriguez for employing the alternate methodology to confirm his prior opinions and to address CIBC's own concerns. Moreover, Mr. Rodriguez created a detailed chart to summarize his analysis of lease rollover and revenue [Debtors' Ex. 8] which included an assumption that the Property would never exceed 90% occupancy. [Transcript, p. 149 at lines 19-22]. Mr. Rodriguez further explained that his use of the 10% rate was based on what lenders using such underwriting approach would use. [Transcript, p. 150 at lines 4-7]. Indeed, Mr. Ferrell corroborates the use of such rate. [CIBC Ex. Q, p.36, ¶5]. Mr. Rodriguez,

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post
Trial\Reply\v9.docx

14

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 18 of 24

therefore, provided ample corroborating facts.

34. CIBC's mischaracterization of Mr. Rodriguez's testimony as a "monologue essentially justifying the Debtors' behavior" provides still another example of CIBC's *ad hominem* approach in viewing the evidence. In response to direct questions from CIBC's counsel at Trial, Mr. Rodriguez testified that he did, in fact, consider the Debtors' alleged behavior in determining his adjustment for the "circumstances of the estate" factor, including the Debtors' behavior when facing the unreasonable terms imposed by CIBC. [Transcript, p. 157 at 15 through p. 158 at 18]. In response to the question whether CIBC was obligated to provide any terms, Mr. Rodriguez responded that it was obligated to act in good faith and, therefore, obligated to provide terms. [Transcript, p. 159 at lines 2-11]. These answers, while not to CIBC's liking, are responsive to CIBC's questions and hardly amount to a monologue.

## F. Feasibility.

35. CIBC's discussion regarding feasibility follows its pattern of manipulating facts, in this instance arriving at conclusions based on its own carefully-selected data. For one, CIBC indicates that the debt service coverage ratio is less than 1.0 for much of the life of the Plan. [CIBC Post-Trial Brief, p. 19 at lines 19-20]. This again is not true, even assuming CIBC's counsel is correct in asserting that tenant improvements and leasing commissions should be included in calculating the debt service coverage ratio. At Trial, pursuant to the request of CIBC's counsel to deduct all leasing and capital costs, Mr. Rodriguez calculated the ratio for the year 2013, and CIBC's counsel concluded it was 1.04:1. [Transcript, p. 238 at 14 through p. 239 at 15]. Based on those same calculations, the ratios would still be 1.06:1 for 2014, 1.07:1 for 2015 and 1.10:1 for 2016, respectively. [*See* Debtors' Ex. 4]. As it is, and as noted above (in Paragraph 26), CIBC's own documents [*see* Debtors' Ex. 33, p. CIBC0073766] confirm that Mr. Rodriguez's calculations of debt service coverage ratio set forth in Debtors' Exhibit 4 are correct.

36. CIBC also argues its own higher numbers rather than using those in the Forecast, [CIBC Post-Trial Brief, p. 19 at line 23 through p. 20 at line 2], including numbers for leasing commissions (which are deferred under the Plan), and lower revenue numbers (which conflict with both the Debtors' September Projections and the Forecast, and do not reflect revenues for the period

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

15

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 19 of 24

during which the Plan will be in effect)[13]. [Debtors' Ex. 3 and Ex. 4]. Evidently, CIBC believes it has the expertise and knowledge to forecast the Debtors' revenues more accurately than the Debtors themselves, despite Mr. Rodriguez's in-depth analysis. [Rodriguez Dec. ¶70]. Not surprisingly, CIBC concludes that the Plan is not feasible based on its numbers.

37. CIBC then looks to the Debtors' Monthly Operating Reports for the past 11 months, ignoring the abundance of evidence that the Debtors' operations and the Property have improved and stabilized within that period and especially during the latter portion. In fact, the Debtors' efforts to lease up the building during the period, while initially requiring expenditures on tenant improvements, have resulted in a trend towards stabilization, including higher occupancy, lower tenant improvement costs and lower commissions.[14] Notably, in 2009, when the Property was last leased to over 90% occupancy, commissions were $76,832 and tenant improvements were $149,887, which both are comparable to the amounts set forth in the September Projections and Mr. Rodriguez's Forecast. [Debtors' Ex. 23].

38. In addition, as set forth in the Debtors' MONTHLY OPERATING REPORT for October 2012, the Debtors have approximately $1,156,000 in cash which will be sufficient to cover any shortfall during the first years of the Plan.

**G. Guaranty of John and Rosalie Feece; Disbursements to John and Rosalie Feece.**

39. The Debtors have made it clear that they will modify the Plan to address CIBC's purported concerns about fairness and equity relative to the guaranties of, and disbursements to, John and Rosalie Feece. Nonetheless, CIBC uses the Debtors' proposed accommodations with respect to these issues to further falsely cast the Debtors in a bad light. CIBC again alludes to the payment to Focus Bank, of which it was well aware, to support some imagined willingness of management to abscond with funds notwithstanding the $19 million invested into the Property. CIBC also invents evidence, indicating that Mr. Feece testified "in essence, that he thinks of the alleged debt as equity"

---

[13] In fact, the Debtors' MONTHLY OPERATING REPORT for October 2012 indicates gross rents at approximately $510,000.

[14] CIBC's misrepresentation that the Debtors "vigorously" opposed an increase to its oral request at Trial for an increase in its adequate protection payments, without any briefing on the topic, is wrong. The Debtors opposed such request because it was not properly before the Court, and the Court agreed. [Transcript, p. 278 at line 23 through p. 279 at line 21].

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

16

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 20 of 24

which, of course, he does not. [CIBC Post-Trial Brief, p. 21 at lines 24-25]. At any rate, the Debtors again reiterate that they will propose language to CIBC to modify the Plan to address these issues, to be incorporated into the order confirming the Plan.

### H. Reserve Account

40.     Without explaining why CIBC's imposition of the reserve accounts on the Debtors was not arbitrary and capricious, CIBC merely dismisses the Debtors' argument as nonsense. Yet, as the evidence has shown, CIBC knew that the Debtors would not be able to meet the reserve payment requirements. It would only be nonsense then to retain the very same unconscionable reserve requirements which forced the Debtors into the position they are in today. CIBC claims that it requires the reserve accounts for protection, but reserves for tenant improvements and leasing commissions, which are now substantially diminished as has been abundantly demonstrated by the Debtors, are no longer necessary. In addition, the Debtors' execution of the Plan will be supervised by the Bankruptcy Court, and CIBC is offered remedies under the Plan in the event the Debtors default. [Plan, Article IX].

41.     Moreover, the Debtors drafted the Plan with consideration of amounts budgeted for tenant improvements, and the proposed cramdown interest rate accounts for this consideration. Thus, reserves for such amounts are superfluous. *See, e.g., North Valley Mall*, 432 B.R. 825, 837-838 (comparing the facts in *In re SM 104 Ltd.*, 160 B.R. 202, 238 (Bankr.S.D.Fla. 1993), where the debtor proposed elimination of all tenant and capital improvements for the entire plan term without reserves, with the facts in *North Valley Mall*, where debtor's projections accounted for fees, maintenance and replacement reserves, and explaining that "while it is of course preferable to see a cash cushion in excess of all projected needs, this is not the kind of bare skin and bones attempt to ignore the realities of commercial leasing which was presented in *SM 104*.").

42.     A final matter is worth addressing in conjunction with the issue of fair and equitable treatment. Throughout the Plan confirmation process, CIBC has attempted to overreach for greater concessions and an increased interest rate under the guise of "fair and equitable" treatment.[15] In this

---

[15] In fact, CIBC implies that its Claim should include attorneys' fees in the amount of approximately $860,000 based on the fact that they were "set forth without challenge in Mr. Gordon's declaration." [CIBC Post-Trial Brief, p. 10 at line 12, n.8]. CIBC did not include any such fees in its Proofs of Claims filed in the Bankruptcy Cases, nor has it set

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

17

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

respect, CIBC has raised issues such as the reserve accounts, alleged modification of guarantees and the potential eminent domain transaction with the San Jose Redevelopment Agency, and the Debtors have addressed them all, yet CIBC persists. CIBC has lost sight of the fact that *Till* mandates an objective rather than a subjective inquiry, to arrive at an interest rate which provides a creditor with the present value of its claim. As the *Till* plurality explained, it does not require "that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a 'cram down' loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose." *Till v. SCS Credit Corp.*, 541 U.S. 465, 476 (2004).

43. The cases which CIBC cites for the premise that a plan must be literally fair and equitable to a secured creditor, [CIBC Post-Trial Brief, p. 3 at lines 9-22], are inapposite. The Plan does not invoke issues regarding potential bad faith attempts to release nondebtor guarantors, *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350-51 (5th Cir. La. 1989); negative amortization coupled with extensive deferment of principal payment, *In re D & F Constr., Inc.* ("*D & F Constr.*")[16], 865 F.2d 673, 676 (5th Cir. Tex. 1989); the control of collateral and retaining proceeds without lender consent, coupled with a deferred valuation, in direct contravention to section 1129(b)(2)(A)(ii), *In re Riverbend Leasing LLC*, 458 B.R. 520, 538-539 (Bankr. S.D. Iowa 2011); or alternate, hypothetical plan scenarios based on the outcome of litigation with its largest tenant, *In re Grandfather Mt. Ltd. Pshp.*, 207 B.R. 475, 488-89 (Bankr. M.D.N.C. 1996).

44. Further, CIBC has failed to address the issue of the treatment of other creditors in these Bankruptcy Cases. As the Debtors have explained, the Court may entertain equitable considerations in the context of a cramdown. The Debtors have shown that the Plan is in the best

---

forth any argument or supporting evidence (other than Mr. Gordon's self-serving declaration filed on the eve of Trial) that such fees are reasonable and should be allowed under section 506(b) of the Bankruptcy Code. In addition, it should be noted that the Debtors may be entitled to attorneys' fees as a 'prevailing party' under Cal. Civ. Code Sec. 1717. *See, e.g.*, *Farmer v. Moser (In re Moser)*, 2011 Bankr. LEXIS 2667 (Bankr. N.D. Cal. July 9, 2011).

[16] *D & F Constr.* illustrates the parameters of what may be considered fair and equitable. There, the real property debtor proposed a negative amortization of a construction lender's loan for the first 12 years of the plan, and deferred payment of principal for another 15 years. The court opined that negative amortization does not render a plan unfair, and that under the extreme terms proposed by the debtor, such terms could only be considered reasonable if the present condition of the market "will improve substantially" during the plan's term. Ultimately, the court found that such speculation was impermissible under the circumstances where the creditor was "effectively denied access to the security it contracted for during the next fifteen years and must furnish further funding to the project." *Id.* at 676.

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944    Doc# 226    Filed: 11/30/12    Entered: 11/30/12 15:15:21    Page 22 of 24

interests of creditors, [Post-Trial Brief, Sec. III-G], and that the alternative – a liquidation and/or foreclosure by CIBC – would be to the detriment of all parties [STATEMENT RE REQUIREMENTS OF 11 U.S.C. § 1129(a) AND (b) AND CHECKLIST FOR CONFIRMATION HEARING ¶7].

45.     Furthermore, where unsecured creditors would suffer prejudice, courts have exercised their discretion under section 506(b) to disallow contractual default interest. [*See* Objection to Claim ¶31]. Thus, to the extent inclusion of default interest in estimating CIBC's claim would harm unsecured creditors, the Court should exercise its discretion and deny enforcement such interest.

46.     On the other hand, prejudice to CIBC is minimal. If the Debtors do default under the Plan, CIBC may pursue its remedies under the Plan in the Bankruptcy Court, including foreclosure if appropriate. Meanwhile, it will continue to receive payment at the proposed 6% interest rate, a rate which is not only fair but provides CIBC a spread of more than 5% over current LIBOR rates on a loan originally priced at 2% over the then LIBOR rate. [Rodriguez Dec. ¶83]. Finally, CIBC has presented no evidence that the value of its security is declining, and, in fact, a review of all news accounts shows economic conditions improving significantly in the San Jose area. Consequently, CIBC will not be prejudiced by the implementation of the Plan.

### III.     CONCLUSION

CIBC's attempts to portray the Debtors in a negative light and itself as a shining light are unavailing. CIBC offered the loan in its "interim" program and indicated that once the Property was income-producing, it would offer financing through a loan with standard 10-year fixed rate terms. [Debtors' Ex. 25 and 26; *see also* Transcript p. 182, at lines 5-6, wherein Mr. Gordon, in response to questions about the fixed-rate program, states "I think that was an expectation that if he performed and his property performed, that would be offered"]. The Debtors achieved that result by investing an additional $6 million into the Property. CIBC then pulled the rug out, reluctantly "offered" a variable rate for two years rather than its 10-year fixed rate program, imposed onerous terms on the Debtors including the unworkable reserve requirements, required yet even more fees, and otherwise took most or all of the cash flow such that an event of default was inevitable.

After the default it caused, CIBC and the Debtors entered into negotiations for over two years, at which time CIBC then used the pretext of the Debtors' payment to Focus Bank of which

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

19

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN

Case: 11-58944     Doc# 226     Filed: 11/30/12     Entered: 11/30/12 15:15:21     Page 23 of 24

CIBC was fully aware, as the basis to pin blame on the Debtors.  Further, to penalize the Debtors for seeking protection from the bankruptcy process, CIBC informed the Debtors, for the first time and following the commencement of the Bankruptcy Cases, that it was charging default interest on the entire principal balance for missed reserve payments dating back to October 2009 and missed interest payments dating back to October 2010, and late charges on all amounts, totaling approximately $6.7 million.

CIBC's proposed cramdown interest rate is not reasonable as it seeks a return that would represent a windfall.  CIBC is entitled to repayment of its claim at a rate equal to the present value of the deferred payments, when discounted at the proposed interest rate, which equals the amount of the allowed secured claim.  CIBC's proposed rate of 8.5% represents an amount expected from an investor, not a lender.

The Plan is feasible.  The Debtors' projections are conservative, reliable and reasonable. CIBC's presentations of a variety of "doomsday" scenarios are not based in fact.  "[The] possibility of failure is not fatal . . . The Code does not require debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy §1129(a)(11) so long as adequate evidence supports a finding of feasibility." *North Valley Mall*, 432 B.R. at 838 (*citations omitted*).

The Plan should be confirmed and CIBC's objections should be overruled.

Dated:  November 30, 2012          Respectfully submitted,

                                   **MURRAY & MURRAY**
                                   A Professional Corporation


                                   By:  */s/ John Walshe Murray*
                                        John Walshe Murray
                                        Attorneys for Debtors

TTH:sb
K:\Community Towers\Pl\Comm. Towers I, LLC\Plan and DS\Plan Confirmation\Post Trial\Reply\v9.docx

DEBTORS' POST-TRIAL REPLY BRIEF IN SUPPORT
OF CONFIRMATION OF DEBTORS' JOINT PLAN