

**The following constitutes**
**the order of the court. Signed January 25, 2013**

**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

<div style="vertical margin text">

**UNITED STATES BANKRUPTCY COURT**
**for the Northern District of California**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| COMMUNITY TOWERS, I, LLC., <br> COMMUNITY TOWERS, II, LLC., <br> COMMUNITY TOWERS, III, LLC., <br> COMMUNITY TOWERS, IV, LLC., <br><br> Debtors. | Jointly administered under <br> 11-58944 SLJ |

### ORDER DENYING CONFIRMATION OF DEBTORS' JOINT PLAN

Debtors in these administratively consolidated cases filed a Joint Plan of
Reorganization.  Creditor CIBC Inc. ("CIBC") voted against the Joint Plan and opposed
confirmation contending, principally, that the Joint Plan was not fair and equitable (11 U.S.C.
§ 1129(b))[1] and was not feasible (§ 1129(a)(11)).

The court held a confirmation trial on October 15 and 16, 2012.  The court asked for
post-trial briefs, and held closing argument on December 5, 2012.  Appearing at trial and

---

[1]     All section references, unless otherwise noted, are to the Bankruptcy Code, 11 U.S.C.
§ 101 et. seq.

ORDER

-1-

closing argument were John Murray and Robert Franklin, Esq. of Murray and Murray, for Debtors, and Adam Lewis, Vincent Novack, and Kristin Hiensch, Esq. of Morrison & Foerster, LLP, for CIBC.

Debtors filed an objection to CIBC's proof of claim on October 5, 2012.  The court entered its Order re: Objection to Proofs of Claim Nos. 4, 5, 6, and 7 (corresponding to the proofs of claim filed in each of the cases noted above) on October 11, 2012, indicating that the claim objection was not on the court's calendar for trial on October 15 – 16, 2012.  Because the amount of the claim bears on confirmation, however, the court has considered the objection and has made tentative findings for the purpose of confirmation solely.

Having considered the testimony of the witnesses, the legal standard for confirmation of a chapter 11 plan, the argument of counsel, and the record in this case, the court concludes the Joint Plan cannot be confirmed because it is does not satisfy the best interests of creditors test under § 1129(b) and is not feasible as required by § 1129(a)(11).

## I. FACTUAL BACKGROUND[2]

### The Debtors

A. Community Towers I – IV, LLCs, are limited liability companies.

B. Each of the debtor limited liability companies is owned by a limited partnership. Each limited partnership is operated by a general partner.

C. Either John Feece individually or John and Rosalie Feece jointly own between 90-99% of the limited partnership interests in each of those limited partnerships.

D. John Feece is the president and chief executive of each of the Debtors.

---

[2]  This decision constitutes the court's findings of fact and conclusions of law under FED. R. BANKR. P. 7052.

ORDER

-2-

### The Real Property – Community Towers

E.    Community Towers is a two building office complex located at 111 West Saint John Street and 111 North Market Street, in downtown San Jose, California.  The buildings have a total of 307,840 in marketable square footage.

F.    Debtors acquired Community Towers in 2006.  At acquisition, Community Towers was only 65% occupied, and required extensive repair and maintenance work.  Debtors upgraded the heating, ventilation, and air conditioning systems, and made repairs and improvements to bathrooms, water pumps, and sprinkler systems.

G.    Debtors hold the Community Towers as tenants in common, with ownership shares in the limited liability companies ranging from 12.7% to 54.4%.

H.    Community Towers is now managed by California Towers Management, which is owned by John and Rosalie Feece.  John Feece has primary responsibility within that company for managing Community Towers, including leasing, construction, and maintenance of the buildings.

### The Original CIBC Loan

I.    To purchase Community Towers, Debtors used money advanced by John and Rosalie Feece, and Debtors, and by money borrowed from CIBC.  The Feeces invested $12 million through Debtors.  The Feeces also guaranteed Debtors' obligations to CIBC.

J.    On June 5, 2006, Debtors borrowed $33,500,000 from CIBC.  They signed a promissory note (the "Original Note") with interest payments at LIBOR plus 2%, with a floor of 7%.  The Original Note included a 5% default interest rate over the nondefault rate. The Original Note's maturity date was June 10, 2009.

K.    On the same date, Debtors gave CIBC a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (the "Deed of Trust").  The Deed of Trust conveyed to First American Title Insurance Company, as Trustee, for the benefit of CIBC, Debtors' interests in Community Towers, the leases, rents generated by the property, and all personalty.  The Deed of Trust was recorded.

ORDER

Case: 11-58944    Doc# 251    Filed: 01/25/13    Entered: 01/25/13 15:56:40    Page 3 of 28

L.      On the same date, Debtors also gave CIBC an Assignment of Leases and Rents ("Assignment of Rents"), which granted CIBC an assignment of Debtors' interests in the leases at Community Towers, as well as the rents generated by those leases.

M.      Thus, CIBC has a first-priority lien on Community Towers' real and personal property, including rents received from tenants.

<div align="center">

**CIBC Loan Extension**

</div>

N.      The weak condition of the American economy between Fall 2008 and 2009 requires little elaboration. Unfortunately, it was during this time of falling property values, frozen credit markets, and poor financial performance, that the Original Note came due.

O.      Debtors could not pay off the Original Note when it came due on June 10, 2009. They attempted to locate take-out financing but were unsuccessful. Debtors considered selling Community Towers but decided against this course of action after being advised by real estate brokers there was no market for real property at that difficult time.

P.      Debtors approached CIBC about an extension on the Original Loan, to which CIBC agreed, subject to certain modifications. On or about June 10, 2009, Debtors, John and Rosalie Feece, and CIBC executed an Omnibus Amendment to Loan Documents ("Amendment"), which extended the maturity date of the Original Loan for two years—to June 10, 2011. The Original Note, Deed of Trust, and Assignment of Rents underwent corresponding modifications (and will be referred to as the "Amended Note," "Amended Deed of Trust," and "Amended Assignment of Rents" (collectively, the "Amended Loan Documents").

Q.      The Amended Loan Documents contain changes. These include the payment of a Deferred Commitment Fee of $1,005,000 (Amended Note § 6), a loan extension fee of $335,000 (Amendment § 4), an increase in the interest rate to LIBOR plus 4% (from LIBOR plus 2%) (Amended Note § 3), and the establishment of a monthly tenant improvement/leasing commission reserve (the "TI/LC Reserve") of $104,043.

ORDER

1  R.  The Amended Loan Documents also contained a long series of agreements

2 pertaining to the extension.  Among other things, Debtors waived any claim they might have

3 against CIBC arising out of the original or Amended Loan Documents (Amended Note § 9).

4 The documents contain a merger clause (Amended Note § 10).

5      **Allegations of Unfair Dealing in Connection with Loan Extension**

6  S.  Debtors contended at trial that CIBC's demands in connection with the Amended

7 Loan Documents amounted to unfair dealing.  The court does not accept this premise, and puts

8 the changes in conditions in the loan documents down to a dramatic and adverse change in

9 economic conditions.

10  T.  The testimony at trial supported a conclusion that when the Original Loan was

11 made in 2006, the parties (CIBC, Debtors) anticipated that it was a relatively short term loan of

12 three years.  At the conclusion of this time, with an expectation that occupancy would increase

13 from 65%, the parties also believed that Debtors would refinance the obligation or CIBC would

14 extend a new loan.

15  U.  Debtors essentially contend that CIBC promised or committed to lending the

16 money to Debtors at the conclusion of the term.  Only two documents in the record support such

17 a claim:  an internal loan memorandum generated pre-closing at CIBC which indicates, in a

18 checked box, that it was anticipated that CIBC would provide permanent financing at the

19 maturation of the Original Loan.  That same document indicates that the "Sources of

20 Repayment" would be "from a refinance or sale of the property."

21  V.  Debtors also relied on a 2008 pamphlet entitled CIBC Annual Accountability

22 Report.  That document discussed, in general terms, CIBC's engagement with the communities

23 where it operates.  It stated:

24

25    In our U.S. real estate finance business, we operate a full-service platform which
    originates commercial mortgages to mid-market clients, under three programs …

26    The interim program offers fixed and floating-rate financing for properties that
    are fully leased or with some leasing or renovation yet to be done.  These

27    programs provide feeder product for the group's permanent fixed-rate loan
    program and typically have an average term of 1 to 3 years.  Once the

28

ORDER

-5-

Case: 11-58944  Doc# 251  Filed: 01/25/13  Entered: 01/25/13 15:56:40  Page 5 of
28

construction and interim phase are complete and the properties are income-producing, borrowers are offered fixed-rate financing within the permanent program (typically with terms of 10 years).

W.    Neither of these documents, nor any of the evidence at trial, supported a conclusion that CIBC had promised to provide additional financing at the maturation of the Original Loan.

X.    The information about a long term fixed rate loan was entirely consistent with CIBC's marketing program and Debtors' goal of stabilizing the property's rents and finances. The information in the CIBC Annual Accountability Report appears to the court to be in the nature of marketing, and guidance to investors and local communities seeking to understand CIBC's engagement efforts. The pamphlet describes a financing program in general terms. It does not discuss Community Towers specifically. It does not purport to be a binding commitment or a promise, and is simply a reflection of goals or practices. It was not a promise to lend on a permanent basis to Debtors.

Y.    Circumstances overcame Debtors. Mr. Feece acknowledges as much in his Declaration in Support of Debtors' Joint Plan of Reorganization the ("Feece Decl."). "As a result of the financial crisis of 2008-2009, the securitized loan market evaporated and the lending market was frozen." (Feece Decl., 8:4-5.) Mr. Feece says he attempted to refinance Community Towers through CIBC or other lenders, without success. He considered selling Community Towers but was advised by "several brokers that there was no point in even listing the Property because, at that time, there simply were no buyers in the market." Feece Decl., 8:5-8.

Z.    CIBC refused to enter into permanent financing at the maturation of the Original Loan. Lindsay Gordon, CIBC's Executive Director of Special Loans, testified that by June 2009, Debtors could not meet CIBC's underwriting requirement for a permanent loan. Prior to the recession, some banks lent on a 80% loan to value ratio. Most required 70% by the time the recession was in full swing. CIBC estimated Community Tower's value at $43,750,000. Seventy percent of that figure is $30,625,000, which is almost $3 million less than the amount

ORDER

due under the Amended Loan Documents. Debtors' loan to value ratio was 76% in 2009 and did not meet these standards. Debtors' financing requirements exceeded that figure.

AA. CIBC understood that tenant vacancies had increased during 2008-2009. Mr. Gordon testified that CIBC was concerned that after leasing up the property from 65% to 90%, at the time the Original Loan matured, Community Towers was only 80% leased. While impressed with Debtors' initial leasing efforts, CIBC worried that Debtors' success in leasing the property would be fleeting.

BB. Debtors were particularly frustrated by the requirement that they pay $104,043 into a Leasing Reserve account each month. Mr. Gordon testified that his review of the records indicated this figure originally included an estimated $59,000 in tenant improvement reserves, and $45,000 in principal pay down. The Amended Loan Documents attribute the payment to a Leasing Reserve, and made no mention of principal repayment. According to the Amended Deed of Trust, the money was to be used to pay for tenant improvements.

CC. Debtors contended that CIBC knew the Leasing Reserve requirement was more than Community Towers could afford as it represented much of Debtors' net cash flow from the property after payment of the CIBC loan and property expenses.

DD. On balance, the court does not find fault with CIBC's position. The parties certainly have a difference of opinion about the proper contours of a fair loan package. But given the serious dysfunction in the financial markets, declining property values, tenant vacancies, and changes in lending practices that came to be after 2009, the changes may have been inevitable. Debtors' inability to secure financing from a company other than CIBC confirms Debtors may not have gotten a great deal, but they got an extension where none was available.

### Debtors' Joint Plan

EE. Debtors' Joint Plan provides that Debtors will continue to operate Community Towers, and requires the payment of allowed claims. The property will continue to generate rents, which will be used to pay claims. The Joint Plan (and disclosure statement) projects

ORDER

Case: 11-58944    Doc# 251    Filed: 01/25/13    Entered: 01/25/13 15:56:40    Page 7 of 28

1  annual rental increases of 3-5%, rental rates at $1.60 sq. ft., and a 3% annual increase in

2  expenses.

3       FF.    Administrative claims under § 507(a)(2) , including the expenses arising during

4  the life of the bankruptcy case, will be paid in full, although at present Debtors do not anticipate

5  having any unpaid administrative creditors.

6       GG.    Debtors do not believe they have any priority tax claims under § 507(a)(8).

7  Approximately one-half of the secured tax bill of Santa Clara County has already been paid and

8  the balance was to have been paid by the time of trial.

9       HH.    Debtors contend there are no priority claim under § 507(a), but if such claims

10  exist, they are to be paid in cash on confirmation.

11       II.    Pre-paid rent claims of tenants will be paid by extending a credit against future

12  rents to tenants with such claims.  Lease deposit claims of tenants will be handled in the same

13  manner.

14       JJ.    Unsecured claims total approximately $95,000.  These claims will be paid in full

15  over twelve months with interest at the legal rate.

16       KK.    John and Rosalie Feece, insiders, have a claim of $6,621,000 as of the petition

17  date.  This claim will be paid over five years with interest at 6%.   Payment of this claim is

18  subordinated to those of general unsecured creditors.

19  <center>**CIBC Claim and Treatment**</center>

20       LL.    Debtors scheduled as disputed the CIBC claim of $38,905,806.  CIBC filed a

21  proof of claim alleging it has a claim[3] of $40,578,790, of which $34,100,000 is secured, and

22  $6,437,780 is unsecured.  As noted, Debtors have objected to that claim.

23

24

25

26

27

28  [3]    CIBC filed four proofs of claim, one in each case identified in the caption.  For simplicity, the court will refer to these claims in the singular.

ORDER

<center>-8-</center>

MM.     According to paragraph 12 of the Rider to Proof of Claim of CIBC, the amount due is composed of these elements:

| | |
|---|---|
| Unpaid principal | $33,219,556.00 |
| Nondefault Interest @ 7% | 2,461,015.00 |
| Default Interest @ 5% | 3,303,500.00 |
| Late Charges | 1,660,978.00 |
| Less: Certain Credits | (107,269.80) |
| Total | $40,537,779.20[4] |

NN.     The Joint Plan provides that CIBC will retain its lien against Debtors' property. Debtors intend to make interest only payments at 6% for five years to CIBC on its secured claim.  CIBC will be paid its secured claim in full no later than five years after the Joint Plan becomes effective.[5]

OO.     Paragraph 6 of the Original Note provides that, during the existence of an Event of Default, Debtors are to pay interest on the entire unpaid principal sum and any other amounts due at the rate equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) the greater of (i) five percent above the regular interest rate or (ii) five percent above the prime rate.  The evidence showed that CIBC charged default interest of 5% above the regular interest rate on the entire unpaid principal balance during periods of Debtors' default.

PP.     Paragraph 4 of the Original Note provides that if any installment due is late, the Debtors must pay a late fee equal to the lesser of (a) five percent of the unpaid sum, or (b) the maximum amount allowable by law.

QQ.     Debtors contended at confirmation that CIBC's claim is overstated, and argued that CIBC's claimed default interest is not allowable.

---

[4]     A minor rounding error exists on the proof of claim, and the number used in Debtors' brief is off slightly.   The court will use Debtors' number for the sake of simplicity.

[5]     It appears that Debtors are treating CIBC's claim as fully secured under the Joint Plan, based on a valuation of approximately $41 million.

ORDER

Case: 11-58944    Doc# 251    Filed: 01/25/13    Entered: 01/25/13 15:56:40    Page 9 of 28

**Community Towers Operations during Chapter 11**

RR.    Community Towers continued to operate the property during the course of the bankruptcy case.  According to the August 2012 Monthly Operating Report filed by Debtors (admitted as CIBC Exh. V at trial), Debtors generated revenue from rents, fees, and parking of $4,463,400 over the life of the case (September 26, 2011 to August 31, 2012).  Debtors had $3,708,099 in expenses during this time, and a net income of $755,301, before reorganization items of $834,371 (including professional fees and United States Trustee quarterly fees). This resulted in a net loss, over the life of the case, of $87,138.  Assuming that reorganization items would no longer be necessary at the conclusion of the chapter 11 case, Debtors generated an average of $68,663 income over expenses per month.[6]

SS.    Debtors made a single adequate protection payment of $96,635 to CIBC during August 2012.  With the exception of that payment, the monthly average net income did not include a payment to CIBC.

**Financial Projections for Joint Plan**
**Operating Income & Expenses**

TT.    Debtors contend that during the post-confirmation period, Debtors will generate an annual operating income, before payment of debt under the Joint Plan, ranging between $208,290.90 and $230,145.10.[7]  This figure is premised on monthly tenant improvement expenses of $40,000, or $480,000 annually.

UU.    Debtors' expert Richard Rodriguez opined that Debtors' cash flow forecasts were achievable based on historical performance and projections.

VV.    CIBC's expert witness, Richard W. Ferrell, was critical of Debtors' proposed budget.  He identified two areas of significant concern.

---

[6]    Total net revenue of $755,301 (without deduction for reorganization costs) divided by 11 months is $68,663.

[7]    Debtors' Exh. 1.

ORDER

WW.    First, he considers the gross revenue figure Mr. Rodriguez used to be overstated. Mr. Rodriguez relied on new leases being signed at $1.70 per square foot. This figure appears exaggerated based on Debtors' leasing experience in 2012. According to Exh. 7, for leases commencing in 2012, the average rent was $1.53 per square foot, and the most common rental rate was $1.65 per square foot.

XX.    Mr. Rodriguez relied on tenant improvement and leasing commissions to be approximately $560,000 per year (Exh. 4). Debtors estimated those same expenses at approximately $540,000 per year (Exh. 1).[8]

YY.    The court concludes that number is understated significantly. Doug Feece, who was responsible for leasing activities at Community Towers until shortly before the trial, estimated that Debtors would spend approximately $200-$400,000 per year on leasing commissions over the life of the Joint Plan. He also testified about recent leases the Debtors signed that required significantly higher amounts of tenant improvements, including the Kerio lease ($44 per square foot) and Habitech lease ($40 per square foot).

ZZ.    Moreover, Mr. Ferrell testified credibly that the cost of tenant improvements was greatly understated by Debtors' projections. Mr. Ferrell concluded, based on information obtained from Debtors' appraiser's work, that combined tenant improvement and leasing commission expenses had averaged $1.35 million per year during the six years before the bankruptcy cases were commenced. From the time the bankruptcy cases were filed until August 2012, Debtors incurred $1.36 million, which works out to $1.8 million per year. These figures far exceed Debtors' projected expenses of $540,000 in Exh. 1.

AAA.    Mr. Rodriguez estimated operating expenses at a fixed rate of 33% of gross revenue.[9] This appears to underestimate expenses by more than 5%. Debtors' projections

---

[8]    The difference between these two figures was not explained.

[9]    The 33% figure is used in Exh. 4, but Mr. Rodriguez referred to a 45% figure in his report (Exh. 14). The court believes the 33% figure is what he intended to use.

ORDER

-11-

1  called for operating income in 2013 of $5,149,300, with operating expenses of $1,978,242.10,

2  or a 38.4% expense rate.  Mr. Rodriguez did not explain this discrepancy.

3       BBB.   Mr. Ferrell opined, based on a review of Debtors' operations during chapter 11,

4  that Debtors' projections were unrealistic.  He noted that Debtors' operations during the

5  bankruptcy case had not generated enough money to pay CIBC's claim.[10]  And, he indicated the

6  projections understated significantly Debtors financial obligations by using a low interest rate

7  on the CIBC obligation.

8       CCC.   The court agrees with Mr. Ferrell that Debtors' Operating Projections appear to

9  overstate income and understate expenses.

10  **Terminal Value of Property**

11       DDD.  Debtors' Plan relies on a refinance or sale of Community Towers to pay CIBC at

12  the conclusion of its life.

13       EEE.   Mr. Rodriguez offered testimony regarding the likelihood Community Towers

14  would have sufficient value in five years' time to support a refinancing or sale that would pay

15  CIBC's claim.  Mr. Rodriguez estimated in his report that the terminal value of Community

16  Towers, or its value at the conclusion of Debtor's Plan, would be $47,511,081.92.  Assuming

17  costs of sale of 8%, and further assuming an 8% capitalization rate, Mr. Rodriguez concluded

18  Community Towers' value would support a sale that would pay CIBC at the conclusion of

19  Debtors' Plan.

20       FFF.   Unfortunately, Mr. Rodriguez's conclusion was flawed.  He testified on cross

21  examination that he failed to include the cost of real property taxes in calculating the net

22  revenues that the property would produce.  After taking taxes into account, he revised his

23  estimate of the terminal value of the property to be $39,652,000.

---

[10]    Indeed, Debtors did not commence making post-petition payments to CIBC until August 2012.  As a result, Debtors' operational success was exaggerated.

ORDER

-12-

**Testimony on Appropriate Interest Rate for Joint Plan**

GGG.   Debtors originally offered a 3.25% interest rate to CIBC.  That proposal was modified by the First Modification to Debtors' Joint Plan of Reorganization (dated March 27, 2012).  The current proposal is for 6% annual interest.

HHH.   Debtors' expert, Mr. Rodriguez, opined that the proper interest rate under *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), was 6%.  Mr. Rodriguez started with the prime rate of interest as published in the Wall Street Journal, of 3.25%.  He adjusted that rate upward by 2.75% for risks.  His adjustments were as follows:

| | |
|---|---|
| Circumstances of the estate | -.25% |
| Nature of the security | +1.50% |
| Duration of the plan | +.50% |
| Plan feasibility | +1.00% |

III.   CIBC's expert Richard Ferrell also relied on a *Till* analysis, but came to the conclusion the appropriate interest rate for cram down purposes was 8.25%.[11]  Mr. Ferrell also started with a 3.25% prime rate, and calculated the full rate as follows:

| | |
|---|---|
| Circumstances of the estate | +1.00% |
| Nature of the security | +3.65% |
| Duration of the plan | -0.60% |
| Plan feasibility | +1.0% |

JJJ.   For the reasons discussed below, the court finds Mr. Ferrell's conclusions to be more reliable.  Because Mr. Ferrell appears to have double-counted certain risks, the court will adjust his conclusion and find that an appropriate interest rate for a loan like the one Debtors are proposing to modify is 7.25%

## II.   DISCUSSION

A.   <u>Confirmation Standards</u>

A chapter 11 plan of reorganization must satisfy § 1129(a)(1) to (16) to be confirmed.  If a class of creditors rejects the plan, it can be confirmed only if the standards of § 1129(b) are

---

[11]   Mr. Ferrell rounded down from 8.30%.

ORDER

met.  *See generally Liberty Nat'l. Enters. v. Ambac La Mesa Ltd. P'ship (In re Ambac La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997).  The plan proponent bears the burden of proof to show, by a preponderance of the evidence, that the plan meets the requirements of § 1129(a).  *Id.;  Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n. 5 (9th Cir. 1994).  In the absence of objections, a presumption that a plan has been proposed in good faith arises.  FED. R. BANKR. P. 3020(b)(2).

CIBC raises three objections to Debtors' Joint Plan under § 1129(a)(1):  (1) the Joint Plan improperly includes a third party release in violation of § 524;  (2) the Joint Plan violates § 1129(a)(11) because it is not feasible; and (3) the Joint Plan is not fair and equitable to CIBC because the interest rate proposed to be paid is inadequate to compensate CIBC for the risk inherent in its loan to Debtors.  Debtors also contend that CIBC's secured claim is overstated because it includes unlawful default interest and late fees.

The court will address these points below.  Because CIBC has not objected on other grounds, and because Debtors filed a comprehensive Statement re Requirements of § 1129(a) and (b) and Checklist for Confirmation Hearing, demonstrating Debtors' adherence to the remaining requirements of § 1129(a), the court concludes Debtors' Plan otherwise meets the requirements for confirmation.

B.    CIBC's Default Interest Rate is Not Lawful but its Late Fees are

1.    Allowability of Default Interest

Before addressing the standards for confirmation, the court must address Debtors' contention that CIBC's claim is overstated.  Debtors contend that CIBC has charged default interest and late fees that exceed what is permissible under the law.  Debtors seek a determination that CIBC's claim should be reduced, which will save Debtors money in terms of plan payments.  The court will sustain Debtors' objection in part.

In the Ninth Circuit, the law is clear that a secured creditor is entitled to default interest on its claim "provided that the rate is not unenforceable under applicable nonbankruptcy law." *General Electric Capital Corp. v. Future Media Prod. Inc.*, 536 F.3d 969, 974 (9th Cir. 2008)

Case: 11-58944   Doc# 251   Filed: 01/25/13   Entered: 01/25/13 15:56:40   Page 14 of 28

1  (internal quotation and citation omitted).  Non-bankruptcy law usually means state law, as it

2  does in this case.

3      Under California law, **"a provision in a contract liquidating the damages for the breach

4  of the contract is valid unless the party seeking to invalidate the provision establishes that the

5  provision was unreasonable under the circumstances existing at the time the contract was

6  made." Cal. Civ. Code § 1671(b).  "A liquidated damages clause will generally be considered

7  unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable

8  relationship to the range of actual damages that the parties could have anticipated would flow

9  from a breach. . . . In the absence of such relationship, a contractual clause purporting to

10 predetermine damages 'must be construed as a penalty.'" *Ridgley v. Topa Thrift And Loan*

11 *Association*, 17 Cal.4th 970, 977 (1998), citing *Garrett v. Coast & Southern Fed. Sav. & Loan*

12 *Assn.*, 9 Cal.3d 731, 739 (1973).  "The characteristic feature of a penalty is its lack of

13 proportional relation to the damages which may actually flow from the failure to perform under

14 a contract." *Garrett*, 9 Cal.3d at 739.  The party seeking to rely on a liquidated damages clause

15 bears the burden of proof.  *Garrett*, 9 Cal.3d at 739.

16     In *Garrett*, a lender included in its standard promissory note a provision assessing a late

17 charge for failure to make timely installment payments equal to two percent annual interest on

18 the unpaid principal balance of the loan obligation for the period during which the payment was

19 in default.  The court concluded that "a charge for the late payment of a loan installment which

20 is measured against the unpaid balance of the loan must be deemed to be punitive in character"

21 and that the provision was void. *Garrett*, 9 Cal.3d at 740.  Even though *Garrett* was decided

22 prior to the 1977 amendment of § 1671, "[n]othing in the 1977 legislation indicates an intent to

23 abrogate *Garrett*'s analysis of unjustified late fees as unenforceable penalties[.]" *Ridgley*, 17

24 Cal.4th at 981, n 5.

25     The default interest provision in this case is similar to the one the court considered in

26 *Garrett*.  CIBC charged default interest of 5% on the entire unpaid principal due, rather than on

27 specific payments Debtors failed to make.

28

ORDER

-15-

Given the law in *Garrett*, the court must conclude CIBC's default interest provision is an unenforceable penalty. The security agreement defines fifteen occurrences as an Event of Default, ranging from failure to make monthly payment to failure to provide insurance to dissolution of Debtors without prior consent of CIBC. Any one of these fifteen events will trigger the default interest provision, which bears no relationship to any loss which CIBC may suffer as a result of a default. Under the circumstances, the default interest provision is punitive in character and lacks any proportional relationship to the actual damages which may flow from any of the Events of Default.

CIBC made two arguments in support of its claim for default interest, neither of which is persuasive. CIBC argued that CIBC would lose the opportunity to re-lend and earn interest on the missed payments. The default interest provision imposes a 5% penalty above the regular interest rate on the entire unpaid principal balance, not on the missed payments, so it does not represent the opportunity cost of missed payments. Furthermore, the default interest provision applies whenever any one of the fifteen Events of Default is triggered, and CIBC failed to explain how the provision is a fair estimation of the actual damages which CIBC may sustain as a result of these events. Most importantly, CIBC failed to distinguish how its provision is different from the one in *Garrett*.

CIBC's second argument is that the default interest provision in the Amended Loan was identical to the default interest provision in the Original Note, and Debtors agreed to that without complaint. The fact that parties to a contract agreed to an illegal provision does not make that provision legal. *See Ridgley*, 17 Cal.4th at 981, n 5 ("The dissent suggests a different set of rules must apply because this was an 'arm's-length commercial transaction.' That plaintiffs are small business owners rather than consumers, however, does not deprive them of section 1671's protection against unreasonable penalties . . ."). Thus, under *Garrett* and § 1671(b), the default interest provision is unenforceable, and CIBC is not entitled to the 5% default interest on the unpaid principal balance as part of its claim.

ORDER

-16-

## 2.   Allowability of Late Fees

In addition to the default interest provision, the loan also carries a late fee provision which provides that, upon any untimely installment payment (including the final installment due on maturity), Debtors shall pay a late fee of 5% of the unpaid sum to defray the expenses pertaining to handling and processing and to compensate CIBC for the loss of use of such delinquent payment. Because this late fee provision is measured against the missed payments only, it has a sufficient proportional relationship to the actual damages which CIBC may suffer as a result of any missed payments. *See Garrett*, 9 Cal.3d at 741 ("The lender's charges could be fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting the accounting for a late payment."). The court finds that a late fee of 5% based on untimely installment payments is reasonable.

## 3.   Conclusion – Default Interest and Late Fees

The court therefore estimates, for the purposes of confirmation, that CIBC's claim would be:

| | |
|---|---:|
| Unpaid principal | $33,219,556.00 |
| Nondefault Interest @ 7% | 2,461,015.00 |
| Default Interest @ 5% | *not allowed* |
| Late Charges | 1,660,978.00 |
| Less: Certain Credits | (107,269.80) |
| Total | $37,234,279.20 |

The court does not find that the imposition of default interest is permitted under nonbankruptcy law. It need not address Debtors' contention that the court should find the default interest provision is not enforceable on equitable grounds.

## C.   Bankruptcy Code § 1129(a)(1) (Plan Complies with Bankruptcy Code)

Section 1129(a)(1) provides that a plan can only be confirmed if it complies with the applicable provisions of this title. This is understood to mean the plan complies with the classification requirements of § 1122 and the permissible terms of a plan under § 1123. *See generally Liberty Nat'l. Enters. v. Ambac La Mesa Ltd. P'ship (In re Ambac La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997). CIBC objects to Debtors' Plan because CIBC

ORDER

-17-

contends it includes a release of John and Rosalie Feece's obligations under a guaranty agreement they signed for Debtors' obligations to CIBC. It contends this release violates § 524(e), which provides that a discharge does not affect the liability of any third party on that debt. In particular, CIBC contends the Feece's obligations to pay interest and default interest is modified by Debtors' Joint Plan, in violation of § 524(e).

The court concludes that the Debtors' Plan complies with § 1129(a)(1). Debtors conceded in Debtors' Reply Brief in Support of Confirmation of the Debtors' Joint Plan that under paragraph 6 of the Payment Guaranty the Feeces executed, modification of the guaranty under the terms of a bankruptcy reorganization is barred. The court will treat this statement as a concession that Debtors' Joint Plan does not intend or effect a modification of the Feeces' obligations under the guaranty. CIBC's objection is overruled.

 D.   <u>The Plan does not Satisfy the Requirements of § 1129(b)(2) (Best Interests)</u>

  1.   <u>Requirements of Best Interests Test for Secured Creditor Rejecting a Plan</u>

In order to confirm a plan, the proponent must show that each class has either accepted the plan or is unimpaired. § 1129(a)(8). A class of claims has accepted a plan if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. § 1126(c). If a class of claims is impaired under a plan, at least one class of claims that is impaired under the plan must accept the plan, exclusive of any acceptance by a plan insider. According to Debtors' Ballot Tabulation and Submission of Ballots filed May 29, 2012, Debtors have two impaired consenting classes: Classes 5, and 6. CIBC, the sole entity in Class 2, has rejected the Joint Plan.

A plan that fails to achieve the voting requirements can nonetheless be confirmed if the proponent can show the plan meets the requirements of § 1129(b)(2). This is referred to as "cram down." Under § 1129(b)(2), if all other provisions of § 1129(a) are met except the voting requirement found at § 1129(a)(8), the plan can be confirmed if it does not discriminate unfairly and is "fair and equitable" to creditors. CIBC has a secured claim (Class 2 under the

ORDER

Joint Plan).  To cram down the Joint Plan, Debtors must show they have satisfied one of the "fair and equitable" choices provided by § 1129(b)(2).

The statute provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)     (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii)     for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii)     for the realization by such holders of the indubitable equivalent of such claims.

§ 1129(b)(2)(A).

Thus, CIBC, as a secured creditor voting against the Joint Plan, is entitled—at a minimum—to (1) no change in its lien rights and deferred cash payments; (2) sale of the Community Towers, with its lien attaching to the proceeds; or (3) the indubitable equivalent of its claims.  Because Debtors propose paying CIBC over time with no change in its lien rights, the court must evaluate the plan under § 1129(b)(2)(A)(i), which calls for deferred payments over time.

2.     Calculation of Appropriate Interest Rate under § 1129(b)(2)(A)(i)

Both parties agreed that the appropriate cramdown rate is determined using the "formula" approach set forth in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).  They disagreed

ORDER

-19-

on the application of that standard and the appropriate result, however. Debtors contend the rate should be 6%. CIBC contends it should be 8.25%.

In *Till*, the Supreme Court was asked to determine the appropriate cramdown rate in a chapter 13 case.[12] The Court approved the formula approach, which begins with national prime rate, and makes appropriate upward adjustments based on risk and other factors. The risk adjustment depends "on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.,* at 479. The court referred to the resulting rate as the "prime-plus rate of interest" which, under the formula approach established in that decision, would depend "only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Id.*, at 479. The Ninth Circuit has held that the bankruptcy court must make explicit findings in a chapter 11 case to support the finding of a cram down interest rate. *In re Fowler*, 903 F.3d 694, 699 (9th Cir. 1990).

Before addressing the specific components of the interest rate calculation, the court indicates that in general, it accepts Mr. Ferrell's testimony as being more accurate and comprehensive. As will be shown below, Mr. Rodriguez made a number of computational and judgment errors, suggesting his conclusions were not as sound as Mr. Ferrell's. Mr. Rodriguez testified, by example, that it was appropriate under *Till* to select an interest rate that was "fair" to Debtors. The court does not accept that premise. *Till* enumerates the factors a court must consider to arrive at an appropriate cramdown interest rate. None of those factors includes fairness.

---

[12]     It is so far unclear to what extent *Till* is controlling in a chapter 11 case. Collier on Bankruptcy, ¶ 1129.05[2][c] (16th ed. 2009) ("Courts have unevenly applied *Till* in the chapter 11 setting"). As Debtors pointed out in their Post-Trial Brief, *Till* indicates that a secured creditor is not entitled to any upside in a chapter 13 cramdown situation. However, the Supreme Court suggested in a footnote that it would be appropriate to consider an efficient market rate in a chapter 11 cramdown context. *Till*, 541 U.S. at 476, n.14. Because Debtors and CIBC assumed that the formula approach specified in *Till* applies, the court will evaluate the evidence on that basis.

ORDER

-20-

a.     Circumstances of the Estate

The court finds an upward adjustment of 1% is appropriate in this category.  Community Towers is managed effectively by John Feece, but its occupancy level dropped from approximately 93% to 80% from the time the Disclosure Statement was approved to the confirmation trial.  Also, recent tenants have required very substantial tenancy improvement contributions.  The downtown San Jose, California class B office market has underperformed surrounding areas, and has an approximately 20% vacancy rate.

b.     Nature of the Security

(i)     Mr. Ferrell Double Counted Certain Risks

Mr. Ferrell added 365 basis points (3.65%) to his cram down interest rate based on the nature of the security.  In his expert report, Mr. Ferrell explained his methodology for determining the risk adjustment.  He conducted a survey of lenders to identify their pricing for a commercial real estate loan for same type of office building, taking into account the LTV ratio, debt service coverage ratio (DSCR), and debt yield – factors that a conventional lender would consider.  His 365 basis points adjustment is comprised of two components:  an increase of 200 basis points (or, 2.00%) because the collateral is an office building, and an increase of 165 basis points based on the loan's LTV, the lack of adequate debt service coverage ratio (DSCR) and the low debt yield.  The second adjustment—of 165 basis points—was achieved using a "blended rate approach."

Debtors asserted that the blended rate approach Mr. Ferrell used is contrary to *Till* and impermissibly double-counts the risk factors.  CIBC countered that the blended rate approach is a proper application of *Till*, citing *In re North Valley Mall, LLC*, 432 B.R. 825 (Bankr. C.D. Cal. 2010).  Debtors are right that the court in *North Valley Mall* did not follow the *Till* formula analysis.  The court admitted as much: "Although it is unclear to what extent *Till* governs in Chapter 11s, the Court agrees that it is necessary to adopt *some kind* of a formula approach . . . But still a formula approach is appropriate to 'build up' a rate that can be said to approximately

ORDER

-21-

compensate for the level of risk under the plan." *Id.*, at 831 (emphasis added). *North Valley Mall* did not use the "prime-plus rate of interest" formula approach discussed in *Till.*[13]

The fact is the blended rate approach Mr. Ferrell relied on was disapproved by *Till*. This is explained well in a bankruptcy court decision from 2011. *In re Red Mountain Machinery Co.*, 448 B.R. 1, 9-13 (Bankr. D. Ariz. 2011). First, as noted in *Red Mountain Machinery*, the *amicus* brief for commercial lenders in *Till* argued for the adoption of the blended rate approach in chapter 11 cases, but the Supreme Court did not adopt it. *Id.*, at 11; *Brief Amicus Curiae for Commercial Lenders in Support of Respondent*, 2003 WL 22466038, at *7 (Oct. 24, 2003).

Second, the blended rate approach Mr. Ferrell proposed is quite similar to the "coerced loan" approach rejected in *Till*.[14] In a coerced loan approach, the inquiry focuses on "the interest rate that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy." *Till*, 541 U.S. at 472. The Court rejected the coerced loan approach because it "requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors – an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans. In addition, the approach overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." *Id.*, at 476; *see Red Mountain Machinery*, 448 B.R. at 11 ("[The Supreme Court] rejected the argument that the interest rate necessary to provide present value must be determined as if the lender were making an entirely new loan,

---

[13]     The authority cited by *North Valley Mall* support this conclusion. The law journal article the court refers to, Reehl and Milner, *Cram-Down Interest Rates: The Quest Continues*, 30 Cal. Bankr. J. 15 (2009), refers to both the blended rate approach and the treasury rate approach as "formula approaches." The authors found the formula approach in *Till* most similar to the treasury rate approach. *In re North Valley Mall, LLC*, 432 B.R. at 822, 827.

[14]     The coerced loan approach is sometimes called the "comparable loan approach" in the Ninth Circuit. Reehl and Milner, *Chapter 11 Real Estate Cram–Down Plans: The Legacy of Till,* 30 Cal. Bankr. J. 405 (2010).

ORDER

-22-

which is the only basis for arguing that a comparable secured debt interest rate should be applied to only 65% or 80% of the debt."); *compare North Valley Mall*, 432 B.R. at 834 ("[the blended rate approach] is an attempt by principled approach to create a proxy for a market extrapolated from current data"). The market-based coerced loan approach is precisely what Mr. Ferrell used in his *Till* analysis. *See Red Mountain Machinery*, 448 B.R. at 12 ("in identifying the risk factors that must be considered, the *Till* Court did not include the loan-to-collateral value ratio.").

The court does not suggest that *North Valley Mall* was incorrectly decided. Because the Ninth Circuit has not adopted *Till* in a chapter 11 case, Ninth Circuit pre-*Till* cases are still valid. The Ninth Circuit endorsed the coerced loan approach, also called the comparable loan approach, in *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir. 1987) (holding that the court is to make a case-by-case determination of the interest rate based on "a loan on equivalent terms in the open market"); Reehl and Milner, *Chapter 11 Real Estate Cram–Down Plans: The Legacy of Till,* 30 Cal. Bankr. J. at 412 (After *Till*, "the 'comparable loan approach' espoused in the *Camino Real* case continues to be an approach to consider seriously. It basically seeks a 'market' rate of interest equivalent to what the secured creditor could have obtained had it foreclosed and reinvested the proceeds in loans of comparable length and risk."). In *In re Fowler*, 903 F.2d 694 (9th Cir. 1990), the Ninth Circuit confirms the use of the comparable loan approach in *Camino Real* and also clarifies the approval to use a formula approach using a base rate such as a prime rate and adding risk factors. Both *North Valley Mall* and *In re Boulders on the River, Inc.*, 164 B.R. 99 (9th Cir. BAP 1994), a pre-*Till* case cited in *North Valley Mall*, used the blended rate approach based on current market rates for similar loans, which is permissible under *Camino Real* and *Fowler* given the uncertain applicability of *Till* in chapter 11 cases.

Mr. Ferrell runs into trouble because he combined the coerced loan approach (through the use of the blended rate) with the formula approach in *Till*. In effect, he has double-counted the risk adjustments. *North Valley Mall* and *Boulders* used the blended rate as the final

ORDER

-23-

cramdown rate. Because they are derived from market-based rates, blended rates necessarily have certain risk factors built in. *In re Linda Vista Cinemas, LLC,* 442 B.R. 724, 751 (Bankr. D. Ariz. 2010) ("Whether one starts with a 'base rate' and adds for risk, or just accepts that a proven market rate includes relevant risk (in an appropriate case), the result should not vary by much."). Mr. Ferrell used the blended rate, i.e. market rate, to assess the risk adjustment based on the nature of the security risk factor and then made additional adjustments based on the other risk factors identified in *Till*, namely circumstances of the estate, term of loan, and feasibility of the plan. This was not the approach used in *North Valley Mall*. Having accepted the prime-plus rate of interest formula approach in *Till*, CIBC improperly used the blended rate approach, which was rejected by *Till,* within a *Till* analysis.[15]

<div align="center">

(ii).     Mr. Rodriguez Miscalculated Important Ratios

</div>

Mr. Rodriguez estimated an increase of 1.50% in the interest rate based on the nature of the security. But Mr. Rodriguez made a number of miscalculations or errors in his analysis, casting that conclusion in doubt.

Mr. Rodriguez originally estimated the debt service coverage ratio ("DSCR") at 1.30. DSCR is the ratio of net operating income to debt service. At 1.30, Mr. Rodriguez indicated that Community Towers generated enough net income to cover its CIBC debt by 130%. Mr. Rodriguez conceded on cross examination, though, that the 1.30 figure was wrong because it failed to take account of capital costs, leasing commissions, and other expenses. After making adjustments, Mr. Rodriguez stated that the DSCR was only 1.04.

Second, Mr. Rodriguez opined that the terminal value of the property was $47 million. On cross examination, it was clear he failed to include real property taxes in his projections. After including those expenses, he testified the appropriate terminal value was about $39 million.

---

[15]     Because the parties agreed to the prime-plus interest rate approach propounded in *Till,* the court makes no finding whether *Till* controls in a chapter 11 case or whether a comparable loan (e.g. blended rate) approach is permissible.

ORDER

<div align="center">

-24-

</div>

Mr. Rodriguez's 6% interest rate is premised, therefore, on a misunderstanding. A reduced DSCR of 1.04 is a dramatic and adverse change. It means that almost any significant fluctuation in income or expenses might prevent the property from servicing the CIBC debt. And, with a terminal value of only $39 million, CIBC's loan may not be fully secured. This is important for two reasons. First, if there is a failure under the Joint Plan and CIBC moves to foreclose, the property's value may be insufficient to fully pay CIBC. Second, the Joint Plan is premised on a refinancing or sale of Community Towers at the conclusion of the plan's life. If the property's *future value* is only $39 million, it appears unlikely that Debtors will be able to take out CIBC's loan at the Joint Plan's conclusion.

Mr. Rodriguez would not concede these errors merited a change in his calculated interest rate. The court cannot agree an adjustment is unnecessary. These changes are both material and adverse. It is not possible to conclude that such important variances would have no impact on the 6% interest rate.

After taking these matters into account, the court determines the appropriate adjustment for "nature of the security" is +2.60.

### c. Duration of the Plan

Mr. Ferrell opined that the short length of the Joint Plan's term argued for a reduction in the interest rate. The court agrees that a five year term is comparatively short given the circumstances of the estate. The court accepts the -.60% adjustment.

### d. Plan Feasibility

The court addresses the Joint Plan's failure to satisfy the feasibility requirement of § 1129(a)(11) below. Summarizing, the court finds it likely that Debtors' Joint Plan will not succeed on a cash flow basis, and therefore Debtors will require further reorganization. The court concludes a 1.0% interest rate increase is appropriate under the circumstances

### 3. Conclusion on Joint Plans' Cram Down Interest Rate

The court concludes the correct interest rate in this case should be 7.25%. This is based on a 3.25% prime rate, plus the following adjustments:

ORDER

-25-

| | |
|---|---|
| Circumstances of the estate | +1.00% |
| Nature of the security | +2.60% |
| Duration of the plan | -0.60% |
| Plan feasibility | +1.0% |

E.    Bankruptcy Code § 1129(a)(11)  (Feasibility)

Section 1129(a)(11) requires a finding that the confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further reorganization of the debtor.  In other words, a plan must be feasible to be confirmed.  *Pizza of Hawaii, Inc. v. Shakey's, Inc., (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985).  A plan is feasible if it has a "reasonable probability of success" and is not a "visionary scheme."  *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

Debtors' projections in support of the Joint Plan (Exh. 1) cannot support a conclusion that Debtors can perform if the interest rate is set at 7.25%.  In their projected earnings statement, Debtors indicate that they will achieve a net operating profit of $1.922 million in 2012, and $2.613 million in 2013, and $2.888 million in 2014.  In that same projection, Debtors indicate that payments to CIBC at a 3.25% interest rate (the rate set in the original version of their Joint Plan), would amount to $1.207 million.  At a 3.25% interest rate, the Joint Plan is workable.  Assuming a 7.25% interest rate, the Joint Plan is not workable.  At 7.25%, Debtors' annual interest expense would be approximately $2,699,485.24.[16]  Given Debtors' projections, Debtors would not be able to service the CIBC debt under the Joint Plan.

Two observations are important at this juncture:  First, Debtors' projections at Exh. 1 appear to both overstate income, and to understate expenses. As noted, the projections are based on a future square foot lease rate of $1.70, which does not appear achievable and is not supported by the evidence.  They are also based on leasing commissions and tenancy improvement cost projections that fall far short of historical results.

---

[16]    The monthly expense would be $224,957.10  calculated as one-twelfth the annual interest expense:  7.25% of CIBC's estimated claim of $37,234,279.20, or $2,699,485.24.

ORDER

-26-

1  Second, Debtors' financial results over the life of this chapter 11 case do not support a

2 conclusion that Debtors can afford to pay CIBC 7.25% interest. According to the Master

3 Monthly Operating Report for the Month Ended August 2012, over the life of the case Debtors

4 generated a net income of $755,301, before reorganization items of $834,371 (including

5 professional fees and United States Trustee quarterly fees). This resulted in a net loss, over the

6 life of the case, of $87,138. If the reorganization items are added back, Debtors would have

7 achieved an average of $68,663 income over expenses per month. That figure does not reflect

8 interest payments to CIBC, with the exception of August 2012. The court must conclude, based

9 on this record, that Debtors' future projections of income and expenses are not supported by

10 historical results or the testimony at trial. It must also conclude that actual results of operations

11 do not support a conclusion that Debtors will be able to service the CIBC under the Joint Plan.

**III.**  **CONCLUSION**

13  For the foregoing reasons, the court denies confirmation of Debtors' Joint Plan.

14  IT IS SO ORDERED.

**\*\*\* END OF ORDER \*\*\***

ORDER

**COURT SERVICE LIST**

**[ECF Recipients]**

ORDER

-28-