JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
THOMAS T. HWANG (218678)
DORSEY & WHITNEY LLP
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288
Email: murray.john@dorsey.com
Email: franklin.robert@dorsey.com
Email: hwang.thomas@dorsey.com

Attorneys for Debtors

WILLIAM L. CONTI (113759)
LAW OFFICES OF WILLIAM L. CONTI
100 E San Marcos Blvd #404
San Marcos, CA 92069
Telephone: (760) 510-5917
Facsimile: (760) 560-3643

Litigation Counsel for Debtors

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re: | Cases Jointly Administered |
| **COMMUNITY TOWERS I, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 75-2456729, | Case No. 11-58944-SLJ-11 |
| **COMMUNITY TOWERS II, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 75-2560662, | Case No. 11-58945-SLJ-11 |
| **COMMUNITY TOWERS III, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 32-0065635, | Case No. 11-58948-SLJ-11 |
| **COMMUNITY TOWERS IV, LLC,**<br>A Delaware Limited Liability Company,<br>Employer Tax I.D. No. 77-0379075, | Case No. 11-58949-SLJ-11<br>Chapter 11 |
| Debtor(s). | Date: August_21, 2013<br>Time: 2:00 p.m. |
| 111 W. Saint John Street, Suite 705<br>San Jose, California 95113 | Place: United States Bankruptcy Court<br>280 S. First Street, Room 3099<br>San Jose, CA 95113<br>Judge: Honorable Stephen L. Johnson |

**MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY**

Community Towers I, LLC, Community Towers II, LLC, Community Towers III, LLC and Community Towers IV, LLC (collectively, the "Debtors") hereby submit their MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY (the "Motion"). This Motion is supported by the DECLARATION OF JOHN L. FEECE IN SUPPORT OF MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY (the "Feece Declaration"), the DECLARATION OF DONN BYRNE IN SUPPORT OF MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY (the "Byrne Declaration"), the DECLARATION OF DOUG FEECE IN SUPPORT OF MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY (the "Doug Feece Declaration") and the DECLARATION OF ERIC MOGENSEN IN SUPPORT OF MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY (the "Mogensen Declaration"), all of which are filed concurrently herewith.

## I. INTRODUCTION

1. By this Motion, the Debtors seek an Order from this Court extending the expiration date of the automatic stay previously set by this Court for September 1, 2013 to December 31, 2013. The purpose of this extension is twofold: 1) to permit the Debtors adequate time to proceed towards confirmation of an amended plan of reorganization; and/or 2) to afford the Debtors additional time within which to obtain refinancing or to sell of their real property in order to pay the secured claim of CIBC, Inc.

2. Although this Court denied the Debtors' original proposed plan of reorganization by Order dated January 25, 2013, that denial was based upon the Court's determination that the plan was not feasible in that the Debtors could not attain sufficient revenues to perform the plan during its term in light of the cramdown interest rate that the Court found to be fair and equitable.[1]

3. The Debtors failed to convince this Court at the confirmation hearing that their proposed plan was "feasible". The Court reached the opinion that the Debtors had overstated the income to be received during the plan term and understated their expenses primarily with respect to tenant improvement allowances required to operate the property and leasing commissions payable to agents and brokers for new leases. [Order Denying Confirmation of Joint Plan p. 26, ll. 21-25].

---

[1] This Court stated in its Order Denying Confirmation of Debtors' Joint Plan, at page 14, ll. 16-17: "…the court concludes Debtors' Plan otherwise meets the requirements for confirmation".

4. The Court has expressed its similar concern over whether the Debtors could ever achieve the income requirements to support any plan that will pay CIBC what it is owed, including at the most recent hearing in March 2013. However, the Debtors have done exactly that in their performance over the past 4 months and believe this significant upturn in their operations warrants a last chance to convince this Court that a workable plan can be confirmed.

5. The Court is respectfully requested to be mindful of the epic and historic economic collapse in this country which precipitated the Debtors filing in this case. The freefall of property values coupled with the issues endured by financial institutions combined to produce a deadly cocktail for business failures. Many like John and Rosalie Feece have had their life's work dissipated into nothing by these circumstances. However, epic times call for epic remedies, and while CIBC may continue to cry that it wants its money (something the Debtors do not fault it for), the entire purpose of this Court and its attendant remedies are to permit a party a second economic life where it is at all feasible to do so.

6. The Debtors have been victims of bad timing and circumstances. First, they purchased the Subject Property and built it up to a 93% occupancy only to be felled by the historic economic collapse of 2008-2010. Despite this collapse, the Debtors managed to recover and maintained effective stewardship of the Property, bringing significant value to the Property. However, the effects of the recent economic upturn were only beginning to be felt at the time of the confirmation trial. The results of the past four months are more indicative of future performance. Accordingly, the Court is respectfully requested to take a second look at the Debtors and their affairs in this Motion. They have battled against the odds to increase their profitability to the point that they believe that their proposed Amended Plan (defined below) is achievable. CIBC is not prejudiced as it is receiving contract rate interest every month and the value of their collateral is steadily increasing. The Debtors ask simply at this time that they be given an opportunity to show the Court that the proposed Amended Plan is indeed "feasible" even assuming a 7.0% or 7.5% interest rate under the law through a final confirmation process and hearing or to obtain a new loan to satisfy the interests

of CIBC on a more even playing field[2].

A.  **Jurisdictional Facts**.

7.  Each of the Debtors is a limited liability company formed under the laws of the State of Delaware on June 1, 2006 for the purpose of acquiring that certain two building, 305,000 square foot office complex located at 111 West Saint John Street and 111 North Market Street, San Jose, California commonly known as the Community Towers (the "Subject Property"). In the ordinary course of their businesses, the Debtors utilized rents from the Subject Property as the source of working capital for their pre-petition operations. CIBC, Inc. ("CIBC") is the holder of a first deed of trust on the Subject Property

8.  On September 26, 2011 (the "Petition Date"), the Debtors filed their Voluntary Petitions under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code[3].

9.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The statutory predicate for the relief sought herein is 11 U.S.C. § 105(a). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10. This Motion requests that the Court extend the deadline for termination of the automatic stay in the Debtors' bankruptcy cases, presently set for September 1, 2013, to through and including December 31, 2013.

II.  **RELEVANT FACTS**

A.  **Procedural Background**

11. On March 27, 2012, the Debtors filed the DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) (as modified by the FIRST MODIFICATION TO DEBTORS' JOINT PLAN OF REORGANIZATION (DATED MARCH 27, 2012) filed on August 31, 2012, the "Plan").

---

[2] As will be shown below, the result of the Debtors' increases in cash flow and an improving lending market will make more alternatives open to the Debtors than those that were present in March, 2013 when this Court afforded them the opportunity to explore a financing alternative. Unfortunately, 180 days was simply too short for the effects of the current operations to be significant in the market.

[3] All statutory references herein are to the title 11, United States Code (the "Bankruptcy Code") unless otherwise specified.

12. The Court held a two-day evidentiary hearing on confirmation of the Plan, on October 15 and 16, 2012 (the "Confirmation Hearing").

13. The only evidence in the record of the Confirmation Hearing on the value of the Subject Property was an appraisal made by Donn Byrne of Colliers International, who opined that the Subject Property had a fair market value of $41,000,000 as of October 31, 2011. [See Debtors' Exhibit 12 submitted at the Confirmation Hearing].

14. On December 12, 2012, the Debtors filed the SECOND MOTION FOR ORDER APPROVING USE OF CASH COLLATERAL (the "Second Cash Collateral Motion") and supporting DECLARATION OF DONN H. BYRNE, JR. IN SUPPORT OF DEBTORS' SECOND MOTION APPROVING USE OF CASH COLLATERAL which attaches an updated appraisal that states, *inter alia*, Mr. Byrne's opinion that the Subject Property was worth $44,000,000 as of October 1, 2012.

15. On January 25, 2013, the Court entered its ORDER DENYING CONFIRMATION OF DEBTORS' JOINT PLAN [Docket No. 251] (the "Confirmation Denial Order"), denying confirmation of the Plan. Among other things, the Confirmation Denial Order found:

    a) The Debtors' gross revenue used by their expert ("Rodriguez") was overstated because he relied on new leases being signed at $1.70 per square foot but the average for 2012 leases was $1.53 per square foot with the most common rental rate at $1.65 per square foot [Confirmation Denial Order, § I-WW];

    b) The Debtors' projected tenant improvements ("TIs") and lease commissions ("LCs") of $540,000 were significantly understated. CIBC's expert concluded that combined TIs and LCs averaged $1.35 million per year during the six-year pre-petition period. Combined TIs and LCs averaged out to $1.8 million per year during the bankruptcy cases [Confirmation Denial Order, § I-ZZ];

    c) The Debtors' projected operating income for 2013 of $5,149,300, with operating expenses of $1,978,242.10, resulting in an expense rate of 38.4%, was overstated [Confirmation Denial Order, §§ I-AAA through I-CCC];

    d) The projected terminal value of the Subject Property estimated by Rodriguez at $47,511,082 was erroneously overstated and should have been estimated at $39,652,000

[Confirmation Denial Order, §§ I-EEE to I-FFF]; and

    e)  The appropriate rate of interest to be accorded to CIBC's secured claim should be 7.25% [Confirmation Denial Order, § I-JJJ].

  16.  In addition, the Confirmation Denial Order discusses in depth CIBC's claim and the Debtors' arguments why the claim is overstated. Ultimately, the Court found that CIBC is not entitled to default interest on its claim in the bankruptcy cases, and it estimated CIBC's claim at $37,234,279.20.

  17.  On February 19, 2013, CIBC filed its SECOND MOTION FOR STAY RELIEF requesting that the Court lift the automatic stay pursuant to 11 U.S.C. §§ 362(d)(1) and 362(d)(3) so that it may "proceed with its rights and remedies as a secured creditor of the Debtors." On March 3, 2013, the Debtors filed the DEBTORS' OPPOSITION TO CIBC'S SECOND MOTION FOR STAY RELIEF [Dkt. No. 264] (the "Opposition to Stay Relief") contending, *inter alia*, that sec. 362(d)(3) was inapplicable as the Debtors had fully complied with the statute and that there was no "cause" to lift the automatic stay because CIBC remained adequately protected by an equity cushion of at least $4 million as the value of the Subject Property continues to increase.[4] In addition, the Debtors indicated that they were pursuing refinance and sale opportunities pursuant to which the Debtors would satisfy CIBC's allowed secured claim through a sale or a debt/equity transaction.

  18.  After a hearing on March 5, 2013, the Court entered its ORDER CONDITIONALLY GRANTING CIBC INC.'S SECOND MOTION FOR STAY RELIEF (the "Conditional Stay Order") increasing the adequate protection payments to be paid by the Debtors to CIBC and providing, among other things, that the automatic stay provided under 11 U.S.C. § 362(a) will be lifted if the Debtors fail to pay CIBC all amounts allowed in connection with its secured claims in the bankruptcy cases, by September 1, 2013.

**B.  Factual Background**

  19.  Since the Confirmation Hearing, the Debtors have continued to operate their

---

[4] The Opposition to Stay Relief details how CIBC is adequately protected and how relief from stay is unwarranted. As set forth herein, since the Opposition to Stay Relief was filed, the Debtors have made adequate protection payments at the contract rate to CIBC, and the Subject Property has increased in value. Thus, CIBC is even more adequately protected at this time.

businesses and have timely made all adequate protection payments at the full contract rate to CIBC as required under the Conditional Stay Order, while increasing the profitability of their business.

20. Among other operational improvements, the Debtors have accomplished the following:

    a) The Debtors have signed new leases and have increased the overall occupancy rate to over 95%. The majority of the leases for the buildings are now for longer than the 3-year period of term. [See Declaration of Doug Feece, Exhibit "B" to Declaration of Doug Feece);

    b) TIs and LCs are substantially reduced based upon the fact that the majority of leases at this juncture will be renewals of recent leases (in which the TI work was already completed in the initial term), thereby reducing both the commissions payable and the TIs required to maintain the tenant in the space. [See Declaration of Doug Feece, para. 6, 8, Declaration of John Feece para. 20-21]. A true and correct copy of the Debtors' most recent projections for the period from 2013 through December 2017 (the "July 2013 Projections") is attached to the Declaration of John Feece as its Exhibit "B" and is incorporated herein by this reference;

    c) As a result of current leasing conditions and reduced operating expenses, the Debtors projected operating income has increased dramatically and indeed surpasses the projections this Court felt were "overstated" at the Confirmation Hearing - the difference being that the current state of operations now support the projections.

21. The value of the Subject Property has increased significantly based upon the increase in occupancy, the Debtors' improvement in operations, and continually improving market conditions. Mr. Byrne has completed an updated appraisal which states, *inter alia*, Mr. Byrne's opinion that the Subject Property was worth ***$46,000,000*** as of February 28, 2013. A true and correct copy of such appraisal is attached to the Byrne Declaration as Exhibit "B" and is incorporated herein by this reference.

22. The Debtors have worked and continue to work diligently in seeking alternate lenders for the Subject Property as well as potential buyers and investors for the Subject Property. The Debtors have received several term sheets for refinancing and have communicated such refinance opportunities to CIBC. However, because of the recent developments and the upward trending of

TTH:sb
H:\Client Matters\- F&R\CommTowers\Pld\Extend Stay\Mot v5.docx

7

MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY

Case: 11-58944  Doc# 297  Filed: 07/23/13  Entered: 07/23/13 18:14:06  Page 7 of 14

the Debtors' profits from operations, the Debtors believe that more opportunities will be available in the next few months provided the Debtors have the time to use the latest developments as part of the lending process. The Debtors believe that sales opportunities will increase once the "deadline" of September 1, 2013 is extended and is not used as a leverage point by potential buyers.[Mogensen Declaration para. 7; John Feece Declaration para. 11].

23. The Debtors have informally approached CIBC with proposals for a reduced payoff based upon the financing efforts they are engaged in. CIBC has not responded to these proposals. The Debtors also have reached out to CIBC on multiple occasions in an attempt to reach agreement on a payoff number, but again CIBC has not responded. [John Feece Declaration, para 11]. In the event the Court grants the relief requested in this Motion, the Debtors intend to seek more formal discussions through counsel and perhaps a mediation effort.

24. Notwithstanding any opportunities for refinance and/or to sell the Subject Property, the Debtors believe that conditions have evolved so that the Debtors are now able to propose and likely confirm a plan for their reorganization. Accordingly, they respectfully request an extension of the date on which the automatic stay will terminate in order to allow them additional time to seek confirmation of the Amended Plan, or to obtain financing or a sale of the property to satisfy the secured claim of CIBC.

### III. DISCUSSION

**A. The Automatic Stay.**

25. It is axiomatic to the bankruptcy process that the debtor be permitted a fresh start and the opportunity to reorganize its affairs. Consequently, the automatic stay established under section 362(a) is fundamental to the bankruptcy process. *See In re Peregrine Systems, Inc.*, 314 B.R. 31, 44 (Bankr. D. Del. 2004) *aff'd in part, rev'd in part on other grounds*, *AW Treuhand Wirtschaftsprufungsgesellschaft v. Peregrine Sys. (In re Peregrine Sys.)*, 2005 U.S. Dist. LEXIS 21707 (D. Del. Sept. 29, 2005) (automatic stay is a "fundamental protection provided to a debtor for the purpose of stopping all creditor collection efforts and harassment of the debtor and to provide … a fresh start."). The stay not only protects the debtor, but also creditors. *Shaw v. Ehrlich*, 294 B.R. 260, 267 (W.D. Va. 2003), *aff'd*, 99 Fed. Appx. 466 (4th Cir. 2004) ("stay protects debtors, as well

as creditors, by providing debtors a breathing spell from collection efforts"). This is because the stay protects the bankruptcy estate's assets while enabling an equitable distribution of the estate for the benefit of all creditors. *See Reliant Energy Services, Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) ("purposes of the bankruptcy stay 'are to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse.'") (*quoting GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985)); *Mann v. Chase Manhattan Mortgage Corp.*, 316 F.3d 1, 3 (1st Cir. 2003) ("automatic stay provision is designed to defend against the disorderly, piecemeal dismemberment of the debtor's estate outside the bankruptcy proceedings").

### B. 11 U.S.C. § 105(a).

26. Given that the automatic stay is integral to every bankruptcy case, it is not surprising that bankruptcy courts have invoked their equitable powers under sec. 105(a)[5] to continue the stay for various reasons. *Bank Hapoalim B.M., Chicago Branch v. E.L.I., Ltd.*, 42 B.R. 376, 378 (N.D. Ill. 1984). *See also, e.g., In re Medical Plaza Associates, Ltd.*, 67 B.R. 879 (W.D. Mo. 1986) (extending automatic stay beyond 30-day limit imposed by sec. 362(e) in single asset real estate case, where termination of stay would permit foreclosure leading to irreparable harm to debtor, unsecured creditors, and equity security holders; *In re Mendez*, 464 B.R. 63, 66 (Bankr. D. Mass. 2011) (invoking sec. 105 in a case which had been administratively closed under sec. 350(a) to afford "all parties the most equitable and all-encompassing relief possible in the circumstances."). Courts also have invoked sec. 105(a) as a basis for injunctive relief where the stay has already terminated. *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989) ("Section 105(a) should be considered as a safety net by which actions against the bankrupt estate may be enjoined when the automatic stay has terminated but the equities support appropriate injunctive relief."). Further, Courts have even looked to sec. 105(a) to increase the reach of the automatic stay to cover non-debtor parties in certain circumstances. *See e.g., In re All Seasons Resorts, Inc.*, 79 B.R. 901, 904 (Bankr. C.D. Cal. 1987).

---

[5] Sec. 105(a), titled "Power of the Court" provides in part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title…"

27. As set forth below, the Debtors' current operations as well as improving market conditions indicate that the Debtors will likely be able to confirm an amended plan which pays all creditor claims, including CIBC's secured claim within three years.[6] Based on the facts which have evolved during the bankruptcy cases[7], in combination with the Bankruptcy Code's compelling policy to permit the Debtors' to reorganize and facilitate an equitable administration of the estates for the benefit of all creditors, the Debtors respectfully submit that the Court should invoke its powers under sec. 105(a) to extend the automatic stay.

28. As further support for the exercise of this Court's discretion in extending the automatic stay, the Debtors note that in individual debtor cases, § 362(c)(3)(A) limits the duration of the automatic stay to 30-days for re-filing debtors who had a pending case dismissed within the 1-year preceding. § 362(c)(3)(B) permits an extension of the stay if the certain requirements are met including, *inter alia*, the debtor proves that the filing of the new case "is in good faith as to the creditors to be stayed." § 362(c)(3)(C)(i)(III) provides a presumption that a re-filed case is in bad faith which is rebutted if there has been a substantial change in a debtor's financial affairs since dismissal of the prior case, or if there is any other reason to conclude the case will be concluded with a confirmed plan that will be fully performed. *In re Castaneda*, 342 B.R. 90 (Bankr. S.D. Cal. 2006). Thus, in the context of individual bankruptcy cases, courts have extended the automatic stay where a

---

[6] Because the stay has not yet been terminated, this Motion does not examine the tests for injunctive relief which courts typically apply in the instance when a party seeks to reinstitute an automatic stay which has terminated. In California, "'[t]he traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)'… The criteria traditionally are treated as alternative tests. 'Alternatively, a court may issue a preliminary injunction if the moving party demonstrates 'either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.'" *Ostrander v. Fremont Inv. & Loan*, 2009 U.S. Dist. LEXIS 37815, *4-5 (E.D. Cal. May 4, 2009) (citations omitted). Even if applied here, the hardship and level of irreparable injury confronting the Debtors is unquestionable, and the public interest criterion – to reinforce the goal of the bankruptcy process and to reach an equitable result for the benefit of all creditors - also strongly favors the Debtors. Thus, the only criterion in question is the likelihood of the Debtors' success in confirming a Plan which is discussed herein.

[7] It is important to note that the facts set forth herein which depict the current status of the Debtors align in large part with the Debtors' projections with respect to the Plan. As such, the Motion (and the Debtors' amended Plan) are not advanced with the benefit of hindsight but instead are based on circumstances which the Debtors previously anticipated and have become reality. This is especially important because the Court's findings in the Confirmation Denial Order, and CIBC's arguments at the Confirmation Hearing, were based largely on the Debtors' historical performance during the pendency of the bankruptcy cases. As the Debtors projected during that period, and as demonstrated herein, the Debtors' operations and financial position would improve as the Debtors progressed toward stability.

debtor's financial affairs, including for example, an increase in income, have improved. *E.g.,* *Castaneda*, 342 B.R. at 95.

### C. The Circumstances Of These Cases Warrant Extending The Stay.

29. Once again, the Debtors point out that the economic factors which caused the epic economic collapse in this country from 2009 through 2012 are truly extraordinary. The Debtors have taken the brunt of this blow yet have rebounded mightily over the first half of 2013. The Debtors are prepared to and are able to provide adequate protection payments to CIBC for the extended term at the contract rate of 7%, a rate which is in excess of the market rate at this time. [See Mogensen Declaration, para. 4]. The likelihood of the Debtors locating sufficient financing to pay off CIBC is evident.

30. Even if a sale or refinance is not accomplished in the extended term, the Debtors believe they can obtain confirmation of a plan through the Court. The Debtors have attached as Exhibit "A" to the Feece Declaration a copy of a draft of the DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION (DATED JULY 22, 2013) (the "Amended Plan") which the Debtors anticipate will be filed in substantially the form thereof, which has been amended to reflect the actual current market conditions of the Subject Property and the Debtors' operations. As set forth therein, the Amended Plan proposes to amend the original plan by, among other things:

    a) Reducing the overall length of the Plan from 5 years to 3 years;

    b) Providing for monthly payments during the term of the Plan to CIBC of full contract rate interest (7.00%) and payment of its allowed secured claim (as determined by the Court) in full with interest at 7.00% (or at a rate otherwise determined by the Court) within the three-year term from the Plan Effective Date;

    c) Conversion of the debt owed to John and Rosalie Feece to ownership interests in the Debtors, and contribution of resulting capital to fund the Debtors' operations; and

    d) Deferral of all leasing commissions by the Debtors' leasing agent until payment in full of the claim of CIBC.

31. The Debtors' July 2013 Projections fully demonstrate that the Amended Plan is likely

TTH:sb
H:\Client Matters\- F&R\CommTowers\Pld\Extend Stay\Mot v5.docx

11

MOTION TO EXTEND DATE FOR TERMINATION OF AUTOMATIC STAY

Case: 11-58944   Doc# 297   Filed: 07/23/13   Entered: 07/23/13 18:14:06   Page 11 of 14

to be confirmed.[8] First, as illustrated by the schedule attached to the Doug Feece Declaration, the Debtors have now reached 95% overall occupancy in the two buildings combined. As Mr. Feece details in his Declaration, the Debtors' historical lease renewal rate is 90-95%. Thus, it is reasonable to assume that at least 90% of the leases that come up for renewal during the term of the Amended Plan will renew on terms that will not be less than the initial lease terms. Furthermore, as lease renewals, they will not require tenant improvements nor will they incur lease commissions. [Doug Feece Declaration, paras 6 - 8]. The Debtors' occupancy rate will remain stable throughout the plan period.

32. In addition, the Amended Plan proposes payment of interest to CIBC at the contract rate of 7.00%. The Court has already determined that a 7.25% rate is appropriate for the five-year term originally proposed in the Plan. In light of the fact that the Debtors' financial position has improved since the Confirmation Hearing and that the Amended Plan proposes payment over three years, the risk under the Plan to CIBC is reduced, and the Debtors submit that 7.00% interest payments are appropriate. This proposed rate, of course, is subject to the Court's determination at confirmation. However, even at 7.25%, the July 2013 Projections indicate that the Debtors will be able to perform their obligations under the Plan.

33. For example, even if CIBC's claim were to be allowed in full with the exception of the default interest to which it is not permitted, the claim would approximate at most $41,090,000[9]. The July 2013 Projections indicate the Debtors' net operating profit of $3,729,601 million in 2014, $3,813,454 million in 2015 and $3,947,975 million in 2016. Payments to CIBC at an interest rate of 7.25% would amount to $2,979,025.00 annually. Consequently, the Debtors could service CIBC's debt at 7.25% if required to do so, and still retain $750,576,.00 in net profit for 2014,

---

[8] As the Court is aware, feasibility under sec. 1129(a)(11) requires only a showing that a plan has a "reasonable probability of success" and is not a "visionary scheme." *In re Acequia Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

[9] CIBC's MOTION TO DISMISS THE DEBTORS' CLAIM OBJECTIONS FOR WANT OF PROSECUTION filed on June 9, 2013, estimated its claim including default interest, late charges and attorneys' fees, at $44,390,000. *See* CIBC's BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THE DEBTORS' CLAIM OBJECTIONS FOR WANT OF PROSECUTION [Dkt. No. 285], p. 4, lines 13-14, and n. 2. Paragraph 12 of the Rider to CIBC's Proofs of Claim Nos. 4, 5, 6 and 7 assert default interest of $3,303,500.00 *as of the Petition Date*. As of the date of this Motion, the Debtors' OBJECTIONS TO PROOFS OF CLAIM NOS. 4, 5 6 AND 7 (CIBC, INC.) remain pending, and the Debtors reserve their rights to object to CIBC's claims and to assert affirmative claims against CIBC.

1 | $834,429,000.00 in net profit in 2015, and $968,950.00 in net profit for 2016.

2 |   34. Finally, the Debtors' operations since March 2013 provide the most relevant sample from which to project the Debtors' performance as proposed under the Amended Plan. Since that date, the Debtors have been making 7.00% adequate protection payments to CIBC, have entered into the new leases reflected in the current rent roll (attached as Exhibit "A" to the Doug Feece Declaration), and have reduced costs to the levels set forth in the July 2013 Projections. During the period from March 2013, the Debtors' operations have considerably improved, reflecting Net Operating Profits of $162,288 for March, $173,019.00 for April 2013, and $186,966.00 for May 2013. Moreover, this analysis does not take into account the rapidly appreciating value of the Subject Property which increased $5,000,000.00 since October of 2011 and will continue to grow during the term of the Plan.

  35. The Debtors' Monthly Operating Reports since March, 2013 in conjunction with the July 2013 Projections demonstrate that while cash reserves have not decreased and will not decrease, the Debtors have been making and will be able to continue to make adequate protection payments to CIBC indefinitely. Therefore, CIBC will not be prejudiced for the short extension term requested by this Motion while the Debtors continue to improve operations and proceed forward with confirmation of the proposed Amended Plan or an alternative refinance/sale of the Subject Property.

  **WHEREFORE**, the Debtors respectfully request that this Court enter its Order:

1. Granting the Motion;

2. Extending the automatic stay under sec. 362(a) in the Debtors' bankruptcy cases to through and including the 30th day following a final decision by the Court on confirmation of the Debtors' amended plan of reorganization or a date certain as determined by the Court; and

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

3. For such other relief as the Court deems proper and just.

**DORSEY & WHITNEY LLP**

and,

**LAW OFFICES OF WILLIAM L. CONTI**

Dated: July 23, 2013

By: */s/ William L. Conti*
William L. Conti
Litigation Counsel for Debtors