ADAM A. LEWIS (BAR NO. 88736)
ALewis@mofo.com
VINCENT J. NOVAK (BAR NO. 233003)
VNovak@mofo.com
KRISTIN A. HIENSCH (BAR NO. 275676)
KHiensch@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Respondent Secured Creditor
CIBC INC.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| *In re:* | |
| Community Towers I, LLC, a Delaware limited liability company, Employer Tax I.D. No.: 75-2456729, | Case No. 11-058944-SLJ-11 |
| Community Towers II, LLC, a Delaware limited liability company, Employer Tax I.D. No.: 75-2560662, | Case No. 11-058945-SLJ-11 |
| Community Towers III, LLC, a Delaware limited liability company, Employer Tax I.D. No.: 32-0065635, | Case No. 11-058948-SLJ-11 |
| Community Towers IV, LLC, a Delaware limited liability company, Employer Tax I.D. No.: 77-0379075, | Case No. 11-058949-SLJ-11<br>Cases Jointly Administered |
| Debtor(s). | Chapter 11 |
| 111 W. Saint John Street, Suite 705<br>San Jose, California 95113 | CIBC'S OPPOSITION TO THE DEBTORS' MOTION TO EXTEND THE STAY TERMINATION DATE<br><br>Date: August 21, 2013<br>Time: 2:00 p.m.<br>Place: Honorable Stephen L. Johnson<br>280 S. First Street, Room 3099<br>San Jose, CA 95113 |

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 1 of 21

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... ii

I. BACKGROUND .......... 2

A. The Loans .......... 2

B. The Cases .......... 3

1. The Filings and Principal Proceedings .......... 3

2. The Debtors' Financial Performance and CIBC's Claim .......... 5

3. The Debtors' Mismanagement of These Cases .......... 7

II. THE MOTION .......... 9

A. The Debtors' Grounds for Relief .......... 9

B. Feasibility and Value .......... 10

1. Feasibility .......... 10

2. Value .......... 12

III. ARGUMENT .......... 14

A. Applicable Law .......... 14

1. Governing Law .......... 14

2. The Debtors' Purported Authorities Are Inapposite .......... 14

B. The Court Should Deny the Motion .......... 15

IV. CONCLUSION .......... 18

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aheong v. Mellon Mtg. Co. (In re Aheong),*
276 B.R. 233 (B.A.P. 9th Cir. 2002) ........ 14

*Bank Hapoalim, E.M., Chicago Branch v. E.L.I.,*
42 B.R. 376 (N.D. Ill. 1984) ........ 15

*In re Avila,*
311 B.R. 81 (Bankr. N.D. Cal. 2004) ........ 14

*In re Castaneda,*
342 B.R. 90 (Bankr. S.D. Cal. 2006) ........ 15

*In re Mendez,*
464 B.R. 63 (Bankr. D. Mass. 2011) ........ 15

*Wedgewood Inv. Fund, Ltd. v. Wedgewood Realty Group, LLC (In re Wedegwood Realty Group, LLC),*
878 F.2d 693 (3d Cir. 1989) ........ 14, 15

**STATUTES**

11 U.S.C.
§§ 101-1532 ........ 4
§ 105(a) ........ 15
§ 362(c)(3)(B) ........ 15
§ 362(d) ........ 14
§ 362(d)(1) ........ 14
§ 362(d)(3) ........ 4
§ 362(e) ........ 15
§ 362(g) ........ 14

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 3 of 21

CIBC Inc. ("CIBC") submits this brief in opposition to the Motion to Extend Date for Termination of the Automatic Stay (the "Motion") of debtors and debtors in possession Community Towers I-V, LLC (the "Debtors").

By the Motion the Debtors ask the Court to extend for four more months (from September 1, 2013 to December 31, 2013) the deadline by which the Debtors must pay CIBC in full to avoid stay relief for CIBC to exercise its rights and remedies as a secured creditor pursuant to this Court's March 5, 2013 ruling memorialized in its March 18, 2013 Order Conditionally Granting CICB Inc.'s Second Motion for Stay Relief (entered March 19, 2013, Dkt. No. 267) (the "Stay Relief Order"). With the six months the Stay Relief Order gave them to sell or refinance their office building (the "Property"), this relief would afford the Debtors a total of *ten* months, nearly a year, from the Court's stay relief ruling to rescue themselves, a ruling that itself came 17 ½ months after the Debtors filed their voluntary petitions in this one-asset real estate case.

According to the Debtors, the Court should grant relief because their newly-filed Second Amended Joint Plan of Reorganization (the "Second Plan"), unlike the Debtors' Joint Plan of Reorganization (dated March 27, 2012), as amended on September 12, 2012 by the First Modification to Debtors' Joint Plan of Reorganization (the "Original Plan") the Court categorically rejected, is feasible because, they allege, their circumstances have improved so. In the meantime, the Debtors say, CIBC will not be harmed because the alleged $46 value of the Property clearly exceeds the amount of CIBC's claim the Property secures and they are making interest only payments to CIBC.

The "totality of the circumstances" test and equitable principles applicable here cry for this Court to deny the Motion. Among other things: (1) this is a single-asset real estate case that already is nearly two years old and will be two years and three months old by December 31; (2) the Debtor defaulted on CIBC's June 2009 two-year extension almost immediately after it closed; (3) the loan matured in June 2011 and principal, substantial nondefault interest and other sums remain owing to CIBC; (3) the Debtors have had an eminently fair opportunity to confirm a plan; (4) when the Court finally granted CIBC stay relief in March of this year, it strongly advised the Debtors to seek to sell or refinance the Property rather than propose a new plan but by their own

admission the Debtors from the start contemplated primarily trying to confirm a new plan instead; (5) evidencing their plan to seek an extension virtually from the day of the stay relief hearing (and their concomitant assumption that the Court would grant that relief, the Debtors chose not to prosecute their objections to CIBC's claim even though setting the claim before September 1 was an obvious imperative; (6) the value of the Property is far less than the Debtors now claim it is and even under the view of CIBC's claim most advantageous to the Debtors barely exceeds the debt; (7) it is a virtual certainty that some time before December 31 the Debtors will be asking for yet another extension because it will take more than another four months to go through the disclosure statement (none filed yet), discovery, expert report and confirmation process; (8) there are strong grounds to doubt the Debtors' central claim that the Second Plan is feasible; and (9) the Debtors have otherwise ignored the Court's clear guidance in order to chase their dreams.

To grant the Debtors yet another four months (or more) to try to confirm a plan whose prospects cannot meaningfully be tested even on a provisional basis for purposes of the Motion in the short time afforded by the Debtors' last-minute filing but that even on the grossest inspection has some obvious feasibility issues would be manifestly inequitable. The Debtors have not earned another chance and CIBC deserves finally to be able to proceed with its rights.

## I. BACKGROUND

The Court doubtless knows most of the background by heart (unfortunately for both the Court and CIBC). Here CIBC will review the highlights of the proceedings.

### A. The Loans

The Debtors, owned by John and Rosalie Feece, bought the Property in 2006 for $41 million just before the economic bubble burst in 2008.[1] The Feeces have managed the Debtors and Property since then. The Debtors borrowed $33.5 million from CIBC (the "Original Loan"), partly to pay some of the purchase price, partly to effect improvements designed to increase the Property's occupancy. The loan was a three-year, interest-only deal, with a floating rate that in

[1] Much of this history can be found in the Court's January 25, 2013 Order Denying Confirmation of Debtors' Joint Plan (Dkt. No. 251) (the "Confirmation Order"). For material not in the Confirmation Order, CIBC will provide citations to the relevant evidence.

fact remained at 7% per annum. The Debtors secured their obligations to CIBC with a blanket lien on their real and personal property assets. The Feeces guaranteed 20% of the principal. (Declaration of E. Lindsay Gordon in Support of CIBC's Motion for Stay Relief (Dkt. 154) (the "Gordon Dec. I") ¶ 7.)

As the expiration of the term of the Original Loan approached, the Debtors sought refinancing elsewhere, but could not obtain it. After some negotiations, CIBC reluctantly agreed to extend the term of the loan for two more years, again interest only at the actual rate of 7%. (the "Extended Loan").[2] The security and Feece guarantee (*see id.* ¶ 9) remained in place. Almost immediately after the Extended Loan closed in June of 2011, the Debtors defaulted by failing to make payments into various escrows. By the Fall of 2010, the Debtors also had ceased making interest payments. (Transcript of Confirmation Trial ("Tr.") 43-44; Gordon Dec. I ¶ 12.) Negotiations for a further accommodation by CIBC broke down in the Fall of 2011. (Declaration of E. Lindsay Gordon in Support of CIBC's Opposition to Confirmation of the Debtors' Joint Amended Chapter 11 Plan (Dkt. 197) (the "Gordon Dec. II") ¶ 23.) During all this time, the Debtors continued to make substantial distributions to the Feeces and even paid off the Feeces' unsecured loan from another bank. (*See* Tr. 44-49; 214-15.) They also were drawing significant salaries from the Debtors.

**B. The Cases**

**1. The Filings and Principal Proceedings**

CIBC began foreclosure proceedings. (Gordon Dec. II ¶ 28.) With foreclosure imminent, the Debtors filed their voluntary petitions on September 26. From that date on, CIBC pretty much left the Debtors alone except for taking positions in the plan process, seeking stay relief twice (successfully), seeking dismissal of the Debtors' objections to CIBC's claims just recently, opposing the use of its cash collateral to pay the Debtors' professionals and opposing the Debtors' request to make $40,000 monthly distributions to the Feeces, which the Debtors claimed were

[2] Its reward for this has been to be falsely accused of reneging on a promise to refinance the Original Loan and to be held hostage to the nonperforming, now-matured Extended Loan almost since the day the Extended Loan closed.

affordable based upon Mr. Feece's operating projections. As the Debtors' various cash collateral motions reflect, the Debtors also continued to pay compensation to the Feeces for various services, CIBC having not objected to that use of its cash collateral since the compensation appeared to be at market. No other creditor has taken *any* action in the cases beyond those who voted for or against the Original Plan (defined below).

Conceding that the cases were single-asset real estate cases governed by Code[3] section 362(d)(3), the Debtors filed a plan shortly before their initial 90 days expired in December of 2011. Thereafter, the Debtors filed proposed disclosure statements. After several hearings at which it sustained some of CIBC's objections, the Court finally approved a disclosure in March of 2012. Expert reports on value, interest rates and feasibility, and discovery followed. The two-day confirmation trial occurred in mid-October of 2012, followed by post-trial briefing and, on December 5, closing oral arguments. On January 25, 2013, the Court issued the Confirmation Order denying confirmation of the Original Plan as offering an inadequate interest rate and being manifestly infeasible. The Court noted, among other things, that the Debtors had lost substantial money during the course of the cases even while making no payments to CIBC for all but a couple of months prior to the confirmation trial. The Court also rejected the Debtors' claims that when making the Original Loan CIBC had promised to refinance it with a permanent loan but reneged in 2009.

In February of 2013, CIBC filed its second stay relief motion. The first motion had resulted in an August 2012 order that the Debtors begin making monthly payments to CIBC at 3.25% on CIBC's unpaid principal balance. (Dkt. No. 165.) The 3.25% figure was the interest rate that the Debtors originally proposed to pay CIBC under the Original Plan. Those payments were about $96,000 a month. CIBC's second stay relief motion resulted in a March 5 ruling memorialized in the March 18 Stay Relief Order that the automatic stay be terminated as to CIBC at the earlier of the date that the Debtors fail to make monthly payments to CIBC of about $189,000 or September 1, 2013 if the Debtors have not paid CIBC in full by then. The $189,000

[3] The "Code" is the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

figure reflects payments of interest at the note rate of 7% on the principal balance. At the hearing on the second stay relief motion, the Court urged the Debtors to concentrate on selling or refinancing the Property because the evidence at the confirmation trial indicated that the Property simply could not support CIBC's debt. (Stay Tr. 11:15-12:25.) Nevertheless, the Debtors were already contemplating getting a further extension. (*See* Stay Tr. 16:22-17:9.) And by the Debtors' own admission, they have been working on a plan ever since. As they wrote in opposition to CIBC's Motion to Dismiss Debtors' Claim Objections for Want of Prosecution (Dkt. No 284):

> The reasons why the Debtors have not set the Claim Objection for hearing are obvious. *First, the Debtors have been focused on preparing an Amended Plan of Reorganization and gathering the required evidence from their current operations that establish the viability of the [proposed] Amended plan. . . .* Second, the Debtor [sic] has placed considerable effort into locating alternate financing to satisfy CIBC's claim as well as to "lean out" their operating expenses to make the business as attractive as possible to potential buyers. Third, there is no need to litigate the Claims Objection issues until a refinancing or sale is in place for approval by the Court, *or a reorganization plan is presented to the Court for confirmation*. Fourth, not only would litigating the Claims Objection require expenditure of the Debtors' resources, it would also require the Debtors' professionals and CIBC's professionals to incur expenses.

(Dkt. No. 290 5:25-6:8 (emphasis added).)

**2. The Debtors' Financial Performance and CIBC's Claim**

Having started with $808,000 in cash, the Debtors entered July of this year with only 668,000 in cash, down even from the $730,000 at the end of May (and well below the $1,021,229 the Debtors had entering March of this year, when they first began making monthly payments to CIBC of $189,000 pursuant to the Stay Relief Order). (*See* Master Monthly Operating Reports for May and June 2013, Summary of Financial Status, Section 3, item 3.d, third column, item 3.e, third column, item 3.e, second column.) Only $59,000 of this was due to any extraordinary item (specifically, the U.S. Trustee's fees). (*Id.* Statement of Operations, line 38.) The Debtor's poor financial performance outlined above occurred despite having made no payments to CIBC during the case until August of 2012. And just before the Debtors began making the larger payments to CIBC required by the Stay Relief Order, the February 2013 monthly operating report showed that

the Debtors would enter March with $1,138,192 in cash. (*See* Master Monthly Operating Report for February 2013, item 3.e, first column.) Clearly, things have not gone so well for the debtors since that time, with their cash having dropped by just under half just since then. This does not quite comport with the Debtors' claims in the Motion that the Property is performing on all cylinders.[4]

It is worth remembering that the latest adequate protection payments are calculated based on only the unpaid principal of the Extended Loan. But under any plan, the monthly interest payments would have to be calculated on the total of the unpaid principal, unpaid nondefault interest and, to the extent allowed,[5] default interest, late fees and attorneys' fees. Of these, the first two items, totaling about $38.2 million, are undisputed.[6] Thus, monthly payments at 7% on this figure alone would be about $222,883, not the $217,000 assumed in Mr. Feece's projections. The other three parts of CIBC's claim are, respectively, approximately $4,061,755, $1,660,978 and about $1,350,282.[7] Thus, CIBC's claim is anywhere from $38.2 million to about $45.25

[4] Ironically, had the Debtors made some of the adjustments several years ago that they now claim will finance the Second Plan – and had they eschewed the $40,000 monthly distribution to the Feeces while the Debtors were not performing under the Extended Loan – perhaps there would have been no default in the first place, or a least a far more manageable default.

[5] Unfortunately, because of the Debtors' documented deliberate decision not to prosecute their claims objections even though the order on the second stay relief motion made resolution of them no later than September 1 imperative, we will not know what those figures are by the time the Motion is heard (or, indeed, by September 1).

[6] The Court's provisional conclusion that CIBC's claim as of the confirmation hearing was $37,234,279.20 included $1,660,978 in late fees, but omitted (no doubt accidentally) CIBC's *post*-petition interest, which at that time was about another $2.395 million. (*See* Declaration of E. Lindsay Gordon [etc.] (Dkt. No. 197) ¶ 25.) That would make CIBC's principal and nondefault interest claim as of October 1, 2012 about $39.6 million. More interest continued to accrue until the Debtors began making payments to CIBC at 7% in March of 2013. (CIBC suspects that the Court calculated CIBC's interest based on the as-of-filing figure in CIBC's proofs of claim.)

[7] The Debtors complain that CIBC has failed to give them a payoff figure since the second stay relief hearing. That is not true. (Declaration of E. Lindsay Gordon in Support of CIBC's Objection to the Debtors' Motion to Extend the Stay (the "Gordon Decl.") ¶ 4.) Moreover, the Debtors have not suggested or supplied any evidence that they had a deal anywhere in the same universe as what past information indicated CIBC thinks its claim is or what discounted amount it would accept; certainly CIBC has not received any such proposals or offers. (*Id.* ¶ 5.) Thus, there would have been no prejudice to them even were the allegation true. Doubtless this lack of information about what kind of deals the Debtors have been able to scrounge up is no accident; clearly, the Debtors do not want to admit to this Court that they have not come close to the

(Footnote continues on next page.)

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 9 of 21

million. Of course, the Extended Loan – a loan CIBC made to the Debtors as a favor – matured by its own terms in June of 2011, over two years ago.

### 3. The Debtors' Mismanagement of These Cases

The Debtors have failed to make intelligent, responsible use of their opportunity to reorganize. In a piece of manifestly bad judgment, they began by asking this Court to allow them to make $40,000 monthly distributions to the Feeces (in essence, the Feeces as the Debtors owner/managers ask the Court to allow them to pay themselves $40,000 a month). (Dkt. No. 5; Dkt. No. 7, Ex. A, line item "Owner Draw"; Dkt. No. 21 4:12-22.) Sustaining CIBC's objection, the Court rejected that request. (Dkt. No. 34, ¶ 1.a; Dkt. No. 78 ¶ 1.a .) Had it not done so, the Debtors' financial performance during the cases would have been even more miserable than it has been (at CIBC's expense).

The Debtors then proposed wishful-thinking plan based on bad, engineered projections and financial analysis, and a ridiculous proposed interest rate,[8] that after 13 months and substantial cost to all concerned that the Court decisively declined to confirm.

Next, following the Court's ruling the CIBC's second stay relief motion and issuance of the Stay Relief Order, the Debtors knew (1) that the Court believed that they should try to refinance or sell the Property rather than try to confirm a new plan because it did not think they could earn their way of their predicament, (2) that they had until September 1 to pay CIBC in full or suffer stay relief, and (3) that they therefore had to get their objections to CIBC's claim resolved not later than September 1. Obviously assuming they would get an extension of the September 1 deadline the Motion now seeks, they then made poor use of the six months that the

---

(Footnote continued from previous page.)

necessary terms (even at the level CIBC has indicated it would accept). In any event, the Debtors need only have looked at the Gordon declarations filed in support of the second stay relief motion and the motion to dismiss their claim objections for want of prosecution to get a nearly precise figure of what CIBC believes its claim to be, the only uncertainty coming from the continued accrual of attorneys' fees.

[8] The Debtors' original proposal was 3.25%. They changed it to 6% on the eve of trial because their expert himself came in at 6%. The Court adopted 7.25%, but even at 6% the Original Plan was not feasible.

Case: 11-38944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 10 of 21

Court granted them to try to refinance or sell the Property. It is clear from the transcript of that hearing, their response to CIBC's objection to their motion to employ William Conti as litigation counsel (see Ex Parte Application for Order Authorizing Employment of Litigation Counsel for Debtors (Law Office of William L. Conti) (Dkt. No. 283, filed June 18, 2013) 3:11-13 and this Motion that they put their eggs in the basket of looking not for a workable solution to the Debtors' troubles, but cooking up another plan (or at perhaps an optimum solution for the Feeces that maximizes what they believed to be the value of their investment as though the Debtors were operating in a normal commercial environment rather than in chapter 11).

Mr. Feece touts the Debtors' grace period efforts in broad generalities.[9] But he fails to detail them. He does not describe what efforts to sell or refinance the Property the Debtors made or what responses, whether formal or informal, the Debtors drew. To get credit for these alleged activities as a part of the totality of the circumstances the Court must consider, the Debtors should have to provide that kind of detail.[10] They have not done that even though they previously have been challenged to do so because issue of what they have done came up on the Conti employment application and CIBC's motion to dismiss. (*See* Dkt. No. 286 7:21-8-10; Dkt. No. 290 4:7-9, 6:2-3, Dkt. No. 293 5:18-6:3.) Yet, they are studiously avoiding the subject.

The inescapable reason is that the results of those efforts, such as they may have been, must conflict with the Debtors' rosy portrait of their situation. Clearly, the market (sale, investment or refinance) is not interested in the Debtors at any value close to what would pay off CIBC in full (even at the undisputed claim figure of $38.2 million, the amount that CIBC has told them and others it would accept). That this is likely to be the case is confirmed by CIBC's contacts with those who might be interested investing with, refinancing or buying from the

[9] Mr. Feece also claims that CIBC did not respond to proposals. That claim is false. (Gordon Decl. ¶ 4.) In any case, since CIBC was obligated to accept nothing less than 100% payment, it had no obligation to consider any proposals.

[10] Because the Debtors filed this Motion at the last possible moment before September 1, there is no time to conduct discovery on this subject. Nor, for that matter, is there time for discovery on the Debtors' claims of the current operations of the Property and the feasibility of the new plan, even for the limited kind of test that would be appropriate for this Motion, as contrasted with a confirmation hearing.

Case: 11-33944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 11 of 21

Debtors. (Gordon Decl. ¶¶ 4, 5.)[11] It is also probable that Debtors' efforts were not nearly as vigorous as Mr. Feece's declaration suggests, something they do not want the Court to know. If the Debtors were too busy to tee up the claim objections because they were working on their new plan (in anticipation of having this yet-to-be-filed Motion granted), it is doubtful that they had time or the interest to do much on the sale/refinance front, either.

The Debtors have also ignored the Court's caution since the first fee applications that they should not use special counsel to do or duplicate the work of its general bankruptcy counsel. And yet that is what they continued to do with Mr. Mogensen and have now done with Mr. Conti, who appeared for the Debtors to argue against CIBC's motion to dismiss the Debtors' claim objections.

## II. THE MOTION

### A. The Debtors' Grounds for Relief

In the Motion, the Debtors ask the Court to extend the current stay relief deadline from September 1 to December 31 so that they can try to confirm the Second Plan. The Second Plan proposes to pay CIBC interest only at 7% per annum (or whatever figure the Court sets if CIBC contests the interest rate) for three years. In the meantime, the Debtors may try to sell the Property or refinance CIBC's claim. It appears that the Debtors contemplate that a sale could be subject to CIBC's lien, leaving CIBC unpaid and subject to the terms of the plan with the buyer performing the Debtors' obligations.[12] Conceding the obvious (*see* Tr. 67-68), the Feeces will convert their alleged $6.4 million claim against the Debtors to equity. However, the Second Plan does not restrict distributions to them during its term. The Second Plan's treatment of other creditors is similar to that of the Original Plan. The Debtors present projections and other evidence that purports to indicate that the Second Plan will be feasible.

---

[11] Thus, too, Mr. Feece's claim that CIBC has not responded to proposals is, flatly, false.

[12] CIBC believes this and some other plan provisions may make the plan unconfirmable in the end; at the very least, they will require a higher interest rate because of the additional risk they pose to CIBC. The Motion is not, however, the place to litigate the Second Amended Plan.

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 12 of 21

According to the Debtors, an extension of the stay grace period for four months will not harm CIBC because it will result in confirmation of a plan that will pay CIBC in full eventually and because in the period leading up to confirmation, CIBC will continue receiving adequate protection payments of 7% on unpaid principal. Moreover, CIBC will be further adequately protected by the alleged $46 million value of the Property. (Motion 6 n.4; 6-8; 11-13.) By contrast, if the Court declines to extend the stay grace period, the Debtors argue, they and the other creditors will be denied the fruits of a confirmable plan. (Motion 7, 11-13.)

**B. Feasibility and Value**

As CIBC will argue later, whether or not the Second Amended Plan is likely confirmable is not the only factor this Court must consider in ruling on the Motion. However, the prospective feasibility of the Second Amended Plan certainly is one relevant consideration. In the time available on this calculatedly last-minute motion, it simply is not possible to do a thorough analysis of the Debtors' projections, let alone conduct discovery on them, to test the Debtors' claim that the Second Amended Plan will likely be feasible.[13] But even on this short notice it is possible to make some general points that show that the projections are unreliable. That CIBC will do next. Following that discussion, it will address, again on a truncated basis, the Debtors' claim that the Property is worth $46 million.

**1. Feasibility**

The following observations cast doubt on the reliability of the projections:

- To put it mildly, Mr. Feece has not excelled in his projections during the cases. He repeatedly has overstated the Debtors' prospects.
- The projections are totally divorced from history. According to the Debtors' monthly operating reports, for the 12 months ending June 2013, the Debtors' revenues were $5,237,942, its expenses (including TIs, taxes, leasing commissions and capital expenditures) were $3,364,480, so its cash flow available for debt service ("CFADS") was $1,873,462, an amount insufficient to pay CIBC 7% a year on its principal and nondefault interest (about $2.67 million), let alone the other creditors under the Second Plan. By contrast, the Debtors project CFADS of $3.133 million, $3.212 million and $3.343 million for the plan calendar years 2014-2016, the three years of the Second Plan assuming it is confirmed by

[13] In light of the timing of the Motion, any uncertainties about the Debtors' projections should be resolved against them.

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 13 of 21

December 31, 2013. Another way to see this same point is to see that the Debtors' projections represent a overnight reversal of their very recent financial performance in these cases as summarized in Section I.B.2 *supra*. In other words, the Debtors have applied their usual groundless optimism in trying to convince the Court that their troubles are suddenly behind them.

- The projections state prospective revenue, but they do not expressly state what rental rates the Debtors are assuming. Hence, the revenue projections cannot be assessed.

- The projections do not state what vacancy and credit loss (if any) the Debtors are assuming. Again, this makes the revenue projections of limited persuasiveness.

- As noted above, the projections assume payments to CIBC that are at least $5,000 a month too low, and, depending on how much of the late fees, default interest and attorneys' fees are awarded to CIBC, as well as the appropriate interest rate, perhaps even further below what CIBC would have to be paid.

- The Debtors' 95% occupancy projection based upon that current figure is less than convincing given the Debtors' up-and-down occupancy figure (*see, e.g.,* Tr. 61; 147 (vacancy 11% in October 2012); Declaration of Doug Feece [etc.] (the "DFeece Dec.") ¶ 4) and the 24% vacancy rate in the market in which the Debtors directly compete according to the Debtors' own appraiser (*see* Declaration of Donn H. Byrne, Jr., in Support of Motion to Extend Date for Termination of Automatic Stay, Exhibit B (the "Byrne Appraisal") at 48 (12 of 21)); *see also* Declaration of Ken Cantrell in Support of CIBC's Opposition to the Debtors' Motion to Extend the Stay Termination Date, Ex. A (the "Cantrell Appraisal") 22 (vacancy rates of directly competitive office buildings).[14]

- The Debtors claim that the current asking rate for lease space is $1.85 and that they hope to achieve that soon. (*See* Feece Dec. ¶ 18; *but see* Byrne Appraisal 75 (asking rate $1.75).) The Court has seen Mr. Feece's prior slight of hand trying to portray asking as getting. (Tr. 53-59; 98-108 (actual recent leases well below $1.79).) Even today the current leases are around only $1.55-$1.65. (*See* Byrne Appraisal 46-47.)

- The Debtors' claim that they will not have substantial Tenant Improvement ("TI" expenses any longer because the Property's space is up to date is nonsense. What determines TIs is not only the current condition of the Property, but what other competitive properties are offering to tenants. If a tenant can go elsewhere for a more attractive package, it will demand more concessions from the Debtors to stay. That will happen with those leases that mature during the life of the Second Plan.

- Unless the Debtors have assumed it in their revenue projections, the Debtors have not accounted for any collection loss even though they are carrying about $738,000 in 90+ receivables and another $54,000 in younger receivables on their monthly operating report. (*See* June 2013 Master Monthly Operating Report at

[14] Although this information shows that the Property had a much higher occupancy than those competitors, the Court will recall from the confirmation trial that the Debtor purchased that higher rate through extraordinary tenant improvements made with the funds it was not paying to CIBC.

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 14 of 21

page 7 of 22.) Even if they have assumed it in their projections, they have not stated what that assumption is, so its credibility is in doubt.

- Doug Feece's predictions of a high renewal rate based on historic results (DFeece Dec. 4:13-21) ignores the fact that the Debtors have "purchased" that renewal rate through high TIs. But now the Debtors claim they will be scaling back their TIs precipitously.

- The idea that the Debtors, who have averaged around $1.5 million yearly in TIs will suddenly be able to get by with an average of $38,000 a year (*see* DFeece Dec. Ex. A, at 4 of 4) is a pipe dream.

- Whatever the appropriate interest rate will be, the environment has changed dramatically from what it was last October at the confirmation trial. In January of this year, the three, five and ten year treasury ("risk free") rates were .42%, .87%, and 1.98%. As of August 1 they were .65%, 1.49% and 2.74%. Thus, in just seven months each of these rates have risen significantly. Presumably, that trend will continue through confirmation proceedings and beyond as they try to sell or refinance the Property in the time they will have available if they are able to confirm the Second Plan.

**2. Value**

As with the Debtors' financial projections, it is virtually impossible to dig deeply in to the Byrne Appraisal in the time available via the Motion. Nevertheless, some useful observations are possible.

The first is an obvious question. The date of valuation in the Byrne Appraisal is late March of this year, shortly after the Court's stay relief ruling. If the Debtors have been vigorously marketing the Property since the Court's stay relief ruling, why hasn't there been a sale at around $46 million, a figure that would satisfy all claims and perhaps even leave something for the Feeces? Indeed, the Debtors have had a $44 million appraisal since last October. (Dkt. No. 234 at ¶ 6 & Ex. B, Part 1.) If Mr. Bryne's valuations are reliable, the Debtors have had at least 10 months since early last October to market the Property for an adequate price. And if the Debtors believe that the Property is worth $46 million, why have they been approaching CIBC with discounted deals? The just as obvious answer is that the Property is not worth anything like $46 million. In fact, CIBC's appraiser put the value at $38.8 million as of mid-March of this year. (*See* Cantrell Appraisal.)

As they do in the Motion (Feece Decl. 4:1-6; Declaration of Eric Mogensen in Support of Debtors' Motion to Extend the Automatic Stay (the "Mog. Dec.") 3:15-19), the Debtors will of

course claim that they could not sell the Property with the stay relief deadline looming, for potential buyers will just wait for CIBC to foreclose. That argument is bogus for at least two reasons. First, even if the argument were factually sound, stay relief has not been imminent until very recently; the Debtors have had the balance of the six months to market the Property, as well as a long time preceding the stay relief ruling. Second, buyers have no reason to believe that CIBC will not credit bid up to what it thinks the value is or to sell the Property if it is the winning bidder for anything less than its real value.[15] If the Property really were worth $46 million, such a sale would have been realized.

Nor is the Byrne Appraisal convincing even on the cursory review afforded by the timing of the Motion. For example,

- For a property carrying such substantial receivables, including over $738,000 in 90+ receivables, Byrne's estimate of only 2% collection loss is too conservative.
- Bryne's assumption of 95% occupancy rate conflicts both with the Property's historic performance and with the 74% vacancy rate among direct competitors.
- As with the Debtors' projections, the Byrne Appraisal assumes a dramatic drop in TIs, leasing commissions and capital costs that is in a different universe from that of the Debtors' historic performance.[16]
- Mr. Bryne concludes that the current market for the Debtors' space is $1.65 per square foot (Byrne Appraisal 46-47), but his own review of recent leases there shows a spread of $1.55-$1.65. (*Id.*) In a weak market, that is the future.

In short, there are good reasons to doubt the confirmability of the Second Plan and the alleged $46 million value of the Property. If the Second Plan is not confirmed, CIBC will have been forced to wait yet another four to six months and spent a lot of money for nothing. At this juncture, confirmability should be a virtual sure thing as a reason (but not necessarily a sufficient reason) to grant the Motion. It is not.

[15] The Debtors will face the same issue, if it is an issue, as the three-year term of the Second Plan approaches. Will that be grounds for reinstating the stay or granting them injunctive relief to prevent CIBC from foreclosing if they cannot sell or refinance the Property by then? Surely not.

[16] Evidently, Mr. Byrne assumes the Debtors proposal in the Second Plan to turn over leasing to the Feeces and to defer Doug Feece's commissions if there is insufficient money to pay them. If that is what Mr. Bryne has done, he has not prepared an appraisal of market value, but of *plan* value.


Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 16 of 21

## III. ARGUMENT

### A. Applicable Law

The Debtors cite authority regarding the purpose of the stay and supporting extension of the stay. As CIBC will explain presently, both sets of authority are entirely irrelevant to the issues this Motion presents. First, however, CIBC will discuss the legal principles that *do* apply to this situation.

#### 1. Governing Law

In deciding the Motion, the Court should consider the "totality of the circumstances." *In re Avila*, 311 B.R. 81, 84 (Bankr. N.D. Cal. 2004). Moreover, as one the cases that the Debtors cite itself says in the quotation they excerpt (*see* Motion 14), the Court should consider the "equities" of the situation in deciding whether to extend the stay. *Wedgewood Inv. Fund, Ltd. v. Wedgewood Realty Group, LLC (In re Wedegwood Realty Group, LLC)*, 878 F.2d 693, 701 (3d Cir. 1989). "Cause to annul the stay may exist where 'the stay harms the creditor and the lifting of the stay will not *unjustly* harm the debtor or other creditors.'" *Aheong v. Mellon Mtg. Co. (In re Aheong)*, 276 B.R. 233, 250 (B.A.P. 9th Cir. 2002) (citation omitted) (emphasis added). Finally, the Debtor had the burden of proof on whether CIBC had cause for stay relief under Code section 362(d)(1) and, therefore, on whether that cause no longer persists. Code § 362(g).

#### 2. The Debtors' Purported Authorities Are Inapposite

The Debtors begin their legal analysis by citing a string of cases stating the beneficent purposes of the automatic stay. (Motion 14-15.) The Debtors write, "It is axiomatic to the bankruptcy process that the debtor be permitted a fresh start and the opportunity to reorganize its affairs." *Id* 14. But the Debtors *have* had a generous opportunity to reorganize their affairs. They have wasted it. Moreover, whatever may be the initial salutary purposes of the stay, Congress just as clearly envisioned that creditors nonetheless could get stay relief. *See* Code § 362(d). Other legitimate interests, such as those of CIBC, act as a curb on the purposes of the stay. The law does not provide that the stay remains in effect until the Debtors can reorganize, however long that may take.

Case: 11-38944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 17 of 21

By the same token, none of the cases the Debtors cite as grounds for extending the stay support the Motion. (Motion 14-15.) Three involve a court's extending the stay because the court itself failed to meet the deadlines of Code section 362(e) for setting hearings or making rulings on stay relief motions. *See Wedgewood*; *Bank Hapoalim, E.M., Chicago Branch v. E.L.I.*, 42 B.R. 376 (N.D. Ill. 1984). One case involved the extension of the original 30-day stay in a refiled chapter 13 case under Code section 362(c)(3)(B) after a determination that the debtor re-filed the case in good faith. *In re Castaneda*, 342 B.R. 90 (Bankr. S.D. Cal. 2006). Not only does this case not involve stay relief for "cause", but its ruling came early in the new case, not following the grant of stay relief by motion after 20 months in a single-asset real estate case following a failed attempt at confirmation.

Finally, in the fifth case the court granted an extension of the stay *for the benefit of the creditors* in an individual chapter 11 case for the period between the closing of the case, so that the debtor would not have to pay United States Trustee fees while performing under his confirmed plan, and his eventual grant or loss of a discharge depending on whether he completed plan. The creditors were at risk from the court's gesture to the debtor because with the stay terminating by operation of law upon the closing of the case, the statutes of limitations on their underlying claims against the debtor were no longer tolled. Thus, if the statutes expired but the debtor later was denied his discharge because he defaulted under the plan, the innocent creditors would have no remedy even though the debtor was not discharged. The court therefore extended the stay to protect the creditors despite the closing of the case, but also noting extending the stay pursuant to Code § 105(a)'s equitable powers should occur "only in rare circumstances." *In re Mendez*, 464 B.R. 63, 66 (Bankr. D. Mass. 2011).

Plainly, none of these five cases is at all relevant to the Motion.

**B. The Court Should Deny the Motion**

In capsule form, here are the relevant circumstances for the resolution of the Motion:

- Despite a generous opportunity to do so, the Debtors have been unable to confirm a plan or otherwise solve their financial issues in the 23 months these single-asset real estate cases have been on file, 23 months in which CIBC has been denied the right to proceed with its remedies on a loan it made to accommodate the Debtors in

Case: 11-38944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 18 of 21

mid-2009 that went into default almost immediately after it closed, and matured in mid-2011.

- If the Motion is granted, that will add at least four months to the duration the cases and postponement of CIBC's rights.

- In all likelihood, the four months the Debtors seek will not be an adequate period for them to try to confirm the Second Plan. Indeed, Mr. Mogensen so opines. (*See* Mog. Dec. ¶ 7.) Thus, there can be no doubt that the Debtors will be back before this Court before December 31 asking for yet more time, claiming yet again that paradise is just around the corner.

- The Debtors have wasted their time in these cases by pursuing a plan that was based upon demonstrably unrealistic projections and an obviously inadequate interest rate.

- The Debtors have equally wasted the six months that the Stay Relief Order by focusing on preparing the Second Plan instead of concentrating on a sale or refinance of the Property, as the Court counseled them to do at the March 5 stay relief hearing.

- Assuming they would get a stay extension, the Debtors deliberately chose not to prosecute their objections to CIBC's claims even though it was clear those claims needed to be resolve by the September 1 deadline to pay CIBC in full per the Stay Relief Order.

- The grounds upon which the Debtors say CIBC will be adequately protected do not stand up to inspection. First, the reason this Court issued the Stay Relief Order is not that CIBC was not adequately protected (the Court made no finding on that), but because "[A]t this point, I think I agree with CIBC that CIBC is entitled to relief. They have been waiting a long time. Mr. Lewis rightly indicates that the loan has more or less been in default since the day it was granted." (Transcript of March 5, 2013 hearing at 14:7-10.) Second, the alleged $46 million value of the property is seriously in doubt. Third, the Debtors' projections upon which they base their claim that they will be able to confirm the Second Plan are equally dubious.

- In addition to essentially ignoring the Stay Relief Order's imperatives of resolving the claim objections and finding a sale or refinance instead of pursuing a new plan, the Debtors have also blatantly disregarded the Court's repeated instructions not to have special counsel do or duplicate the work of general bankruptcy counsel, as Mr. Conti's argument of CIBC's motion to dismiss and signature on the Motion's pleadings newly attests.

The balance of harms and the equities clearly favor CIBC. The harm to the Debtors is that they *may* be deprived of the benefits of the Second Plan, but only if it really is confirmable. There is manifest reason to doubt that it is. The projections and valuation of the Property have the earmarks of the Debtors' characteristic overestimates. They therefore are a thin reed upon which to conclude that the Debtors will be harmed, especially at this late stage of the cases. Nor, having wasted their opportunity for the last two years and thumbed its nose at this Court, do the

Case: 11-58944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 19 of 21

Debtors deserve a further opportunity. At some point, the opportunity to confirm a plan in chapter 11 must become subordinate, especially a plan such as the Second Plan whose confirmability is in doubt. The Code simply does not say that the stay remains in place as long as there is some hope of a debtor's confirming a plan.

By contrast, CIBC faces further postponement of the exercise of its rights on a loan it reluctantly made to the Debtors at the urgent entreaties of the latter in 2009, has been in default almost since it closed and matured in mid-2011. The *possibility* that CIBC will get paid at 7% for yet another 3+ years (including the time to get to confirmation) is no substitute for finally recovering its principal and unpaid debt in September of this year after two years of these chapter 11 cases and two more years before that of not getting paid. CIBC did not bargain for a seven year loan, it bargained for a two year loan. Moreover, not only will CIBC have to wait at least another four-to-six months while the Debtor tries to confirm the Second Plan, if, as CIBC believes, the Second Plan is not confirmable, CIBC's wait will have been for nothing and it will have had to spend substantially more in attorneys' fees and other costs, as well.

Thus, looking at the totality of the circumstances, the equities and the balance of the harms require a denial of the Motion. Nor will denial of the Motion "unjustly" harm the Debtors or the other creditors. As noted above, the Debtors have had great chance to confirm a plan or otherwise pay off CIBC. They have squandered it. Having shown no interest whatsoever in the cases aside from some voting on the Original Plan, the creditors, too, will not be unjustly harmed if the Court denies the Motion.

///

///

///

///

///

///

///

Case: 11-38944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 20 of 21

## IV. CONCLUSION

The relief the Debtors seek might be appropriate regarding extending the stay early in a case. It is inequitable and unjust in the circumstances of these aged single asset real estate cases.

Dated: August 7, 2013

ADAM A. LEWIS
VINCENT J. NOVAK
KRISTIN A. HIENSCH
MORRISON & FOERSTER LLP

By: /s/ Adam A. Lewis
ADAM A. LEWIS

Attorneys for Secured Creditor
CIBC INC.

Case: 11-33944 Doc# 308 Filed: 08/07/13 Entered: 08/07/13 15:46:41 Page 21 of 21