```
WILLIAM L. CONTI (113759)
LAW OFFICES OF WILLIAM L. CONTI
100 E San Marcos Blvd #404
San Marcos, CA 92069
Telephone: (760) 510-5917
Facsimile:  (760) 560-3643
```

Litigation Counsel and Attorney For Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| In re: | Cases Jointly Administered |
|---|---|
| **COMMUNITY TOWERS I, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 75-2456729, | Case No. 11-58944-SLJ-11 |
| **COMMUNITY TOWERS II, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 75-2560662, | Case No. 11-58945-SLJ-11 |
| **COMMUNITY TOWERS III, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 32-0065635, | Case No. 11-58948-SLJ-11 |
| **COMMUNITY TOWERS IV, LLC,** A Delaware Limited Liability Company, Employer Tax I.D. No. 77-0379075, | Case No. 11-58949-SLJ-11  Chapter 11 |
| Debtor(s).  111 W. Saint John Street, Suite 705 San Jose, California 95113 | Date: November 19, 2014 Time: 2:00 p.m. Place: United States Bankruptcy Court 280 S. First Street, Room 3099 San Jose, CA  95113 Judge: Honorable Stephen L. Johnson |

**DEBTORS' OBJECTION TO FEE APPLICATIONS BY MURRAY & MURRAY AND DORSEY & WHITNEY**

Community Towers I, LLC, Community Towers II, LLC, Community Towers III, LLC and Community Towers IV, LLC (collectively, the "Debtors") hereby respectfully submit their OBJECTION TO FEE APPLICATIONS BY MURRAY & MURRAY AND DORSEY & WHITNEY (the "Objection"). This Objection is supported by the DECLARATION OF JOHN L. FEECE IN SUPPORT OF OBJECTION TO FEE APPLICATIONS OF MURRAY & MURRAY AND DORSEY & WHITNEY (the "Feece Declaration"), the DECLARATION OF WILLIAM L. CONTI (the "Conti Declaration"), and documentary Exhibits 1- 7), all of which are filed concurrently herewith.

## I. INTRODUCTION

The Court has before it four separate fee applications related to the Debtors' bankruptcy proceeding. Debtor's original counsel (Murray & Murray) seek payment of a total of $557,946.40, in addition to the $500,633.49 previously awarded on a First Interim Application. Dorsey & Whitney who substituted in as counsel for the Debtors in mid 2013 after Murray & Murray closed its firm seek a total of $243,665.65. Eric Mogensen who has been "special counsel" for the Debtors throughout the case seeks $131,675.00. Finally, William L. Conti who was employed after the Debtors request to confirm a plan of reorganization was denied, and who continues to represent the Debtors to date, seeks $177,271.51.

By this Opposition, the Debtors ask this Court to deny **any** further payment of fees or expenses to Murray & Murray, John Murray, or Dorsey & Whitney over the $470,000.00 in fees previously paid to them in this case from the balance of cash remaining in the Debtors' Estate. [See Declaration of John Feece]. The Debtors make this request based upon their utter dissatisfaction with the manner in which their case was handled primarily by Mr. Murray, and what can only be called a complete lack of any benefit to the Estate in the matters for which these lawyers were retained.

The Debtors ask instead that this Court reward the substantial benefit to the estate of the efforts of Eric Mogensen, Esq., and Mr. William L. Conti, Esq. who are both responsible for there being **any funds whatsoever for the payment of the creditors of the Estate, administrative expenses of the Estate, Trustee's fees of the Estate, and ultimately, a portion of the professional fees which the Court is asked to approve**. As will be shown below, Mr. Conti and Mr. Mogensen managed to protect nearly $1,000,000.00 in funds in the Debtors' DIP account at a time when Mr. Murray and Dorsey & Whitney advised to simply turn over the funds to a secured creditor and do nothing. Because of their action, the Debtors will be paying 100% of all unsecured creditor claims, 100% of its Bankruptcy Trustee fees (subject to approval), and 100% of the administrative fees of this estate.

The Debtors issues with Mr. Murray and Dorsey & Whitney are not simply sour grapes. As will be shown below, the Debtors specifically retained Mr. Murray and his firm nearly 18 Months

before a bankruptcy petition was filed to seek to help them avoid bankruptcy if at all possible and/or to be fully prepared to have a successful exit from bankruptcy if required. After having incurred in excess of $1,000,000.00 in fees to Murray & Murray through the Confirmation Hearing, and prior to the Court's ruling, the Debtors unceremoniously discovered that Murray & Murray had closed the firm effective January 1, 2013. [Declaration of John Feece]. Shortly thereafter, the Debtors learned that their Plan had been denied confirmation, and when they sought advice on how to proceed, they were shunned by Mr. Murray. According to the Debtors, Mr. Murray simply "checked out" and refused to communicate with them further.

As a result, the Debtors secured new counsel to come in and attempt to resurrect their Plan of reorganization (William L. Conti). After having his employment approved with the Court, Mr. Conti came in and attempted implement an emergency strategy to get new facts before the Court which favored an amended plan. This Court was clear in noting that duplicative efforts in the case would not be compensated and the parties took efforts to ensure that did not happen, such as specifically assigning duties. [See Exhibit "1"]. However, Mr. Conti ultimately became responsible by necessity for every substantive action in the bankruptcy proceeding through conversion of the case to a Chapter 7 on January 23, ,2014.

Moreover to date, Mr. Conti remains as the attorney for the Debtor, having incurred substantial time in marshalling assets and information for the Chapter 7 Trustee, presenting the Debtor's representative for a 2004 Exam, reviewing and providing amended financial documents, working with the Chapter 7 Trustee to investigate potential claims of the Estate, and generally supervising the case to closure. The Fee Application before the Court for Mr. Conti does not include a request for any of this time[1].

The Debtors ask the Court at this time to exercise its discretion under the circumstances of this case and Order that Murray & Murray, John Murray, and Dorsey & Whitney are not entitled to recover any additional fees or costs from the Debtors' Estate beyond the $470,000.00 previously paid by the Debtors.

---

[1] Pursuant to *In re Century Cleaning Services, Inc.*, 195 F.3d 1053 (9th Cir.1999), such fees are allowable if approved by a separate fee application in the Chapter 7 case. However, they are obviously subject to funds being available in the Estate.

3   DEBTORS' OBJECTION TO FEE APPLICATIONS OF
MURRAY & MURRAY AND DORSEY & WHITNEY

Case: 11-58944   Doc# 412   Filed: 11/12/14   Entered: 11/12/14 17:08:45   Page 3 of 13

## STATEMENT OF FACTS

Debtors will restrict their recitation of the facts to those relevant to the Fee Applications before the Court.

2. In June, 2006, the Debtors purchased two large office buildings located at 111 N. Market Street and 111 W. St. John Street, San Jose, California (the "Property"). The purchase price was $41,500,000, and the purchase price was funded from cash received by my wife and me from the sale of another office building we owned, and by a loan from CIBC for $29,500,000. The initial term of the loan was for 3 years with the understanding if certain maintenance items were completed and the building was at least 80% - 85% occupied, permanent 10 year financing would be issued at then market rates.

3. The loan came due in June, 2009 during one of the worst financial times of recent history and while the office rental market in San Jose was a disaster. Due to the financial collapse, CIBC was unwilling to fund the permanent loan. Instead, they offered a 2 year extension. Under that extension, (i) the interest rate was increased to LIBOR + 4% with a floor of 7%, (ii) a "deferred commitment fee" of $1,005,000 was imposed, which would be reduced to $335,000 if everything paid in full by December 10, 2009; (iii) a leasing reserve of $104,043 per month was imposed starting August 10, 2009; (iv) an extension fee of $335,000 was imposed, payable in 3 installments, the first on the date of the extension; the second on June 30, 2009 and the third on July 31, 2009.

4. Three payments of the reserve were met. However, the property was simply unable to generate sufficient income to pay the reserve, as a result of which the Debtors ceased making payment of the reserve in November, 2009. At that time, the Debtors began negotiations with CIBC to restructure the note. Proposals were exchanged in earnest in March, 2010 and revealed the parties had considerable distance between them on a restructure.

5. In May, 2010 Mr. Feece (the Debtors Principal) felt it was in the best interests of the

Debtors to seek and engage bankruptcy counsel to advise his of the alternatives to reaching agreement with CIBC through this process. On or about May 5, 2010, Mr. Feece met with Mr. John Murray and Janice Murray of Murray & Murray in their offices, who informed him that they had extensive experience representing debtors such as Community Towers in negotiating with lenders to restructure debt and, if necessary, in handling Chapter 11 cases. Mr. Feece signed an engagement letter for their services on or about June 10, 2010. An initial retainer of $10,000.00 was agreed upon and paid to Murray & Murray on June 11, 2010, and an additional retainer of $10,000 was paid on August 17, 2010. From that point forward until after the bankruptcy filing, John Murray, personally, was intimately involved in all negotiations and discussions held with CIBC, advising about alternatives in bankruptcy and what the risks and likely outcomes would be if a Petition was filed, and evaluating offers from the bank and whether better results could be achieved in bankruptcy.

6. Negotiations with CIBC were painfully slow over the next year. During this time, the Debtors followed the advice of Mr. Murray throughout the process, including ceasing making payments of interest to CIBC in late 2010, and rejecting several proposals throughout the process because of Mr. Murray's stated "opinions" that we could do "much better" through a Bankruptcy Petition. When it looked like negotiations were breaking down, the Debtors deposited another $250,000 with Murray & Murray on November 10, 2010, and another $100,000 on March 15, 2011, which was the retainer Mr. Murray indicated would be required for his firm to file a Chapter 11 petition.

7. On or about August 11, 2011, CIBC submitted its "final and last" offer to modify the loan. Among the terms was a requirement that the Debtors deposit $200,000.00 into a new reserve account as additional security for future payments, and cash from the project was greatly restricted. The funds were available, but were in Mr. Murray's trust account, and payment of this would have largely depleted the Debtors' cash reserves to pay the Chapter 11 retainer of Murray & Murray

should such action become necessary. Once again, Mr. Murray told Mr. Feece: "I can get you a better deal in bankruptcy court" and indicated that, prior to the hearing on any plan, Mr. Feece could use the rents generated from the project to support the project, and that he could continue to receive compensation from the project in the amount of $40,000 per month, as he had in the past, to support his personal living expenses. At that point, Mr. Murray advised that the Debtor to submit a counter-offer which eliminated all terms previously agreed, with the full awareness that this would likely be unacceptable to CIBC and would likely result in a termination of the negotiations. CIBC indeed terminated negotiations and began enforcement proceedings under their deed of trust, leading the Debtors filed a Petition in Bankruptcy on September 26, 2011.

8. In addition to the $370,000 in retainers paid to Murray & Murray as mentioned above, on August 10, in anticipation of negotiations being terminated and a bankruptcy filing being imminent, an additional $100,000.00 was deposited with Murray & Murray which was specifically "earmarked" within Murray & Murray's trust account to pay for special litigation counsel who was an expert in lender liability to pursue a lender liability claims against CIBC if that became necessary. Later, when the Debtors began searching for such a counsel and requested confirmation from Mr. Murray that he would release this $100,000 to that counsel, Mr. Murray refused and instead insisted in applying it against his own invoices.

9. During the initial phases of the bankruptcy, a cash collateral motion was presented to the court to permit utilization of rents generated from the project. In that cash collateral motion, and contrary to what I had been advised by Mr. Murray, the court specifically denied any draw to me personally to cover living expenses during the pendency of the case. The result was that, ultimately, I was forced to sell two other properties I held personally because I could no longer afford to cover the expenses associated with those properties.

10. Over the next several months, the Debtors focused on presenting their Plan of

6  DEBTORS' OBJECTION TO FEE APPLICATIONS OF
MURRAY & MURRAY AND DORSEY & WHITNEY

Case: 11-58944   Doc# 412   Filed: 11/12/14   Entered: 11/12/14 17:08:45   Page 6 of 13

Reorganization to the Court. Throughout this time, Mr. Murray advised that the terms of any debt repayment which a borrower sought to "cram-down" on a lender was entirely discretionary with the court, and proposed that that we fashion a plan based upon (i) prime rate of interest; and (ii) a 10 year repayment term. According to the Mr. Feece, Mr. Murray <u>never</u> mentioned or identified any "standards" for a cram-down; never mentioned anything regarding a "<u>*Till* analysis</u>", and, more importantly, never took any action on behalf of the Debtors to challenge the amount of money claimed by CIBC other than to file an objection to their proof of claim.

Just prior to the Confirmation hearing in October, 2012, the Debtors learned that a "*Till*" analysis would have to be performed, and Mr. Murray and his team located an expert to perform the analysis. The Debtors became concerned about the lack of preparation on this issue at a meeting with Mr. Murray. When the Debtors pressed the question, Mr. Murray became extremely agitated and threatened to throw Mr. Feece out of his office if he questioned him again. From that point forward, Mr. Murray became less and less engaged in the case.

The Court held a two-day evidentiary hearing on confirmation of the Plan, on October 15 and 16, 2012 (the "<u>Confirmation Hearing</u>"). Throughout the hearing the Debtors observed that Mr. Murray and his team seemed to be distracted and ill prepared, at times not even remembering the names of witnesses or basic facts about the case. [Declaration of John Feece]. The Debtors' expert's analysis contained numerous errors, which were pointed out by CIBC's counsel and which were apparently not caught by Mr. Murray and his team, despite having months of preparation time. Mr. Murray did address the court in closing arguments. However, his presentation seemed disjointed and misstated basic facts of the case. At the conclusion of the case, the Debtors were extremely concerned that, despite months of preparation time, the plan did not seem to have been well presented or supported.

On January 1, 2013, Murray & Murray closed their doors and ceased operations of the firm.

The Debtors learned of the firm closing through a general announcement made by the firm. Mr. Murray never called the Debtors to discuss the firm closing prior to it happening to discuss what impact this could have on the case and/or ongoing representation.

On January 25, 2013, the Court entered its ORDER DENYING CONFIRMATION OF DEBTORS' JOINT PLAN [Docket No. 251] (the "Confirmation Denial Order"), denying confirmation of the Plan. In short, the Court felt that the Debtors had failed to establish the feasibility of the Plan, and specifically, that the terms proposed for repayment of the debt to CIBC met the cram down rate formula established by *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) (the *Till* analysis).

When Mr. Feece called to discuss the ruling with Mr. Murray, he would not take his calls, referring me instead to Mr. Franklin. The Debtors requested advice on what steps to take to address this adverse ruling. None were ever provided by Mr. Murray. In short, Mr. Murray checked out of the case and had very few substantive conversations with the Debtors about the case from that point forward.

On March 5, 2013, the Court entered its ORDER CONDITIONALLY GRANTING CIBC INC.'S SECOND MOTION FOR STAY RELIEF (the "Conditional Stay Order") increasing the adequate protection payments to be paid by the Debtors to CIBC and providing, among other things, that the automatic stay provided under 11 U.S.C. § 362(a) will be lifted if the Debtors fail to pay CIBC all amounts allowed in connection with its secured claims in the bankruptcy cases, by September 1, 2013. Throughout this time, and despite repeated efforts, Mr. Murray never provided the Debtors any options on how to proceed in the bankruptcy. The Debtors were basically told they should either figure out how to refinance or sell the properties or lose them in foreclosure.

By April, 2013, the office space market in San Jose was the subject of a radical turn around. The Debtors had been successful in raising their occupancy rate to nearly 96% and increasing its revenues substantially, while at the same time reducing its costs of operation. In short, the facts

8  DEBTORS' OBJECTION TO FEE APPLICATIONS OF MURRAY & MURRAY AND DORSEY & WHITNEY

Case: 11-58944  Doc# 412  Filed: 11/12/14  Entered: 11/12/14 17:08:45  Page 8 of 13

supported a new plan of reorganization. However, Mr. Murray flatly refused to become engaged and continued o refuse to communicate with the Debtor. As a result, the Debtors obtained the services of Mr. William L. Conti to join the Debtors legal team and litigate a new plan of reorganization. Mr. Feece, personally paid Mr. Conti a retainer of $100,000.00 out of my personal funds in order to engage him immediately in order to protect the Debtor's interests.

Over the next several weeks, Mr. Conti engaged our legal team, set forth a new strategy to attempt to get a revised plan of reorganization before the Court, and coordinated the Debtors efforts to reorganize through the bankruptcy process. From the date that Mr. Conti's application to be employed was approved, he effectively became the lead counsel on virtually every proceeding thereafter in the bankruptcy court because of Mr. Murray's lack of participation. [See Declaration of William Conti; Exhibits 1-7].

On August 21, 2013 the Court heard the Debtors Motion to Extend Automatic Stay. However, the Court treated this Motion as an untimely Motion for Reconsideration and denied the relief requested. [See Order, Docket #315]. On or about November 5, 2013, San Jose Towers Corp (as the assignee of CIBC) foreclosed upon the real property through non-judicial sale and acquired ownership of the real property as the successful bidder at sale for $22,500,000.00.

On November 6, 2013, the Debtors turned over possession of the real property to SJTC, together with all of the rent checks received by them for the Month of November, 2013. At the same time, SJTC demanded that the Debtors turnover the entire balance remaining in the Debtor in Possession account claiming it was their "collateral" for the loan. On that date, Mr. Feece sent an e-mail to Mr. Conti and all other counsel representing the Debtors in the case requesting instructions on the DIP account. [See Exhibit "5"]. Mr. Murray and Mr. Franklin's response was to simply advise the Debtors to immediately release the money to CIBC as they believed they were entitled to all funds in the DIP account. [See Exhibit "6"]. Both Mr. Conti and Mr. Mogensen believed that CIBC

did not have a perfected security interest in the cash and that it belonged to the Debtors' Estate, not CIBC.

Mr. Conti and Mr. Mogensen did the necessary research and analysis, and Mr. Conti lead the litigation which ultimately lead to the Court finding that the Debtor, in fact, was entitled to the vast majority of the balance in the DIP account. ***Without this effort, and had the Debtors simply followed the advice of Mr. Murray and his team, there would be zero funds to pay any remaining unsecured creditors or administrative claims***. As a result of the efforts of Mr. Conti and Mr. Mogensen, the Debtors were successful in retaining nearly $1,000,000.00 in the DIP account. Thereafter, the United States Trustee moved the Court for an Order converting the Debtors' cases to Chapter 7 cases.

Mr. Conti and Mr. Mogensen believed that the foreclosure by SJTC was improper in violation of state law, and that it could potentially be set aside. They suggested the Debtors' should oppose the conversion to Chapter 7 to permit those claims to be investigated and potentially pursued. Mr. Murray became openly hostile to this and specifically stated that he did not want to pursue claims which would deplete the funds which now had been confirmed to belong to the Debtor, as that could affect what he would be paid. [Declaration of John Feece]. Mr. Murray and Dorsey & Whitney were tasked to oppose the Motion, which they did.

At the conversion hearing, at the Debtors' insistence, Mr. Murray did in fact present an "argument" against conversion. However it was presented by him as clearly not his idea and in a manner which seemed to mock the very idea of its being presented. Not surprisingly, the "argument" was not successful and the case was converted to a Chapter 7 liquidation in January, 2014.

Because the Debtors had funds in their account, the Debtors were able to pay 100% of all unsecured claims, 100% of all Chapter 11 Trustee's Fees, 100% of all Chapter 7 administration fees,

and has a balance left to pay a portion of the professional fees incurred in the Chapter 11 case. The determination of the competing Fee Applications is now before the Court.

## ARGUMENT

### I.

### THE FEES REQUESTED BY MURRAY & MURRAY AND DORSEY & WHITNEY ARE NOT REASONABLE IN LIGHT OF THE BENEFIT CONFERRED UPON THE ESTATE.

11 U.S.C. Sec. 330(a)(1) authorizes a fee award by the Court for "reasonable compensation for actual, necessary services rendered by" an attorney for the debtor. Section 330 further limits the compensation payable to the debtor's attorney as well as other professionals to a reasonable amount for "actual" services that are "necessary" in connection with the bankruptcy process. It has long been recognized that whether the attorney's services benefitted the estate is a threshold concern. See 11 U.S.C. § 330(a) (permitting the award of "actual, necessary" fees and expenses); *In re Ryan,* 82 B.R. 929, 932 (N.D.Ill.1987). *In re Amir Moshen,* 506 B.R. 96 (N. D. Cal. 20130. As one commentator notes, "The tangible benefit conferred on the estate and its creditors is clearly a proper measure of the appropriate compensation. Indeed, .. '[t]he sine qua non of the allowance is the benefit the bankrupt's estate and its creditors have derived from the services rendered.' " 2 Collier on Bankruptcy, ¶ 330.05[2][d] at 330-50 (L. King 15th ed. 1992); *Yermakov v. Fitzsimmons (In re Yermakov),* 718 F.2d 1465, 1472 (9th Cir.1983).

The Debtors recognize that under the standard adopted by the Ninth Circuit, this means simply that the services were "reasonably likely" to benefit the estate at the time the services were rendered. *In re: Mednet,* 251 B.R. 103 (9th Cir.BAP (Nev.) 2000). The fact that a Chapter 11 Plan was ultimately not confirmed (as in the case at bar) does not, by itself, bar recovery of compensation for services performed in the Chapter 11 case. *In re American Metallurgical Products Co., Inc.,* 228

11    DEBTORS' OBJECTION TO FEE APPLICATIONS OF
MURRAY & MURRAY AND DORSEY & WHITNEY

Case: 11-58944    Doc# 412    Filed: 11/12/14    Entered: 11/12/14 17:08:45    Page 11 of 13

B.R. 146, 159 (Bankr.W.D.Pa. 1998). On the other hand, whether a reorganization is successful is a factor to be considered in determining whether a debtor's counsel's services are reasonable in light of their benefit to the estate. *In re Lederman Enterprises, Inc.*, 143 B.R. 772, 775 (D.Colo. 1992); aff'd, 997 F.2d 1321 (10th Cir. 1993).

The present case involved a single asset real estate case. While the numbers involved were quite large, the issues were fairly straightforward. Including the claims which the Debtors asserted against CIBC, hearing on the Plan lasted less than two full court days. Throughout the bankruptcy process, the Debtors maintained impeccable financial records that made monthly reporting very routine. The Murray firm billed a total of $920,000.00 (+/-) through the Conversion hearing before closing their doors in January, 2013. At the Conversion hearing, the Debtors observed Mr. Murray to be unprepared. Nothing was done to establish the amount of the CIBC debt at or prior to the hearing. Clearly, this fact was critical to assessing a plan of reorganization.

Once the Plan was denied confirmation, it is apparent the relationship between Mr. Murray and the Debtors fell apart. New counsel was employed in an attempt to revive the case, but to no avail. Ultimately, the property was lost in foreclosure and the Debtors case converted to a liquidation. Under the facts as set forth, the Debtors believe that the fees requested by Murray and Murray, Mr. Murray, and Dorsey & Whitney are patently unreasonable. Were they to be awarded what they have requested, the total fees would be nearly $2,000,000.00.

The Debtor respectfully requests that the Court deny any further fees or costs to Murray & Murray, Mr. John Murray and/or Dorsey & Whitney, allowing them to keep the $470,000.00 in fees already paid to them. Alternatively, if the Court awards any further fees to these attorneys, the Debtor requests that their claims be paid after the payment of the claims of Mr. Mogensen and Mr. Conti, each of whom provided a tangible benefit to the estate through their representation of the Debtors when their other counsel refused to act.

## CONCLUSION

Based upon the foregoing, Debtors request that the Fee Applications of Murray & Murray, John Murray and Dorsey & Whitney be denied in their entirety as being in excess of a reasonable fee given the lack of benefit provided to the Estate. The Debtor's further request that Court Order no further fee payments to be made to them form the Debtors' Estate. Lastly, should these attorneys be awarded anything, the Debtors request that any amounts to be paid to them be subject to payment of the fees awarded to Mr. Mogensen and Mr. Conti.

Dated: November 11, 2014          **LAW OFFICE OF WILLIAM L. CONTI**

By: *William L. Conti, Esq.*
      Name
      Attorneys for Debtors